# Exhibit 10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION<br>OF THE KINGDOM OF DENMARK<br>(SKATTEFORVALTNINGEN) TAX REFUND<br>SCHEME LITIGATION<br><br>This document relates to case nos.: 18-cv-04051;<br>18-cv-09840; 18-cv-09841; 18-cv-10098;<br>19-cv-01812; 19-cv-01866; 19-cv-01898. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

### PLAINTIFF SKATTEFORVALTNINGEN'S
### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' AND
### THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

# <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF MATERIAL FACTS .................................................................................... 4

LEGAL STANDARD ............................................................................................................... 13

ARGUMENT ........................................................................................................................... 14

I.     The revenue rule does not bar SKAT's claims .............................................................. 14

        A.     Defendants' argument that the plans were the beneficial owners of shares and dividends and entitled to tax refunds under Danish law is meritless ............. 15

                1.     The Solo bellwether defendant plans were not the beneficial owners of Danish shares or dividends under Danish law ......................... 18

                2.     The ED&F bellwether defendant plans were not the beneficial owners of Danish shares or dividends under Danish law ......................... 22

                3.     Defendants in the Proper Pacific and FWC Capital bellwethers are collaterally estopped from relitigating whether a binding purchase agreement establishes beneficial ownership ............................... 23

        B.     The Court will not enforce Danish tax law directly by rejecting defendants' meritless Danish law beneficial ownership argument ...................... 25

        C.     The Court will not enforce Danish tax law indirectly by rejecting defendants' meritless Danish law beneficial ownership argument ...................... 26

                1.     Rejecting defendants' Danish law beneficial ownership argument would not raise sovereignty concerns ....................................... 27

                2.     Rejecting defendants' Danish law beneficial ownership argument would not raise separation of powers concerns .......................... 30

        D.     SKAT is not collaterally estopped from litigating the revenue rule issue in the ED&F bellwethers ........................................................... 31

II.    Defendants' motion for summary judgment on the ground that defendants made no false statements to SKAT should be denied .......................................................... 34

        A.     The defendants' false statements that the plans were the owners of shares and dividends and tax-exempt are actionable ........................................ 35

i

B.     SKAT is not required to prove that the defendants' purported interpretations of applicable law were objectively unreasonable .........................38

C.     The refund applications included false representations of share ownership, dividend receipt, suffering of withholding tax and tax-exempt status..................39

    1.     Defendants' representations that the plans owned Danish shares, received dividends and suffered withholding tax were false ....................40

       i.     The testimony of ED&F's Rule 30(b)(6) witness admitting the falsity of the Annex E vouchers is admissible ........................ 41

       ii.     ED&F's FCA reports admitting the falsity of the Annex E vouchers are admissible under the residual exception to the rule against hearsay....................................................................... 43

    2.     Defendants' representations that the plans were tax-exempt were false..............................................................................................44

III.     Defendants' motion for summary judgment on the ground that the amounts SKAT paid did not belong to it should be denied ........................................................48

IV.     Defendants' motion to dismiss certain of SKAT's claims as time-barred should be denied...............................................................................................................49

A.     Defendants' motion for summary judgment on the ground that certain of SKAT's claims are time-barred under Danish law should be denied...................49

B.     Defendants' motion for summary judgment on the ground that certain of SKAT's New York law unjust enrichment claims are time-barred should be denied ............................................................................................54

V.     Defendants' other arguments that the Court should dismiss SKAT's claims on summary judgment fail .............................................................................................55

A.     SKAT's actions do not implicate the limits of the Court's equity jurisdiction ...................................................................................55

B.     The Court should deny defendants' motion for summary judgment on SKAT's New York law payment by mistake claims ...............................................56

C.     Defendants' motion for summary judgment on SKAT's negligent misrepresentation claims on the ground that SKAT cannot show reasonable reliance should be denied..................................................................58

D.     Defendants' motion for summary judgment on SKAT's fraud and negligent misrepresentation claims in the ED&F bellwethers on the

ground that SKAT cannot show defendants' scienter or negligence should be denied ..................................................................................61

E.    Defendants' motion for summary judgment on SKAT's aiding and abetting fraud claims in the ED&F bellwethers should be denied ........................64

     1.    Utah courts would recognize the cause of action aiding and abetting fraud .............................................................65

     2.    If Utah law does not recognize the cause of action, then the Court should apply Danish law to SKAT's aiding and abetting fraud claims in the Utah bellwethers ................................67

VI.    Defendants' motion for summary judgment on SKAT's restitution claims in the Proper Pacific, FWC Capital and ED&F bellwethers should be denied .........................69

A.    Defendants Bradley and Lehman's motion for summary judgment on SKAT's restitution claims to recover the "introducing broker" fees they were paid should be denied .............................................69

B.    The ED&F bellwether defendants' motion for summary judgment on SKAT's restitution claims should be denied ...........................73

VII.    Defendant Altbach's motion for partial summary judgment should be denied ...............75

A.    Genuine issues of material fact exist as to whether Altbach is liable for fraud ....................................................................75

     1.    Altbach is liable for the acts of his authorized agents .............................76

     2.    Altbach is liable as the Roadcraft Technologies plan's alter ego ............77

     3.    Altbach's agent Goal need not have knowledge and intent for Altbach to be held liable .............................................79

B.    The Court should not dismiss SKAT's aiding-and-abetting fraud claim against Altbach ....................................................................80

     1.    Genuine issues of material fact exist as to whether Altbach had actual knowledge of the fraud .............................................80

     2.    Genuine issues of material fact exist as to whether Altbach substantially assisted the fraud .............................................82

C.    Genuine issues of material fact exist as to whether Altbach is liable for negligent misrepresentation .............................................83

CONCLUSION ..................................................................................84

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*221 Second Ave., LLC v. Fid. Nat. Fin., Inc.*, 33 Misc. 3d 1208(A), 2011 WL
4861853 (Sup. Ct. N.Y. Cty. 2011) ...................................................................82

*Abraham v. Wechsler*, 200 N.Y.S. 471 (Sup. Ct. N.Y. Cty. 1923)..............................37

*Ace Invs., LLC v. Rubin*, No. 2:08-CV-289 TS, 2009 WL 1684482 (D. Utah Jun.
16, 2009) ...........................................................................................................74

*Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269 (S.D. Fla. 2013)............72

*Advanced Comfort Techs., Inc. v. London Luxury, LLC*, No. 2:17-cv-00497-JNP,
2017 WL 6060634 (D. Utah Dec. 6, 2017)........................................................67, 68

*AIU Ins. Co. v. Deajess Med. Imaging, P.C.*, 24 Misc.3d 161 (Sup. Ct. Nassau
Cty. 2009) ........................................................................................................36, 45

*Am. Protein Corp. v. AB Volvo*, 844 F.2d 56 (2d Cir. 1988) ........................................77

*Anapoell v. Am. Express Bus. Fin. Corp.*, No. 2:07-CV-198-TC, 2007 WL
4270548 (D. Utah Nov. 30, 2007) ......................................................................67

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986) .......................13

*Anonymous v. N.Y. State Just. Ctr. for the Prot. of People With Special Needs*,
167 A.D.3d 113 (3d Dep't 2018) ........................................................................24

*Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103
(2d Cir. 2001)................................................................................................ *passim*

*Auqui v. Seven Thirty One Ltd. P'ship*, 22 N.Y.3d 246 (2013) ....................................23

*Bibicheff v. PayPal, Inc.*, No. 2:17-cv-4679 (DRH)(AYS), 2020 WL 2113373
(S.D.N.Y. May 4, 2020)......................................................................................73

*Blue Ridge Invs., LLC v. Republic of Arg.*, 902 F. Supp. 2d 367 (S.D.N.Y. 2012)......44

*Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177
(E.D.N.Y. 2009)..................................................................................................78

*Bruff v. Mali*, 36 N.Y. 200 (1867)................................................................................79

*Buechel v. Bain*, 97 N.Y.2d 295 (2001) ................................................................23, 24

*Charid Props., Inc. v. Berger*, 37 A.D.2d 987 (2d Dep't 1971) .................................................38

*Chino Elec., Inc. v. U.S. Fidelity & Guar. Co.*, 578 So.2d 320 (Fla. Dist. Ct. App. 1991) ............................................................................................................................35

*City of Almaty v. Sater*, 503 F. Supp. 3d 51 (S.D.N.Y. 2020) ....................................54, 55, 72, 73

*CMB Infrastructure Grp. IX, LP v. Cobra Energy Inv. Fin., Inc.*, No. 2:21-cv-00214-JAD-DJA, 2021 WL 5304175 (D. Nev. Nov. 15, 2021)...........................................66

*Colosimo v. Gateway Cmty. Church*, 424 P.3d 866 (Utah 2018) .................................................65

*Com. Fixtures & Furnishings, Inc. v. Adams,* 564 P.2d 773 (Utah 1977).....................................75

*Condas v. Adams*, 388 P.2d 803 (Utah 1964) ...............................................................................61

*Coyle v. United States*, 954 F.3d 146 (2d Cir. 2020) ....................................................................13

*Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230 (2d Cir. 2006)..................................................60

*Cucchiaro v. Cucchiaro,* 627 N.Y.S.2d 224 (Sup. Ct. Orange Cty. 1995)....................................37

*In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, No. 18-md-2865 (LAK), 2021 WL 6064793 (S.D.N.Y. Dec. 22, 2021) ....................42

*In re Customs and Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Scheme Litig.*, No. 18-md-2865 (LAK), 2021 WL 2689908 (S.D.N.Y. Jun. 30, 2021) ...........................................................................................................................74

*D.D.Z. v. Molerway Freight Lines, Inc.,* 880 P.2d 1 (Utah Ct. App. 1994) ................................66

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S. Ct. 894 (1962)............................................55, 56

*In re Dana Corp.*, 574 F.3d 129 (2d Cir. 2009)............................................................................80

*Deer Crest Assocs. I., L.C. v. Deer Crest Resort Grp., L.L.C.*, No. 2:04-CV-220 TS, 2006 WL 722216 (D. Utah Mar. 16, 2006).......................................................................75

*Demarco v. LaPay*, No. 2:09-CV-190 TS, 2009 WL 3855704 (D. Utah Nov. 17, 2009) ....................................................................................................................35, 36

*DER Travel Servs., Inc. v. Dream Tours & Adventures, Inc.*, No. 99 CIV. 2231 (HBP), 2005 WL 2848939 (S.D.N.Y. Oct. 28, 2005)..............................................................78

*Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580 (Utah 2000)................................................74

*Deutsche Bank, AG v. Vik*, 142 A.D.3d 829 (1st Dep't 2016).......................................................54

v

*Deutsche Bank Nat. Tr. Co. v. Bills*, 37 Misc. 3d 1209(A), 2012 WL 4868108
(Sup. Ct. Essex Cty. 2012) ........................................................................... 82

*DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359 (S.D.N.Y. 1999) ................................. 60

*DirecTV, Inc. v. Lewis*, No. 03-CV-6241-CJS-JWF, 2005 WL 1006030
(W.D.N.Y. Apr. 29, 2005) ............................................................................ 37

*DiTucci v. Ashby*, No. 2:19-cv-277-TC-PMW, 2020 WL 956890 (D. Utah Feb.
27, 2020) ........................................................................................ 67

*Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087 CSH, 1999 WL 566311 (S.D.N.Y.
Aug. 3, 1999) ..................................................................................... 60

*Donovan v. Sutton*, 498 P.3d 382 (Utah 2021) ...................................................... 61, 62

*Drew v. Pacific Life Ins. Co.*, 496 P.3d 201 (Utah 2021) ........................................... 36

*Eaton Cole & Burnham Co. v. Avery*, 83 N.Y. 31 (1880) ............................................. 79

*Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217 (S.D.N.Y. 2013) ....................... 82

*El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875 (W.D. Mich.
2010) ......................................................................................... 65, 66

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615
(S.D.N.Y. 2001) ................................................................................. 61

*Est. of Hatch, ex. rel. Ruzow v. NYCO Mins. Inc.*, 270 A.D.2d 590 (3d Dep't
2000) ....................................................................................... 56, 57

*European Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123 (2d Cir. 2004) ............................ 25, 26, 28

*Farm Bureau Life Ins. Co. v. Am. Nat'l Ins. Co.*, 505 F. Supp. 2d 1178 (D. Utah
2007) ....................................................................................... 65, 67

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12-CV-7372 (LJL), 2020
WL 5518146 (S.D.N.Y. Sept. 14, 2020) ............................................................. 79

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349
(S.D.N.Y. 2007) ................................................................................. 80

*Gadd v. Olson*, 685 P.2d 1041 (Utah 1984) .......................................................... 36

*Gelb v. Bd. of Elections of City of New York*, 224 F.3d 149 (2d Cir. 2000) ........................ 80

*Green Tree Servicing, LLC v. Christodoulakis*, 689 F. App'x 66 (2d Cir. 2017) ..................... 76

*Green v. Gaskell*, No. 87 CIV. 3861 (CSH), 1988 WL 78373 (S.D.N.Y. Jul. 18, 1988) ........................................................................................................37

*Gudmundson v. Del Ozone*, 232 P.3d 1059 (Utah 2010) ..................................31, 33, 34

*Hetrick v. Ideal Image Dev. Corp.*, No. 8:07-cv-871-T-33TBM, 2008 WL 5235131 (M.D. Fla. Dec. 13, 2008) ........................................................................59

*Holiday Inns, Inc. v. City of Jacksonville*, 678 So. 2d 528 (Fla. Dist. Ct. App. 1996) ........................................................................................................23

*HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (1st Dep't 2012) ..................................61

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132 (2009) ....................73

*Ingrami v. Rovner*, 45 A.D.3d 806 (2d Dep't 2007) ....................................................54

*ITT World Directories, Inc. v. CIA Editorial de Listas SA*, 525 F.2d 697 (2d Cir. 1975) ........................................................................................................57

*Janneh v. GAF Corp.*, 887 F.2d 432 (2d Cir. 1989) ....................................................77

*Jardine v. Brunswick Corp.*, 423 P.2d 659 (Utah 1967) ..............................................60

*Jehly v. Brown*, 327 P.3d 351 (Colo. App. 2014) ......................................................82

*Jenkins v. Prime Ins. Co.*, No. 2:21-cv-00130-DAK, 2021 WL 3726620 (D. Utah Aug. 23, 2021) ..............................................................................................31

*Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465 (Utah 2011) ................................32

*Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000 (Utah 2015) ....................56

*Judge v. Saltz Plastic Surgery, P.C.*, 367 P.3d 1006 (Utah 2016) ................................65

*Jurgensen v. Felix Storch, Inc.*, No. 12 Civ. 1201 (KBF), 2012 WL 2354247 (S.D.N.Y. June 14, 2012) ..................................................................................83

*Kessler v. Mortenson*, 16 P.3d 1225 (Utah 2000) ......................................................65

*Khodeir v. Sayyed*, 348 F. Supp. 3d 330 (S.D.N.Y. 2018) ..........................................77

*Kirchner v. Muller*, 280 N.Y. 23 (1939) ..................................................................77

*Klas v. Van Wagoner*, 829 P.2d 135 (Utah Ct. App. 1992) ........................................61

*Knight v. Post*, 748 P.2d 1097 (Utah Ct. App. 1988) ................................................75

*Koss Corp. v. Am. Express Co.*, No. 2:10-cv-00543 JWS, 2010 WL 1168769 (D. Ariz. Jul. 12, 2010) .............................................................................................66

*Kuhar v. Thompson Mfg. Inc.*, 506 P.3d 1200 (Utah Ct. App. 2022) ...........................32

*Lefferts v. Lefferts*, 243 A.D. 278 (1st Dep't 1935) ...................................................37

*Magalnick v. Empire State Mut. Life Ins. Co.*, 180 N.Y.S.2d 575 (2d Dep't 1958) ....................37

*Mfrs. Hanover Tr. Co. v. Jayhawk Assocs.*, 766 F. Supp. 124 (S.D.N.Y. 1991) .........................82

*Martineau v. Currutt*, No. 1:21-cv-00045-JNP-DBP, 2022 WL 180735 (D. Utah Jan. 19, 2022) ....................................................................................67

*Mayaguez S.A. v. Citibank, N.A.*, No. 16 Civ. 6788 (PGG) (JLC), 2022 WL 901627 (S.D.N.Y. Mar. 25, 2022) .......................................................58

*McCarthy Concrete, Inc. v. Banton Constr. Co.*, 203 A.D.3d 1496 (3d Dep't 2022) ...............................................................76

*Mfrs. Hanover Trust Co. v. Chem. Bank*, 160 A.D.2d 113 (1st Dep't 1990) ...............58

*Miller v. Doniger*, 293 A.D.2d 282 (1st Dep't 2002) ...........................................55, 56

*Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703 (2d Cir. 1996) .............77

*Moore v. Mitchell*, 30 F.2d 600 (2d Cir. 1929) ..........................................................27

*Mower v. Simpson*, 278 P.3d 1076 (Utah Ct. App. 2012) ...........................................66

*Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201 (S.D.N.Y. 2016) .................................................................................73

*Nat'l Conversion Corp. v. Cedar Building Corp.*, 23 N.Y.2d 621 (1969) .........35, 36, 37

*Netherby Ltd. v. G.V. Licensing, Inc.*, No. 92 Civ. 4239 (MBM), 1993 WL 463679 (S.D.N.Y. 1993) ..............................................................................38

*Nolan v. Sam Fox Pub. Co.*, 499 F.2d 1394 (2d Cir. 1974) ........................................82

*Oliver Wyman, Inc. v. Eielson*, No. 15 Civ. 5305 (RJS), 2016 WL 5339549 (S.D.N.Y. Sep. 22, 2016) .................................................................14

*OneWest Bank, N.A. v. Guerrero*, No. 14-cv-3754, 2018 WL 2727891 (S.D.N.Y. Jun. 6, 2018) ...............................................................................42

*Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254 (S.D.N.Y. 2016) ......................42

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005) ...............................78

*Parsons v. Honeywell, Inc.*, 929 F.2d 901 (2d Cir. 1991) ........................................................43, 44

*Paskenta Enters. Corp. v. Cottle*, No. 1:17-cv-00033-JNP-BCW, 2018 WL 522322 (D. Utah Jan. 22, 2018).................................................................58

*Pasquantino v. United States*, 544 U.S. 349, 125 S. Ct. 1766 (2005) .............................................................................................................14, 27, 32

*Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817 (2016) ............................................79

*Picard v. Est. of Stanley Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206 (Bankr. S.D.N.Y. 2011) ...............................................................80

*Picard v. Gettinger (In re Bernard L. Madoff Inv. Secs. LLC)*, 976 F.3d 184 (2d Cir. 2020)..........................................................................................21

*Quest Holdco, LLC v. Bushkie*, No. 21-cv-0051-ABJ, 2021 WL 7210165 (D. Wyo. Jul. 19, 2021)........................................................................66

*Quinn v. Monroe Cnty.*, 330 F.3d 1320 (11th Cir. 2003) ...........................................................24

*Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249 (D. Utah 2017)........................................67

*Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365 (E.D.N.Y. 2007) .........................................................................26, 27, 29, 31

*Republic of Honduras v. Philip Morris Cos.*, 341 F.3d 1253 (11th Cir. 2003) ...........................26

*Richmond v. Weston*, No. 20020799-CA, 2004 WL 440187 (Utah Ct. App. Mar. 11, 2004) ..............................................................................60

*Rivera v. Est. of Ruiz*, No. 16 CIV. 7328 (ER), 2020 WL 1503663 (S.D.N.Y. Mar. 30, 2020) ...................................................................................76

*Robert v. O'Meara*, 28 A.D.3d 567 (2d Dep't 2006) ................................................................25

*Schaer v. State By & Through Utah Dep't of Transp.*, 657 P.2d 1337 (Utah 1983) ....................31

*Schaifler Nance & Co. v. Est. of Warhol*, 413 F. Supp. 3d 329 (S.D.N.Y. 2019) ..................59, 60

*Scheiner v. Wallace*, 832 F. Supp. 687 (S.D.N.Y. 1993).........................................................31, 32

*Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456 (S.D.N.Y. 2000).....................................42

*Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Bernard L. Madoff)*, 528 F. Supp. 3d 219 (S.D.N.Y. 2021).......................................................43

*Sender v. Mann*, 423 F. Supp. 2d 1155 (D. Colo. 2006)............................................................66

*In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300 (S.D.N.Y. 2019) .................... *passim*

*In re SKAT Tax Refund Scheme Litig.*, No. 18-md-2865 (LAK), 2020 WL
    7496272 (S.D.N.Y. Dec. 21, 2020)..........................................................................58, 59, 84

*Slisze v. Stanley-Bostitch*, 979 P.2d 317 (Utah 1999)...............................................................65

*Societe Genarale Energie Corp. v. N.Y. Marine and Gen. Ins. Co.*, 368 F. Supp.
    2d 296 (S.D.N.Y. 2005) ...............................................................................................42, 43

*Sperry v. Crompton Corp.*, 8 N.Y.3d 204 (2007) .......................................................................73

*Stogniew v. McQueen*, 656 So.2d 917 (Fla. 1995)......................................................................24

*The Sample Inc. v. Pendleton Woolen Mills, Inc.*, 704 F. Supp. 498 (S.D.N.Y.
    1989) ..............................................................................................................................14

*Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F.
    Supp. 2d 267 (S.D.N.Y. 2009)..........................................................................................14

*Turner Network Sales, Inc. v. DISH Network L.L.C.*, 413 F. Supp. 3d 329
    (S.D.N.Y. 2019)...................................................................................................................57

*UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485
    (S.D.N.Y. 2003)...................................................................................................................82

*United States v. Harra*, 985 F.3d 196 (3d Cir. 2021) .............................................................38, 39

*United States v. Migliaccio*, 34 F.3d 1517 (10th Cir. 1994).........................................................38

*United States v. Prevezon Holdings, Ltd.*, 319 F.R.D. 459 (S.D.N.Y. 2017) ...............................44

*United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002) ........................................................38

*UST Priv. Equity Invs. Fund v. Salomon Smith Barney*, 288 A.D.2d 87 (1st Dep't
    2001) ....................................................................................................................................61

*Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054 (Utah 2002)..............................................67

*Wagner v. State*, 122 P.3d 599 (Utah 2005) ...............................................................................65

*Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398 (E.D.N.Y. 2010).......................................45

*Wardley Better Homes & Gardens v. Cannon*, 61 P.3d 1009 (Utah 2002) ..................................82

*Wieczoreck v. H & H Builders, Inc.*, 475 So.2d 227 (Fla. 1985)..................................................14

*Wood v. United Parcel Serv., Inc.*, 496 P.3d 139 (Utah 2021) ....................................................65

*Zuyder Zee Land Corp. v. Broadmain Bldg. Co.*, 86 N.Y.S.2d 827 (Sup. Ct. N.Y. Cty. 1949) ....................................................................................................37

**Statutes and Rules**

26 U.S.C. § 401(a) ......................................................................................46, 47

Fed. R. Civ P 56 .................................................................................................13

Fed. R. Evid. 807(a) ..........................................................................................43

U.C.C. § 8-501(b)(1) & (c) ................................................................................21

U.C.C. § 8-503(b) .........................................................................................21, 22

Utah Code Ann. § 78B-2-305 ...........................................................................54

**Regulations**

26 CFR 1.401-1(b)(2) ........................................................................................48

**Treatises and Periodical Materials**

A.M. Hess, et al., Bogert's The Law of Trusts and Trustees § 731 (2022) ...................77

Restatement (Second) of Conflict of Laws § 148(2) .......................................68

Restatement (Second) of Conflict of Laws § 148, Comment ....................68, 69

Restatemsent (Second) of Torts § 876(b) ........................................................65

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this memorandum of law in opposition to the motion by defendants and third-party defendant ED&F Man Capital Markets Ltd. ("ED&F") for summary judgment in the seven bellwether cases.[1]

## PRELIMINARY STATEMENT

Defendants' principal argument for dismissal of SKAT's claims—that the revenue rule bars all SKAT's claims as a matter of law—fails because SKAT's claims do not seek to enforce Danish tax law, and a judgment in SKAT's favor would not require the defendants to pay any Danish taxes. SKAT's claims cannot be for unpaid taxes because the defendants never owed Denmark any taxes in the first place. SKAT is claiming the cash that it paid defendants in reliance on representations that they owned shares and had suffered tax on dividends—all of which was a fraud, plain and simple.

In the Solo bellwether cases, the Danish shares and dividends the defendants claimed their U.S. pension plans owned and received were a pure fiction. The Solo Custodians' sub-custodians have no record of the Solo Custodians ever holding or receiving any such Danish shares or dividends.[2] The Solo Custodians' U.K. regulator the Financial Conduct Authority ("FCA") found no evidence of any such Danish shares or dividends. And the Solo Custodians'

---

1. Not. of Defs.' & Third-Party Def.'s Mot. for Summary Judgment Pursuant to Fed. R. Civ. P. 56, ECF Nos. 798-809 (unless indicated otherwise, citations to the docket are to case number 18-md-02865). The five "Solo bellwethers" consist of the four "New York Solo bellwethers" that were originally filed in this Court and the "Florida Solo bellwether" that was transferred to this Court from the Southern District of Florida. The two "ED&F bellwethers" are the two bellwethers that were transferred to this Court from the District of Utah. SKAT does not oppose dismissal of its unjust enrichment, money had and received, and payment by mistake claims against defendant Michael Ben-Jacob in the two New York Solo bellwethers arising from defendants Roadcraft Technologies LLC Roth 401(k) Plan's and Basalt Ventures LLC Roth 401(k) Plan's tax refund applications. *See* Def. Michael Ben-Jacob's Supplemental Mem. in Support of Mot. for Summary Judgment, ECF No. 805. Nor does SKAT oppose dismissal of its unjust enrichment and money had and received claims against defendant Stacey Kaminer in the ED&F bellwether arising from defendant American Investment Group of New York, L.P. Pension Plan's tax refund applications.

2. The "Solo Custodians" are the four U.K.-based custodians controlled by Sanjay Shah who issued the defendants fraudulent dividend credit advices in the Solo bellwethers: Solo Capital Partners LLP, Telesto Markets LLP, Old Park Lane Capital PLC, and West Point Derivatives Ltd.

records themselves show the plans' purported trading was fraudulent and circular.  Since the defendant plans never received any Danish dividends from which tax was withheld, they never owed any Danish taxes for SKAT to collect.

The same is true of the defendant plans in the ED&F bellwethers.  As ED&F has admitted with respect to the "Annex E" tax vouchers it issued based on the plans' cum-ex trades with its Dubai affiliate, the cum-ex trades were circular and did not result in the plans receiving any Danish dividends.  And, in any event, with respect to all the plans' trades (cum-ex and cum-cum), under their agreements with ED&F, the plans transferred to ED&F all right, title and interest in any shares and therefore owned no shares or dividends.  As in the Solo bellwethers, the defendant plans in the ED&F bellwethers never owed any Danish tax that SKAT could now be seeking to collect.

Nor will the Court enforce Danish tax law in any sense in rejecting defendants' fanciful argument that under Danish law the plans were somehow beneficial owners of non-existent shares and dividends or of shares and dividends they did not own.  Defendants omit mention that their Danish law expert Mr. Pilgaard (acting in his capacity as counsel for some of the defendants) presented this very argument to the Danish National Tax Tribunal and that the Tribunal rejected the argument.  Recognizing their cause was lost in Denmark, defendants chose not to appeal the Tribunal's decisions to the Danish courts, preferring to press the argument in this Court, which they now argue is barred from hearing SKAT's claims.  But no amount of forum shopping can save defendants here.  As this Court held in its previous revenue rule decision, defendants' "argument that an action is one for 'enforcement' if it involves the

determination that defendants were not eligible for or entitled to tax refunds under Danish law is foreclosed by the case law."[2]

Defendants make a host of other arguments for summary dismissal of some or all of SKAT's claims, each of which fails as a matter of law or raises genuine issues of disputed material fact precluding summary judgment in defendants' favor:

- defendants fail to make the showing required to support their argument that SKAT is collaterally estopped from contesting the motion in the ED&F bellwethers on revenue rule grounds (Section I.D, *infra*);

- the argument that the representations of beneficial ownership of shares and dividends and the plans' tax-exempt status are inactionable legal conclusions fails because under the law of New York, Florida and Utah, such mixed statements of law and fact are actionable (Section II.A, *infra*);

- defendants attempt to fashion an argument that their representations are inactionable as "objectively reasonable" legal interpretations, but the only support they provide for this argument is inapposite cases discussing the government's burden of proof in criminal prosecutions, and regardless defendants' purported interpretations were not objectively reasonable (Section II.B, *infra*);

- defendants' argument that the representations that the plans owned shares, received dividends, and suffered withholding tax were true is refuted by the record establishing otherwise (Section II.C.1, *infra*);

- the argument that the representations of the plans' tax-exempt status were true is refuted by disputed issues of material fact as to whether the plans met basic requirements such as operating exclusively for the benefit of plan participants (and not for the benefit of others, such as Sanjay Shah and certain defendants) (Section II.C.2, *infra*);

- the argument that SKAT's claims must be dismissed because the amounts it seeks belong to the Kingdom of Denmark ignores that this Court has previously rejected this argument and that SKAT is not a separate legal entity distinct from the Kingdom (Section III, *infra*);

- the argument under the three-year Danish statute of limitations fails because defendants' purported undisputed facts fail to establish that any of SKAT's claims against any of the bellwether defendants are untimely (Section IV.A, *infra*);

---

2.  *In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 318 (S.D.N.Y. 2019).

- the argument that some of SKAT's New York unjust enrichment claims are time-barred fails because the applicable limitations period is six, not three, years (Section IV.B, *infra*);

- the argument that the Court lacks subject matter jurisdiction over SKAT's "equitable" claims is meritless because SKAT's claims seek money damages, not equitable relief (Section V.A, *infra*);

- the argument that SKAT's New York law payment by mistake claims should be dismissed fails because defendants' purported undisputed facts fail to show that SKAT consciously paid defendants money to which they were not entitled (Section V.B, *infra*);

- the argument that SKAT's negligent misrepresentation claims should be dismissed fails because the reasonableness of SKAT's reliance is a fact issue for trial (Section V.C, *infra*);

- the ED&F bellwether defendants' scienter or negligence is likewise a fact issue for trial (Section V.D, *infra*);

- the ED&F bellwether defendants' argument for dismissing SKAT's aiding and abetting fraud claims fails because Utah courts would recognize the cause of action, and if not, Danish law, which does, applies to SKAT's claims (Section V.E, *infra*);

- defendants Doston Bradley and Roger Lehman's argument for dismissal of SKAT's restitution claims is meritless because the record demonstrates conclusively, or there is at least a genuine dispute as to whether, the "introducing broker" fees they received were paid from SKAT's money (Section VI.A, *infra*);

- defendants' argument that SKAT's restitution claims in the ED&F bellwethers should be dismissed fails because each of the defendants benefitted from SKAT's payments and participated in submitting false tax refund applications to SKAT (Section VI.B, *infra*); and

- defendant Ronald Altbach's arguments for partial summary judgment all fail as a matter of law or raise disputed issues of fact precluding summary judgment (Section VII, *infra*).

## STATEMENT OF MATERIAL FACTS[3]

As set forth in SKAT's Memorandum of Law in Support of its Motion for Partial Summary Judgment, the bellwether defendant U.S. pension plans, through authorized agents,

---

3. Pursuant to section 2.5 of Pretrial Order No. 29, on April 22, 2022, the parties filed their Joint Rule 56.1 Statement of Undisputed Material Facts in Support of Motions for Summary Judgment ("Joint 56.1," ECF No. 790.) As the parties were not able to agree to a single set of material undisputed facts, pursuant to section 2.5 of

submitted to SKAT—the part of the Danish government responsible for collecting and assessing taxes—false applications for refunds of "tax" supposedly withheld from dividends Danish companies issued to their shareholders.[4]  In every instance, SKAT paid the defendant plan's agent the full amount requested in the refund application.  (*Id*. at 36 (citing Joint 56.1 ¶¶ 204-06, 208, 212, 215, 218, 376-77).)  As SKAT demonstrated in moving for partial summary judgment on certain of its restitution claims and the false statement element of its fraud and negligent misrepresentation claims, indisputable facts establish that the defendants' tax refund applications included false representations that the defendant plans owned huge amounts of Danish shares and received commensurately large dividends on their supposed shares, on which they suffered withholding tax, and false documents issued by a Solo Custodian or ED&F purporting to evidence as much.  (*Id.* at 12-19, 24-32.)  The refund applications also represented falsely that the defendant plans were tax-exempt under U.S. law, as the U.S.-Denmark tax treaty required for the plans to be entitled to a full refund of the supposedly withheld tax in the first place.

**I.**     **The Solo Custodians never held any Danish shares or received any Danish dividends.**

In the Solo bellwethers, defendants' representations of Danish share ownership and dividend receipt were false because the Solo Custodians never held any such shares or received any such dividends, notwithstanding the defendant plans' Solo Custodian or broker-issued dividend credit advices, account statements and trade confirmations.  (*Id.* at 12-20.)  The U.K.-based Solo Custodians would have needed to hold any such Danish shares and receive any such

---

Pretrial Order No. 29, SKAT subsequently served on defendants its Supplemental Rule 56.1 Statement of Undisputed Material Facts ("SKAT's 56.1,"), and defendants served on SKAT their Supplemental Rule 56.1 Statement of Material Facts in Support of their Motion for Summary Judgment (ECF No. 800).  Pursuant to the Court's Local Rule 56.1, SKAT contemporaneously herewith files its Response and Objections to Defendants' Supplemental Rule 56.1 Statement of Material Facts ("SKAT's 56.1 Resp.").

4.   Pl. Skatteforvaltningen's Mem. of Law in Support of its Mot. for Partial Summary Judgment ("SKAT Mem."), at 35-36.

dividends through a sub-custodian with an account at the Danish securities depository (either directly or through additional sub-custodians), but the records of the three sub-custodians the Solo Custodians purportedly used to custody Danish shares reflect no Danish shareholdings on their behalf.  (*Id.* at 12-14.)  Nor do defendants identify any evidence indicating that any other sub-custodian held Danish shares on the Solo Custodians' behalf.  (*See generally* Defs. Br.)

The Solo Custodians' records themselves show that the defendant plans' "share purchases" were part of fictitious, circular trading.  (SKAT Mem. 15-18.)  In March 2016, counsel for the Solo Custodians informed the FCA, the Solo Custodians' regulator, that the Solo Custodians never received the Danish dividends identified in the plans' dividend credit advices—a fact confirmed by SKAT's expert's review of the Solo Custodians' bank statements for the relevant period.  (*Id.* at 19-20.)  And, in 2021, the FCA concluded its investigations of two of the brokers who executed some of the defendant plans' purported trades and reported that it "found no evidence of ownership of the shares by the Solo Clients," including the defendant plans, "or custody of the shares and settlement of the trades by the" Solo Custodians.  (*Id.* at 18-19 (quoting Sapien Notice ¶ 2.10).)

## II.   ED&F's tax vouchers were false.

Like the Solo Custodians' dividend credit advices, the tax vouchers ED&F issued to the ED&F bellwether defendants based on the defendant plans' so-called cum-ex trades were false because the trading was circular and did not result in the plans receiving dividends or suffering withholding tax.  (*Id.* at 23-34.)  ED&F has admitted as much repeatedly—in a sworn pleading ED&F submitted to the English High Court of Justice, in sworn testimony ED&F's two Rule 30(b)(6) witnesses gave in this litigation, and in two reports ED&F provided to its regulator the FCA—with respect to the portions of the so-called "Annex E" tax vouchers based on cum-ex trades where ED&F's affiliate ED&F Man Proprietary Trading (Dubai) Limited ("ED&F

Dubai") was the ultimate "seller" of "shares" to the defendant plans.  (*Id.* 24-28; Decl. of Marc

A. Weinstein, dated Apr. 29, 2022 ("Weinstein Decl."), Ex. 104 (Re-Amended Defence) at

Annex E ¶ 1; *id.* Ex. 87 (Wall Dep.) at 50:1-55:9, 62:1-63:15, 65:21-66:21; Decl. of Marc A.

Weinstein, dated June 6, 2022 ("Second Weinstein Decl."), Ex. 207 (Hashemi Dep.) at 251:18-

255:10; *id.* Ex. 224 ("June 2019 FCA Report"); *id.* Ex. 261 ("Sept. 2019 FCA Report").)

      ED&F only recently (*i.e.*, after SKAT moved for partial summary judgment) produced its

June 21 and September 16, 2019 reports to the FCA confirming the circularity of the trading

underlying its admittedly false Annex E vouchers.[5]  In particular, ED&F reported to the FCA

that "in none of the relevant transactions" in which ED&F Dubai purportedly sold the defendant

plans Danish shares "did [ED&F Dubai] acquire shares from the market."  (Sept. 2019 FCA

Report at 3.)  Instead, "in every case where [ED&F Dubai] short sold to the [pension plans]

rights to Danish shares . . . it filled these trades by buying back the rights from the" plans

themselves.  (*Id.*)  As ED&F Dubai did not acquire any shares and the plans had no shares either,

the trades were settled using Danish shares ED&F already had on hand, which "shares were then

automatically recycled (*i.e.*[,] sold back to [ED&F Dubai] and resold to a [pension plan])" until

all the trades were settled.  (*Id.* at 3 (italics added), 10.)  In "consequence," ED&F admitted to

the FCA, the defendant plans "did not receive shares in respect of which a dividend was paid

and, therefore, no WHT [withholding tax] reclaim was due" and "the [ED&F Dubai] Trading

Structure should not have resulted in successful [withholding tax] reclaim applications by the"

pension plans.  (*Id.* at 3-4, 10.)  Defendants offer no evidence contradicting ED&F's conclusion

that its Annex E vouchers were false.  (*See generally* Defs. Br.)

---

5.   *See* Memo Endorsed Order on Ltr. Resp. to the Court's Apr. 23, 2022 Order, ECF No. 797.

The record demonstrates conclusively that the same is true with respect to the rest of the defendant plans' cum-ex trades where the "seller" was unaffiliated with ED&F, so the tax vouchers ED&F issued to the defendants based on this trading were false for the same reasons. (SKAT Mem. 28-34.) And the tax vouchers ED&F issued to the defendants based on the plans' cum-cum trades were false because under the terms of the plans' agreements with ED&F, any shares and dividends belonged to ED&F, not the plan. (*Id.* at 22-23, 56-58.)

## III.  __The bellwether defendant plans and their sponsoring companies were shell entities.__

Under the U.S.-Denmark tax treaty, a U.S. "pension fund" must be tax-exempt under U.S. law to be entitled to a full refund of tax withheld on Danish dividend income. (Decl. of Foreign Law of Kasper Bech Pilgaard, dated Apr. 27, 2022 ("Pilgaard Decl."), Ex. 40 (2006 Protocol Amending U.S.-Denmark tax treaty) Art. 10(3)(c).)[6] In each of their refund applications, the bellwether defendant plans claimed a full refund, and included a "Form 6166" issued by the U.S. Internal Revenue Service ("IRS") certifying that "to the best of [its] knowledge," the defendant plan "is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code, which is exempt from U.S. taxation under section 501(a), and is a resident of the United States of America for purposes of U.S. taxation." (Joint 56.1 ¶¶ 92-93, 359-60, 368-69.)[7] Unbeknownst to SKAT and

---

6.  A "pension fund" is defined in the treaty as "a legal person, whether or not exempt from tax, organized under the laws of a Contracting State to provide a pension or other similar benefits to employees . . . pursuant to a plan." (*Id.* Art. 22(2)(e).) As the U.S. Department of Treasury's Technical Explanation to the treaty explains, however, the clause "whether or not exempt from tax" was included because Denmark "taxes some pension funds." (*Id.* Ex. 41 (Dep't of Treasury Technical Explanation) at 65 (Art. 22(2)(e)).) "In the United States," however, "pension funds" "are the tax-exempt organizations described in subparagraph 1(b)(ii) of Article 4 (Residence)," *i.e.*, "[a] legal person organized under the laws of a Contracting State and that is generally exempt from tax in that State and is established and maintained in that State . . . to provide pensions or other similar benefits to employees . . . pursuant to a plan." (*Id.*; *id.* Ex. 39 (U.S.-Denmark tax treaty) Art. 4(1)(b)(ii).)

7.  The IRS's "knowledge" of the plans was minimal and its statements as to the plans' tax-exempt status in the Form 6166s were based on representations made under penalty of perjury by the plans' trustees or other authorized representatives in IRS Form 8802s that the plans were qualified pension plans under section 401(a)

the IRS, however, the defendant plans were not qualified plans exempt from taxation, and at least with respect to the Solo bellwether defendant plans, instead were established to serve as vehicles for fraud.

For example, defendant Bradley established defendant The Proper Pacific LLC 401K Plan and its sponsoring company in September 2014 because, according to Bradley, one of his work colleagues agreed to pay him $100,000 to do so and "introduce" the plan to the Solo Custodians. (Second Weinstein Decl. Ex. 228 (Expert Report of Marcia S. Wagner, dated Dec. 31, 2021 ("Wagner Report")) ¶¶ 81-82; *id.* Ex. 202 (Bradley Dep.) at 306:14-20, 307:14-308:4.) Bradley was the only member of the plan's sponsoring company, and sole participant in and trustee of the plan. (Wagner Report ¶ 81.) Bradley initially "funded" the Proper Pacific plan with $250 and never made any further contributions to it. (*Id.* at ¶ 82.) The plan's sponsoring company was one of 20 companies Bradley established to sponsor pension plans to participate in the fraud. (*Id.* at ¶¶ 68-69.) None of Bradley's companies, including the Proper Pacific plan's sponsor, ever conducted any business or otherwise generated any income. (*Id.* at ¶ 70.) Bradley all but abandoned both the plan and its sponsoring company after SKAT stopped paying the plans' refund applications in 2015. (*Id.* at ¶ 148.)

Similarly, defendant Roger Lehman established defendant The FWC Capital LLC Pension Plan and its sponsoring company in 2014 because, according to Lehman, Solo's Sanjay Shah agreed to pay him $700,000 or $800,000 to do so and "introduce" the plan to the Solo Custodians. (*Id.* at ¶ 77; SKAT's 56.1 ¶ 28.) Lehman was the only member of the plan's sponsoring company, which never conducted any business or otherwise generated any income,

---

of the Internal Revenue Code. (*See generally, e.g.*, Second Weinstein Decl. Ex. 264 (Basalt Ventures Form 8802).).

and sole participant in and trustee of the plan, to which Lehman never made any contributions. (Wagner Report ¶¶ 77-78; Second Weinstein Decl. Ex. 286 at Resp. No. 15.)[8]  Lehman terminated the plan in May 2016 after SKAT stopped paying the plans' refund applications. (Wagner Report ¶ 78.)

Defendants Roadcraft Technologies LLC Roth 401(k) Plan and Basalt Ventures LLC Roth 401(k) Plan and their respective sponsoring companies were among the over two dozen randomly named plans and companies that defendants Richard Markowitz and John van Merkensteijn directed Kaye Scholer LLP to establish in June and July 2014 for the purpose of participating in the fraud.  (*Id*. at ¶¶ 56-57; Second Weinstein Decl. Exs. 273, 296.)  The Roadcraft Technologies plan and its sponsoring company subsequently were assigned to defendant van Merkensteijn's friend defendant Ronald Altbach, who became the only member of the company and sole participant in and trustee of the plan.  (Wagner Report ¶¶ 56-57; Second Weinstein Decl. Exs. 273, 201 (Altbach Dep.) at 35:25-36:15.)  Altbach "funded" the plan with $100 and thereafter contributed only $175 to it.  (Wagner Report ¶ 58.)  The only "business" Altbach purportedly conducted through the sponsoring company was "consulting" for one of van Merkensteijn's companies.  (Second Weinstein Decl. Ex. 243 at RA00001967-68; *id.* Ex. 276.)[9]  Likewise, the "business" van Merkensteijn, who was the only member of the Basalt Ventures plan's sponsoring company and sole participant in and trustee of the plan, purportedly conducted

---

8.  Lehman established four other plans to participate in the fraud.  (Second Weinstein Decl. Ex. 209 (Lehman Dep.) at 393:5-15, 395:25-396:9.)  Lehman did not make any contributions to these plans, and three of the companies did not conduct any business.  (*Id.* Ex. 231 at Resp. Nos. 7-8.)

9.  The only business Altbach purportedly conducted using the four other companies he was assigned, which sponsored plans to participate in the fraud, was "consulting" services for the same van Merkensteijn company.  (*Id.* Exs. 243, 276, 284.)

using his company consisted mostly of providing "services" to companies owned by other

participants in the fraud.  (*Id.* Exs. 267, 271, 218 (van Merkensteijn Dep.) at 280:22-290:10.)[10]

## IV.    SKAT revoked its approvals of the defendant plans' tax refund applications and the plans unsuccessfully appealed SKAT's revocations to the Danish National Tax Tribunal.

In 2018 and 2019, SKAT revoked its approvals of the bellwether defendant plans' tax

refund applications.  (Second Weinstein Decl. Ex. 188 ("AIG Tribunal Decision") at 5; *id.* Ex.

192 ("Basalt Tribunal Complaint") at 2; *id.* Ex. 190 ("FWC Tribunal Decision") at 11; *id.* Ex.

191 ("Proper Pacific Tribunal Decision") at 14; *id.* Ex. 189 ("Riverside Tribunal Decision") at 5;

*id.* Ex. 199 ("RJM Tribunal Complaint") at 2; *id.* Ex. 200 ("Roadcraft Second Tribunal

Submission") at 1.)  Each of the bellwether defendant plans appealed SKAT's revocations to the

Danish National Tax Tribunal, an administrative complaints board.  (*Id.*; Decl. on certain aspects

of Danish law by Mads Bryde Andersen, dated June 6, 2022 ("Andersen Decl."), ¶ 17.)[11]  On

appeal, defendants argued to the Tribunal that settlement of the plans' purported trades with

actual Danish shares was not necessary for the plans to have been the beneficial owners of

shares.  The FWC Capital and Proper Pacific plans argued that the plans were the beneficial

owners of Danish shares because "[i]t is a fundamental principle [under] the law of obligations in

Danish law that ownership of a given asset is acquired when a final and binding agreement has

---

10.  Defendant Markowitz likewise formed defendant RJM Capital Pension Plan in February 2013 to participate in the fraud.  (*Id.* Exs. 297, 211 (Markowitz Dep.) at 137:19-138:21.)  And, at the time of its formation, the sponsoring company of defendant American Investment Group of New York, L.P. Penson Plan had ceased conducting any business.  (SKAT's 56.1 ¶ 57; Second Weinstein Decl. Ex. 204 (Crema Dep.) at 163:23-165:12.)  Defendant Riverside Associates Defined Benefit Plan was funded with a one-time $200,000 payment from Dan Kaminer, who was the founder of defendant Acer Investment Group, LLC, which introduced the Riverside plan to the fraud, and a friend of the plan's participant and trustee defendant David Schulman.  (Joint 56.1 ¶ 267; SKAT's 56.1 ¶¶ 58-59; Second Weinstein Decl. Ex. 213 (D. Schulman Dep.) at 46:18-51:18.)

11.  Defendants Proper Pacific, FWC Capital and Roadcraft Technologies plans were represented in their appeals by defendants' Danish law expert Mr. Pilgaard and his law firm TVC Advokatfirma København P/S.  (Roadcraft Second Submission at 9; Second Weinstein Decl. Ex. 194 (Excerpt from FWC Tribunal Submission) at 2; *id.* Ex. 195 (Excerpt from Proper Pacific Tribunal Submission) at 2.)

been concluded between the parties, which is legally valid" and the plans entered into such binding agreements to purchase the Danish shares.  (*See, e.g.*, FWC Tribunal Decison. at 116.)

Similarly, the RJM Capital and Basalt Ventures plans argued on appeal that the plans "became the rightful owner of the shares before the declaration of the dividend" because "[a]ccording to Danish law, a legal or natural person becomes the rightful owner of the shares at time of purchase."  (Basalt Tribunal Complaint at 3; RJM Tribunal Complaint at 3.)  The Roadcraft Technologies plan likewise argued that it "was the rightful owner ('beneficial owner') of the shares at the time of the declaration of the dividend and received—in accordance with this—payment of the net dividend."  (Roadcraft Second Tribunal Submission at 2.)  And the American Investment Group of New York ("AIG") and Riverside plans argued that they were the civil law and taxable, rightful owners of Danish shares based on trade confirmations, account statements, and other similar documents.  (AIG Tribunal Decision at 8-9; Riverside Tribunal Decision at 8-11.)

On June 26, July 7, July 16, and October 2, 2020, the Danish National Tax Tribunal denied defendants FWC Capital, Proper Pacific, AIG, and Riverside plans' appeals of SKAT's revocations.  (*See generally* FWC, Proper Pacific, AIG and Riverside Tribunal Decisions.)  The Tribunal rejected the FWC Capital and Proper Pacific plans' argument that a binding agreement to purchase shares by itself is sufficient for beneficial ownership, regardless of whether there are actual Danish shares, finding that the plans' "documentation . . . regarding transactions for the purchase and sale of shares, stock lending and entering into of forwards is simply the presentation of a number of agreements, etc., that do not document the Pension Plan's ownership of the alleged shares in question."  (Proper Pacific Tribunal Decision at 229; *accord* FWC Tribunal Decision at 227.)  The Tribunal likewise rejected the AIG and Riverside plans'

12

arguments, finding that "there is no evidence that the Pension Plan had purchased and was the owner of the alleged shares in question or that they received dividends from the shares."  (AIG Tribunal Decision at 54; Riverside Tribunal Decision at 32.)

The FWC Capital, Proper Pacific and Riverside plans did not appeal the Tribunal's decisions to the Danish courts, as they had the right to do, so the decisions are now final.  (Decl. of Foreign Law of Henning Aasmul-Olsen, dated June 6, 2022 ("Aasmul-Olsen Decl.") ¶ 65; Andersen Decl. ¶ 18.)  The AIG plan appealed the Tribunal's decision in its case, but ultimately withdrew the appeal, rendering the Tribunal's decision final.  (Aasmul-Olsen Decl. ¶ 65.)  Only after the Tribunal rejected the appeals of certain other plans, the RJM Capital, Basalt Ventures and Roadcraft Technologies plans withdrew their appeals before the Tribunal could decide them. (*Id.*)

## **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  Material facts are those "that might affect the outcome of the suit under the governing law," and disputes about them are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  In determining whether there is a genuine dispute as to any material fact, the Court must "draw all factual inferences and resolve all ambiguities in favor of" SKAT, "the non-moving party."  *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020).[12]

---

12. Defendants argue that to defeat their motion with respect to the sufficiency of the evidence on SKAT's fraud claims, SKAT must show there is enough to "allow a reasonable jury to find, by clear and convincing evidence, that each of the elements of fraud has been met."  (Defs. Br. 16 (quoting *The Sample Inc. v. Pendleton Woolen Mills, Inc.*, 704 F. Supp. 498, 505 (S.D.N.Y. 1989)).)  But while New York and Utah law require fraud plaintiffs

13

## ARGUMENT

I.    **The revenue rule does not bar SKAT's claims.**

"The revenue rule is a longstanding common law doctrine," with no applicability to these cases, "providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109 (2d Cir. 2001). "[A]t its core," the rule "prohibit[s] the collection of tax obligations of foreign nations." *Pasquantino v. United States*, 544 U.S. 349, 361, 125 S. Ct. 1766, 1775 (2005). It applies only where "the substance of the claim is, either directly or indirectly, one for tax revenues." *Canada*, 268 F.3d at 130.

Defendants' argument that the revenue rule bars SKAT's claims (Defs. Br. 16-38), fails because SKAT's claims are not for tax revenues. With respect to the Solo bellwethers, the defendant plans never owned any Danish shares, beneficially or otherwise, and never received any Danish dividends on which tax was owed. (SKAT Mem. 12-20.) Similarly, in the ED&F bellwethers, the defendant plans never received any dividends on which tax was owed because there were no dividends in the plans' cum-ex trades, which ED&F itself has admitted multiple times with respect to its Annex E tax vouchers, and with respect to the cum-cum trades, ED&F,

---

to prove their claims by clear and convincing evidence, Florida law, which governs SKAT's fraud claims against Lehman and the FWC Capital plan in the Florida Solo bellwether, does not. *See Wieczoreck v. H & H Builders, Inc.*, 475 So.2d 227 (Fla. 1985) ("only a preponderance or greater weight of the evidence is required to establish fraud" (internal quotation omitted)). Nor does the law of Denmark, (*see* Andersen Decl. ¶ 96), which applies to SKAT's fraud claims in the event of a conflict between New York or Utah law and Danish law. *See Oliver Wyman, Inc. v. Eielson*, No. 15 Civ. 5305 (RJS), 2016 WL 5339549, at *4 (S.D.N.Y. Sep. 22, 2016) ("In a fraud claim, the locus of the tort is generally deemed to be the place where the injury was inflicted, rather than where the fraudulent act originated." (internal quotation omitted)); Section V.E.2, *infra* (Utah choice of law); *see also* Pl. Skatteforvaltningen's Rule 44.1 Not. of Intention to Raise an Issue of Foreign Law ("SKAT's Rule 44.1 Not."), ECF No. 692. The differing burdens of proof under Danish and New York and Utah law, respectively, create such a conflict. *See, e.g.*, *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 283 (S.D.N.Y. 2009) (New York law requirement that "fraud claim . . . be proven by clear and convincing evidence, not merely by a preponderance as under Massachusetts law . . . . is enough to establish that a conflict exists" (internal quotation omitted)). But, in any event, the record in each of the bellwethers includes clear and convincing evidence by which a reasonable jury may find that each of the elements of SKAT's fraud claims are met.

not the plan, was the beneficial owner of any such dividends.  (*Id.* at 22-34, 54-58.)  As such, none of the defendants ever had any Danish tax obligations on which SKAT even conceivably could collect.

For this reason, the Court previously held that if "the defendants never in fact owned the relevant Danish stocks," then "the revenue rule would not apply because the substance of the claims would be for garden variety commercial fraud."  *In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 308 (S.D.N.Y. 2019).  The mere fact that SKAT paid the money it seeks to recover in response to fraudulent tax refund applications does not make SKAT's actions ones for tax revenue.  *See id.* (argument that SKAT seeks "to recover lost tax revenue—when the only reason the money was lost is because the defendants in effect allegedly stole it, and the only reason it supposedly concerns tax revenue is because the defendants' alleged victim was the Danish tax authority—is too clever by half").

Nonetheless, defendants argue, the revenue rule bars SKAT's claims because the Court supposedly will enforce Danish tax law by rejecting their argument that the plans were the beneficial owners of Danish shares and dividends.  (*See, e.g.*, Defs. Br. 23 ("what matters is that the parties' dueling positions require this Court to choose between two conflicting views of beneficial ownership").)  But as the Court held in its previous revenue rule decision, the "argument that an action is one for 'enforcement' if it involves the determination that defendants were not eligible for or entitled to tax refunds under Danish law is foreclosed by the" revenue rule "case law."  *In re SKAT*, 356 F. Supp. 3d at 318.

### A.  Defendants' argument that the plans were the beneficial owners of shares and dividends and entitled to tax refunds under Danish law is meritless.

As an initial matter, defendants' argument that they were entitled to tax refunds and the plans were the beneficial owners of Danish shares and dividends is meritless.  According to

defendants and their Danish law expert Mr. Pilgaard, the plans were the beneficial owners of Danish shares and dividends under Danish tax law simply by virtue of having entered into "final and binding and unconditional agreement[s]" to purchase shares before the relevant ex-dividend date, regardless of whether the purported trades ever settled or the purported seller ever had or acquired such shares to sell.  (Defs. Br. 19 (quoting Pilgaard Decl. ¶ 155), 24 n.19.)  A "trade confirmation" evidencing such an agreement, defendants argue, is all that is required for beneficial ownership "regardless of what happens after the trade date."  (*Id*. at 20 (citing Pilgaard Decl. ¶¶ 158-63, 169).)[13]  Defendants' argument is contrary to the Danish National Tax Tribunal's decisions on their appeals, applicable Danish law, and common sense.

Certain of the bellwether defendant plans and Mr. Pilgaard already made this same beneficial ownership argument to the Danish National Tax Tribunal.  (*See, e.g.*, FWC Tribunal Decision at 116 (recounting plan's argument that "[i]t is a fundamental principle [under] the law of obligations in Danish law that ownership of a given asset is acquired when a final and binding agreement has been concluded between the parties, which is legally valid").)  And the Tribunal rejected it, holding that the plans' "documentation to demonstrate the purchase and ownership of the stocks," *i.e.*, the trade confirmations supposedly sufficient to prove beneficial ownership

---

13. Defendants' reliance on confirmations of trades purportedly settled by the Solo Custodians and Solo Custodian-issued account statements and other documents is itself a dubious foundation for their argument.  The Solo Custodians played a central role in the fraud and structuring the fraudulent "trading" scheme and are themselves defendants in separate actions SKAT brought in England.  Further, Sanjay Shah, who owned and controlled the Solo Custodians, was recently arrested in Dubai to face extradition to Denmark, where he has been criminally indicted.  (*See British Suspect in Danish 'cum-ex' fraud case arrested in Dubai*, REUTERS.COM, https://www.reuters.com/world/europe/main-suspect-danish-tax-fraud-case-arrested-dubai-denmarks-justice-ministry-2022-06-03/ (last visited June 6, 2022).)  Many financial frauds are "book entry frauds," *i.e.*, schemes in which the fraud is reflected in an entity's business records, and defendants now argue the revenue rule bars SKAT's claims by relying on the same fraudulent trading records they used to perpetrate the fraud in the first instance.  (*See* Weinstein Decl. Ex. 90 (Rebuttal Report of Bruce Dubinsky, dated Feb. 1, 2022) ¶¶ 10-11, 18-20.)

under Danish tax law, "do not document that the pension plan's actually purchased stocks." (*Id.* at 39, 142.)

Despite his involvement in the Tribunal appeals, Mr. Pilgaard's Danish law declaration defendants submitted to this Court fails to disclose that the Danish National Tax Tribunal rejected the very same Danish law argument defendants now ask this Court to accept. (*See generally* Pilgaard Decl.) Nor does Mr. Pilgaard's declaration disclose the Danish Eastern High Court's holding in a separate action SKAT brought related to dividend withholding tax fraud involving a custodian (North Channel Bank), used by non-bellwether defendants in a break-away from the Solo Custodian scheme, that agreements to purchase shares that do not exist and are never delivered are plain fraud and do not create beneficial ownership. (Andersen Decl. ¶¶ 44-46 ("implementing the tax set-up as proforma or without any shares and actual cashflows must be deemed to be ordinary fraud under criminal law that is merely disguised by complicated transactions" (quoting Andersen Decl. Ex. 35).)

Altogether, four of the seven bellwether defendant plans allowed the Danish National Tax Tribunal to determine their appeals and each lost. Only one of the four, the AIG plan, appealed the Tribunal's decision to the Danish courts, but the AIG plan dropped that appeal before it could be decided. And in summer 2020, with the writing on the wall, the other three bellwether defendant plans withdrew their appeals to the Danish National Tax Tribunal before it could issue decisions. Thus, all seven of the bellwether plans accepted SKAT's revocations of its decisions to grant their refund applications, doubtless to avoid creating an even more extensive record that their representations to this Court about Danish law and their purported "ownership" of Danish shares are fundamentally flawed.

17

### 1. The Solo bellwether defendant plans were not the beneficial owners of Danish shares or dividends under Danish law.

The Solo Custodians and their sub-custodians have no record of the Solo Custodians ever holding or receiving any Danish shares or dividends. (SKAT Mem. 12-14.)[14] Defendants' contrived argument that this is of no moment because the plans did not need to acquire shares to become the beneficial owner of shares, so long as they entered into binding purchase agreements, finds no support in Danish law, tax or otherwise. (Defs. Br. 19-20.)

As an initial matter and as Mr. Pilgaard conceded before the Danish National Tax Tribunal, the relevant Danish legal principles for determining ownership of shares are the same under Danish tax law and Danish civil law. (Second Weinstein Decl. Ex. 196; *see also* Aasmul-Olsen Decl. ¶ 42.) Danish civil law follows the doctrine "*nemo dat quod non habet*" ("no one gives what they do not have"), including with respect to transfers of ownership of shares, under which a seller cannot convey rights greater than it itself possesses. (Aasmul-Olsen Decl. ¶¶ 25, 33-34.) Thus, if a seller does not have any ownership rights in, for instance, a share, the seller cannot convey any ownership rights to a purported buyer. (*Id.* ¶ 28.) Accordingly, for any transfer of ownership, beneficial or otherwise, in a Danish share to be effective, the seller must own the Danish share (and ultimately deliver that share to the buyer). (*Id.* ¶¶ 35-36.) Nothing in Danish tax law supplants this basic concept of Danish civil law, and therefore if a seller does not have ownership rights under Danish civil law, there is no construct in Danish tax laws that could convey or create an ownership right in a buyer. (*Id.* ¶ 42.)

---

14. Defendants' argument that "SKAT's logic that Solo Capital held 'no shares' . . . ignores the realities of the modern financial system" because "physical shares gave way to electronic book entries as early as 1988" is a red herring. (Defs. Br. 30 n.25.) SKAT's conclusion that the Solo Custodians held no Danish shares is based, in part, on the fact that there were no "electronic book entries" of such shares in the Solo Custodians' accounts at their sub-custodians. (SKAT Mem. 13-14.)

In the Solo bellwethers, the defendant plans' purported purchases of Danish shares were parts of fictitious, circular trades, and the Solo Custodians' records show that in every instance the ultimate "seller" did not own any Danish shares to sell to the plans. (SKAT Mem. 15-18.) Thus, under the *nemo dat quod non habet* doctrine, the sellers could not have conveyed to the defendant plans through such fictitious trades any ownership rights in Danish shares or dividends because the sellers had no such rights to convey. (Aasmul-Olsen Decl. ¶¶ 35-39.) The defendants' reliance on "binding agreements" cannot resolve the inherent flaw in their position that the purported seller never owned any shares or had any rights to shares or dividends that could be conveyed.

The Danish cases on which Mr. Pilgaard relies do not support his conclusion. Those decisions did not address the conditions for transfer of ownership but rather the *effective time* of transfer for tax purposes where the conditions for transfer of ownership (including delivery of shares) were satisfied. (*Id.* ¶ 54, Appendix 5.) None of the cases addressed whether a purported buyer obtains ownership rights when a purported seller does not have any shares to convey. (*Id.*) The Danish National Tax Tribunal's decisions in the appeals that defendants allowed to go forward, which are conspicuously absent from Mr. Pilgaard's declaration, rejected the defendants' argument, concluding that the plans were not the beneficial owners of any Danish shares in that circumstance. (*See supra* pgs. 12-13.)

Defendants' argument that "settlement of the trade is no precondition of ownership under Danish tax law" is similarly incorrect. (Defs. Br. 7.) Under Danish securities law, a contract to purchase a dematerialized Danish share, even a final and binding one, does not transfer ownership until the share is delivered or segregated at a custodian. (Aasmul-Olsen Decl. ¶ 41.) Until that occurs, the buyer might have a contractual claim against the seller, but not ownership

of the share.  (*Id.* ¶ 44.)  As the Solo Custodians never received any actual shares as part of the fictious, circular trading, the plans' "binding agreements" alone are insufficient to establish ownership to any shares.  Again, the case on which defendants specifically rely to support their contention that settlement is not required to transfer ownership provides no such support.  (Defs. Br. 24 n.19 (citing Pilgaard Decl. ¶ 162).)  In SKM2008.825.BR, the court simply determined the applicable tax year for the sale of shares that not only existed but were delivered.  (Aasmul-Olsen Decl. App'x 5 at SKM2008.825BR.)

Additionally, defendants' contention that "book entries reflecting stock purchases and dividends suffice to establish an entitlement to those positions," (Defs. Br. 23), is not supported by Danish law.  A custodian cannot simply create ownership rights in Danish shares out of thin air by making a book entry.  Rather, all shares of a Danish company must be registered with the Danish Business Authority and issued in the systems of VP Securities.  (Aasmul-Olsen Decl. ¶ 13.)  Accordingly, for an entity to have ownership of a Danish share, it must be registered in the systems of VP Securities or be traceable through sub-custodians to VP Securities, a fact recognized by Mr. Pilgaard.  (Aasmul-Olsen Decl. ¶¶ 13-15; Pilgaard Decl. ¶ 149.)[15]

The requirement that shares need to exist and trades need to settle with shares to transfer ownership of such shares is consistent with Danish securities law and comports with common sense too.  Danish companies issue a fixed number of shares, and it is not possible for additional shares to be created other than by the Danish company issuing them.  (Aasmul-Olsen Decl. ¶ 11, n.6.)  Further, all shares issued by a Danish company must either be held at, or traceable to, the

___

15. The defendants' reliance on "netting" and internalized settlement is also misplaced.  (Defs. Br. 23-24.)  Netting and internalized settlement are premised on the custodian holding actual shares, and if none of the sellers with accounts at the custodian own any share of the relevant class, none of the sellers are capable of conveying ownership to any purchaser under the "*nemo dat quod non habet*" principle, and any "net" or "internalized" settlement would not cause a transfer of ownership of any shares to the custodian's purchasing customers.  (Aasmul-Olsen Decl. ¶ 35.)

Danish central securities depository VP Securities.  (*Id.* ¶ 16.)  Thus, a true owner of a Danish

share must be able to identify its direct or indirect holding at VP Securities.  (*Id.* ¶¶ 20, 46.)

Thus, two entities cannot create additional shares in a Danish company simply by entering into a

share sale agreement.  (*Id.* ¶¶ 16, 18.)

Similarly, Danish companies issue a fixed number of dividends directly related to the

fixed number of shares they have issued, and the total number of dividends cannot be increased

by two entities entering into a contract.  (*Id.* ¶¶ 59-60.)  This lays bare the flaw in defendants'

argument, which would have the Court accept that two entities entering into a sale contract can

create an ownership right in a "share" and a right to a "dividend" simply by saying it is so, even

if that "share" or "dividend" was not issued or approved by the company or traceable to VP

Securities.  If defendants' argument were correct that simply entering into a binding agreement

to sell shares, without settlement by delivery of any shares, was sufficient to establish ownership,

two individuals would be able to create "ownership" rights in one share, or millions of shares, or

billions of shares, simply by adding more zeros in their agreement.  This absurd result

demonstrates the fanciful premise of defendants' argument.[16]

---

16.  Notwithstanding their repeated citations to it and failure to explain how it could govern any of the purported
transactions in Danish shares supposedly executed at the U.K.-based Solo Custodians, section 8-501 of the
Uniform Commercial Code does not support defendants' "view" that the existence of actual shares is irrelevant
to beneficial ownership.  (Defs. Br. 23; *see also* Defs. Br. 37, 55.)  To the contrary, Article 8 of the Uniform
Commercial Code is consistent with Danish law in that neither provides for share ownership based on
fraudulent trading of non-existent shares.  While section 8-501 provides that "a person acquires a security
entitlement if a securities intermediary . . . indicates by book entry that a financial asset has been credited to the
person's securities account" even if "the securities intermediary does not itself hold the financial asset," U.C.C.
§ 8-501(b)(1) & (c), the "official comment" to the rule "shows" that it "serves chiefly to clarify and secure
customers' rights amid the delays and disconnects that may attend authentic trading activity—there is no
indication that it contemplates fraud."  *Picard v. Gettinger (In re Bernard L. Madoff Inv. Secs. LLC)*, 976 F.3d
184, 197 (2d Cir. 2020).  Further, a "security entitlement" is not the same thing as ownership of shares and only
gives the entitlement holder rights against the securities intermediary.  Under the U.C.C., "an entitlement holder
only has rights to actual securities held by a securities intermediary," not to fictitious shares.  *Id.* at 198; *see also*
U.C.C. § 8-503(b) ("entitlement holder's property interest with respect to a particular financial asset . . . is a pro
rata interest in all interest in that financial asset held by the securities intermediary").

### 2. The ED&F bellwether defendant plans were not the beneficial owners of Danish shares or dividends under Danish law.

Much like the defendant plans in the Solo bellwethers, the ED&F bellwether defendant plans were not the beneficial owners of any Danish shares or dividends as a result of their circular cum-ex trades because the shares ED&F used to settle those trades were recycled shares with no dividend right attached. (SKAT Mem. 24-34, 55-56.) As ED&F admits with respect to the cum-ex trades where ED&F Dubai was the ultimate seller, "in every case where [ED&F Dubai] short sold to the [pension plans] rights to Danish shares . . . it filled these trades by buying back the rights from the" plans themselves. (Sept. 2019 FCA Report at 3.) As with the Solo bellwethers, these circular trades cannot serve as a valid basis of share ownership since ED&F Dubai never had any share ownership rights that could be conveyed. (Aasmul-Olsen Decl. ¶¶ 56-57.)

Further, the supposed "dividends" the plans received were in fact contractual payments from ED&F Dubai unconnected to any actual dividend issued on any shares and on which no Danish tax was ever owed, a fact that ED&F admits. (Sept. 2019 FCA Report at 3.)[17] While these contractual payments were equal in amount to a net dividend, they were not a distribution of earnings made by an issuer to its shareholders and are therefore not dividends under Danish law. (Aasmul-Olsen Decl. ¶¶ 58-60.)

The same is true for the rest of the plans' cum-ex trades. (SKAT Mem. 28-34, 55-56.) Since there were no actual shares or dividends in the cum-ex trades, under Danish law the plans could not have been beneficial owners of them. (Aasmul-Olsen Decl. ¶ 62.) And with respect to the cum-cum trades, the plans immediately transferred to ED&F all right, title and interest in the

---

17. Defendants in fact acknowledge that Denmark never collected any tax on these sorts of dividend compensation payments. (Defs. Br. 25 ("Denmark appears to have failed" to tax "dividend compensation payments . . . where those payments were not associated with any direct shareholding").)

underlying shares and any dividends issued thereon, including any ownership rights, beneficial

or otherwise. (SKAT Mem. 22, 56-58.) Accordingly, the plans retained no interest in any of the

Danish shares or dividends and could not be their beneficial owners.[18]

### 3. Defendants in the Proper Pacific and FWC Capital bellwethers are collaterally estopped from relitigating whether a binding purchase agreement establishes beneficial ownership.

SKAT and the defendants in the Proper Pacific and FWC Capital bellwethers already

litigated before the Danish National Tax Tribunal the issue whether a binding agreement to

purchase shares is sufficient to establish beneficial ownership of shares under Danish law and the

defendants lost. (*See generally* FWC and Proper Pacific Tribunal Decisions.) The doctrine of

collateral estoppel bars the defendants in those actions from relitigating that same issue before

this Court.

As an initial matter, both New York and Florida law afford preclusive effect to decisions

of administrative bodies such as the Danish National Tax Tribunal. *See, e.g.*, *Auqui v. Seven

Thirty One Ltd. P'ship*, 22 N.Y.3d 246, 255 (2013) ("quasi-judicial determinations of

administrative agencies are entitled to collateral estoppel effect where the issue a party seeks to

preclude in a subsequent civil action is identical to a material issue that was necessarily decided

by the administrative tribunal and where there was a full and fair opportunity to litigate before

that tribunal").[19] And the requirements for collateral estoppel are similar in both States. *See,

e.g.*, *Buechel v. Bain*, 97 N.Y.2d 295, 303 (2001) ("Collateral estoppel precludes a party from

---

18. The defendants concede that you cannot be a beneficial owner of a dividend if you are contractually obligated to transfer the dividend to another party, (Defs. Br. 20), which is what the ED&F bellwether plans have done through their agreements with ED&F.

19. *See also, e.g.*, *Holiday Inns, Inc. v. City of Jacksonville*, 678 So. 2d 528, 529 (Fla. Dist. Ct. App. 1996) ("[r]es judicata (and collateral estoppel) is applicable to rulings or decisions of administrative bodies" (internal quotation omitted)); Andersen Decl. ¶ 17.

relitigating in a subsequent action or proceeding an issue raised in a prior action or proceeding and decided against that party or those in privity").[20]

First, both SKAT and the respective defendant plan were parties to the proceedings before the Danish National Tax Tribunal, thus satisfying New York law's requirement that the party against whom the doctrine is invoked was a party to the previous proceeding, *Buechel*, 97 N.Y.2d at 303, and Florida law's "mutuality" requirement. *Stogniew v. McQueen*, 656 So.2d 917, 919 (Fla. 1995) ("Florida has traditionally required that there be a mutuality of parties in order for the doctrine to apply."). Further, defendants Lehman and Bradley, who were the sole participants in, and trustees of, the plans were the plans' privies for collateral estoppel purposes, so the doctrine may be invoked against them as well. *See, e.g.*, *Anonymous v. N.Y. State Just. Ctr. for the Prot. of People With Special Needs*, 167 A.D.3d 113, 117 (3d Dep't 2018) ("privity may be found where a nonparty to a previous proceeding either had control over that proceeding or when the connection between the parties is such that the interests of the nonparty can be said to have been represented in the prior proceeding").[21]

Second, the issue before the Danish National Tax Tribunal is identical to the issue before this Court and it was fully and fairly litigated before the Tribunal. In each appeal, the defendant plan, represented by defendants' Danish law expert Mr. Pilgaard, argued to the Tribunal that under Danish law a binding agreement to purchase shares is by itself sufficient to establish beneficial ownership of shares, *i.e.*, the same argument that defendants now make to this Court. (*Compare, e.g.*, FWC Tribunal Decision at 116 ("ownership of a given asset is acquired when a

---

20. *See also, e.g.*, *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1329 (11th Cir. 2003) ("Under Florida law, collateral estoppel applies if (1) an identical issue, (2) has been fully litigated, (3) by the same parties or their privies, and (4) a final decision has been rendered by a court of competent jurisdiction.").

21. *See also, e.g.*, *Stogniew*, 656 So.2d at 920 (privity requires that "one must have an interest in the action such that she will be bound by the final judgment as if she were a party").

final and binding agreement has been concluded between the parties") *with* Defs. Br. 19 (quoting Pilgaard Decl. ¶ 155) ("final and binding and unconditional agreement" sufficient for ownership).)  And in holding that the plans' "documentation" of their final and binding agreements to purchase shares, the same evidence on which they rely now, did "not document the Pension Plan's ownership of the alleged shares in question," (Proper Pacific Tribunal Decision at 229; *accord* FWC Tribunal Decision at 227), the Tribunal "necessarily decided" the issue against the defendants.  *Robert v. O'Meara*, 28 A.D.3d 567, 568 (2d Dep't 2006).

Finally, the Tribunal's decisions are now final, as the defendant plans did not appeal them to the Danish courts.  (Andersen Decl. ¶ 18.)

### B. The Court will not enforce Danish tax law directly by rejecting defendants' meritless Danish law beneficial ownership argument.

The Court will not enforce Danish tax law directly by rejecting, either based on the merits or collateral estoppel, defendants' meritless Danish law beneficial ownership argument.  "A suit directly seeks to enforce foreign tax laws when a judgment in favor of the plaintiff[] would require the defendants to reimburse [it] for lost tax revenues."  *European Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123, 131 (2d Cir. 2004).  Thus, SKAT's claims "plainly do not seek direct enforcement of Danish tax law" because a judgment in SKAT's favor would not require defendants to reimburse SKAT for any lost tax revenue, the defendants never having owed any tax in the first place.  *In re SKAT*, 356 F. Supp. 3d at 311.

Defendants argue that "there is nothing to distinguish this case from the prototypical Revenue Rule case" and it matters not that "this case involves allegedly fraudulent claims for tax refunds, rather than tax evasion."  (Defs. Br. 26.)  To the contrary, the "crucial ingredient in cases barred by the revenue rule in this circuit," *i.e.*, the prototypical revenue rule case, is "tax evasion."  *In re SKAT*, 356 F. Supp. 3d at 311-12.  In all the revenue rule cases defendants cite

that dismissed fraud claims supposedly analogous to SKAT's, (Defs. Br. 28), the plaintiff sought

damages caused by defendants' evasion of taxes.  *See Canada*, 268 F.3d at 106 (action for

revenue Canada "lost from the evasion of tobacco duties and taxes" (internal quotation omitted));

*European Cmty.*, 355 F.3d at 128-29 ("claiming that as a result of smuggling, the proper duties

and taxes have not been paid" (internal quotation omitted)); *Republic of Honduras v. Philip*

*Morris Cos.*, 341 F.3d 1253, 1255 (11th Cir. 2003) ("The Republics allege that Big Tobacco

engaged in various illegal schemes to avoid paying . . . taxes.").[22]  By contrast, SKAT's actions

have nothing to do with tax evasion, but rather seek to recover amounts defendants stole by

pretending that the plans were entitled to tax refunds because they owned Danish shares and

received Danish dividends, on which Danish tax had been paid, *i.e.*, "garden variety commercial

fraud."  *In re SKAT*, 356 F. Supp. 3d at 308.

### C. The Court will not enforce Danish tax law indirectly by rejecting defendants' meritless Danish law beneficial ownership argument.

Nor will rejecting defendants' Danish law beneficial ownership argument cause the Court

to enforce Danish tax law indirectly.  "[I]ndirect enforcement occurs when a foreign state seeks a

remedy that would give extraterritorial effect to its tax laws."  *European Cmty.*, 355 F.3d at 131.

For instance, in *Canada*, the Second Circuit held that Canada's claim for law enforcement costs

to stop defendants' cigarette smuggling was "in essence an indirect attempt to have a United

States court enforce Canadian revenue laws."  268 F.3d at 131.  "In effect," the Court reasoned,

"Canada [wa]s requesting that defendants pay the salary of the tax enforcers; such police costs

are thus derivative of the taxes Canada sought to enforce."  *Id.* at 132.  By contrast, the amounts

SKAT seeks to recover that were stolen from it through "garden variety commercial fraud," *In re*

---

22. *See also Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 391 (E.D.N.Y. 2007) (dismissing "claims for damages resulting from lost liquor taxes")

*SKAT*, 356 F. Supp. 3d at 308, are not "derivative" of any taxes SKAT seeks to enforce because SKAT's actions are not for taxes.  *Canada*, 268 F.3d at 132.

Thus, while "it is sometimes difficult to draw the line between an issue involving merely recognition of a foreign law and indirect enforcement of it," this is not one of those cases. *Pasquantino*, 544 U.S. at 368, 125 S. Ct. at 1779.  In its previous revenue rule decision, the Court adopted *Colombia's* "test" for where that line is drawn.  *In re SKAT*, 356 F. Supp. 3d at 317.  Under the *Colombia* test, "claims requiring courts to consider or 'pass on' a foreign tax law fall along a continuum with explicit enforcement of a foreign revenue law—barred by the revenue rule—at one end, and 'mere recognition of a foreign tax law' at the other." *Id.* (quoting *Colombia*, 531 F. Supp. 2d at 388).  "Whether 'lesser forms of consideration of a foreign revenue law—for example, recognition or application—are permissible depends on the extent to which the consideration of the foreign revenue law raises separation of powers and sovereignty concerns.'" *Id.* (quoting *Colombia*, 531 F. Supp. 2d at 388).

### 1.    Rejecting defendants' Danish law beneficial ownership argument would not raise sovereignty concerns.

One purpose of the revenue rule "is to ensure respect for sovereignty by keeping courts out of the business of adjudicating and enforcing foreign states' tax laws that embody their moral and political choices."  *In re SKAT*, 356 F. Supp. 3d at 310; *accord Pasquantino*, 544 U.S. at 368, 125 S. Ct. at 1779 ("principal evil against which the revenue rule was traditionally thought to guard" is "judicial evaluation of the policy-laden enactments of other sovereigns").  A court cannot enforce foreign laws that "run counter to the 'settled public policy' of its own" forum, *Moore v. Mitchell*, 30 F.2d 600, 604 (2d Cir. 1929) (L. Hand, J., concurring), so the revenue rule instructs courts to steer clear of enforcing foreign revenue law so as to avoid becoming "embroil[ed] . . . in an evaluation of the foreign nation's social policies, an inquiry that can be

embarrassing to [the forum] nation and damaging to the foreign state." *European Cmty.*, 355 F.3d at 131.

The Court's consideration of defendants' Danish law beneficial ownership argument cannot raise the sort of sovereignty concerns that implicate the revenue rule because it is not even premised on Danish tax law. (*See, e.g.*, Pilgaard Decl. ¶ 155 ("It is a fundamental principle of Danish law, including Danish tax law, that ownership of a given asset is obtained when a final and binding and unconditional agreement between the parties has been validly concluded.").) Danish civil law, not tax law, defines ownership interests in Denmark. (*See* Section I.A.1, *supra*.) "For all the breath spent on beneficial ownership, the defendants" still "fail to explain how beneficial ownership is distinct under Danish law from other kinds of ownership and the basis for their assertion that it is Danish *tax* law, and not some other category of Danish law, that defines the distinction." *In re SKAT*, 356 F. Supp. 3d at 314. In fact, defendants' Danish law expert Mr. Pilgaard conceded before the Danish National Tax Tribunal that Danish civil law, not Danish tax law, defines ownership. (Second Weinstein Decl. Ex. 196.)

But even if beneficial ownership were defined by Danish tax law—which it is not—defendants' argument still fails because the Court would not need to "pass on the validity of any of Denmark's tax laws to determine whether the defendants were the beneficial owners of the shares" or dividends. *In re SKAT*, 356 F. Supp. 3d at 317. "The Court merely would recognize any relevant law and determine its effect." *Id.* at 317-18. Defendants argue that the "Court's consideration of SKAT's claims will touch on fundamental policies undergirding Danish tax law," but fail to explain how that is so. (Defs. Br. 36-37.) Unlike the cigarette and liquor taxes at issue in *Canada*, *European Community*, and *Colombia*, Danish law on beneficial ownership is not a revenue law that embodies Denmark's moral or political choices, thus recognizing its effect

28

will not require the Court to examine any moral or political judgments embedded in Denmark's

tax policies.  *See Colombia*, 531 F. Supp. 2d at 397 ("In hearing the pure narcotics-laundering

claim, this court will not be required to make any value-laden judgment as to whether

Colombia's tax laws are consistent with American public policies.").[23]

Further, there is now no chance that in rejecting defendants' beneficial ownership

arguments, the Court will "render[] a decision under Danish law on the question of beneficial

ownership contrary to an opinion of an administrative or judicial body in Denmark deciding the

same question."  (Defs. Br. 36 (quoting *In re SKAT*, 356 F. Supp. 3d at 318).)  All the bellwether

defendant plans' Danish appeals of SKAT's revocation decisions have now either been rejected

or withdrawn, with the defendants' beneficial ownership arguments having been rejected in each

instance they were considered.  (*See supra* pgs. 12-13.)[24]  The bellwether defendant plans elected

not to press further the same meritless Danish law arguments before the Danish National Tax

Tribunal and Danish courts that they now argue claim bar the Court from hearing SKAT's

claims.[25]

---

23. The *Canada* Court's hypothetical examples of taxes that "demonstrate the sensitive nature of the issues that can be raised through a foreign sovereign's exercise of its taxation powers," *i.e.*, a foreign tax that makes "it very expensive to sell United States newspapers," "the inclusion of United States-made content in machinery built in that foreign country prohibitively expense," "a tax that had been raised to deter the sale of United States pharmaceuticals in that country," or "an immigration tax on members of a particular religious group or racial minority," illustrate that Danish law on beneficial ownership is not even in the same category as the sort of foreign revenue generating laws that implicate the revenue rule's sovereignty concerns.  *Canada*, 268 F.3d at 113.

24. Similarly, all the non-bellwether defendant plans' Danish appeals of SKAT's revocation decisions have now either been dismissed, withdrawn, or otherwise resolved except for of the appeals related to six defendant group trusts.  (Decl. of Anne Christine Kjær Egholm, dated June 6, 2022, ¶¶ 2-5.)  Counsel for five of the group trusts informed SKAT that there is no longer any person or entity authorized to act on behalf of the group trusts, and the remaining group trust similarly admitted that it no longer has a trustee.  SKAT will take appropriate action to seek a default judgment against these entities through a separate motion.  SKAT also explained this in a letter to the Danish Tax Appeals Agency and has moved to have the cases decided.  (*Id.* ¶ 6.)

25. Finally, defendants' argument that the Court's rejection of their Danish law beneficial ownership argument "could potentially result in tension with well-grounded policies in this Court's home locale," (Defs. Br. 37), is based on a misunderstanding of Article 8 of the Uniform Commercial Code.  (*See supra*, pgs. 21 n.16.)

### 2. Rejecting defendants' Danish law beneficial ownership argument would not raise separation of powers concerns.

By prohibiting courts from enforcing foreign tax law, the revenue rule "serves also to preserve separation of powers by carving out from courts' jurisdiction disputes regarding extraterritorial tax enforcement, which can implicate foreign relations and are better left to the political branches of government." *In re SKAT*, 356 F. Supp. 3d at 310; *accord Canada*, 268 F.3d at 115 ("with regard to the domestic collection of foreign taxes and the enforcement of United States taxes abroad, the political branches of our government have consistently acted on behalf of the United States"). SKAT's claims "have no bearing on the executive branch's responsibility to decide when to aid other sovereigns in enforcing their tax laws" because SKAT's claims are not for Danish taxes. *In re SKAT*, 356 F. Supp. 3d at 318. "Any argument that an action is one for 'enforcement' if it involves the determination that defendants were not eligible for or entitled to tax refunds under Danish law is foreclosed by the case law[.]" *Id.*

Thus, contrary to defendants' argument, the tax collection assistance provisions in U.S. tax treaties are irrelevant because SKAT is not seeking to collect taxes. (Defs. Br. 32-36.) For instance, the tax collection assistance provision in the U.S.-Denmark tax treaty is limited to the "collection of taxes" covered by the convention, which with respect to Danish taxes, includes "income tax to the State," "municipal income tax," "income tax to the county municipalities," and "taxes imposed under the Hydrocarbon Tax Act," "together with interest, costs, additions to such taxes, and civil penalties." (Pilgaard Decl. Ex. 39 (U.S.-Denmark Treaty) Arts. 2 & 27.) "Money obtained by fraud from SKAT is none of these things." *In re SKAT*, 356 F. Supp. 3d at 320.[26] Likewise, the tax collection assistance provision in the U.S.-Japan tax treaty defendants

---

26. Nor, contrary to defendants' argument, (Defs. Br. 34 n.29), would the United States be barred from bringing a claim in Denmark the same as SKAT's seeking to recover amounts it was induced to pay by plain fraud. (Andersen Decl. ¶¶ 129-32.)

discuss is limited to "the collection of taxes . . . together with interest, costs of collection, additions to such taxes, and civil or administrative penalties related to such taxes."  (Decl. of Nicholas S. Bahnsen, dated Apr. 29, 2022 ("Bahnsen Decl."), Ex. 69 (Protocol amending U.S.-Japan tax treaty) Art XIII (1).)  Thus, SKAT's actions, which do not seek to collect tax, do nothing to "undermine the delicate balance the political branches have struck by creating an unwarranted asymmetry in international tax collection assistance."  (Defs. Br. 34.)[27]

### D.   SKAT is not collaterally estopped from litigating the revenue rule issue in the ED&F bellwethers.

Defendants argue that Utah's doctrine of collateral estoppel bars SKAT from contesting that the revenue rule requires dismissal of the ED&F bellwethers based on the English High Court of Justice's April 27, 2021 decision dismissing SKAT's claims against ED&F under Dicey Rule 3, the English version of the revenue rule.  (Defs. Br. 38-44.)  But defendants fail to meet their burden to show that the revenue rule issue that this Court must decide under U.S. law is identical to the Dicey Rule 3 issue that the English court decided under English law.  *See Gudmundson v. Del Ozone*, 232 P.3d 1059, 1067 (Utah 2010) ("issue decided in the prior adjudication" must be "identical to the one presented in the instant action").

Under Utah law, issues are identical only if the "issues actually litigated in the first action *are precisely the same* as those raised in the present action."  *Jenkins v. Prime Ins. Co.*, No. 2:21-cv-00130-DAK, 2021 WL 3726620, at *3 (D. Utah Aug. 23, 2021) (quoting *Schaer v. State By & Through Utah Dep't of Transp.*, 657 P.2d 1337, 1341 (Utah 1983)).[28]  Issues are not

---

27. Defendants' argument that if the Court finds that any of SKAT's claims against any defendant is barred by the revenue rule, then all of SKAT's claims against all defendants must be dismissed, (Defs. Br. 30), is contrary to the law in this Circuit.  *See Colombia*, 531 F. Supp. 2d at 395 (revenue rule barred "claims for lost revenues and profits resulting from [defendants'] smuggling and tax evasion," but not "for lost revenues and profits resulting from [defendants'] money laundering").

28. Defendants rely on a case applying New York law to argue that "the issue identity prong is satisfied if the pleadings, parties and claims reveal significant similarities."  (Defs. Br. 43 (quoting *Scheiner v. Wallace*, 832 F.

"identical" when different "legal standards," including "different interpretative case law," apply

to them. *Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465, 476-77 (Utah 2011).[29]  For

instance, in *Jensen*, the Utah Supreme Court held that even though "some of the language of

[Utah's] state and [the] federal constitutions is substantially the same," the plaintiffs were not

collaterally estopped from pursuing their Utah constitutional claims by a previous decision

dismissing their federal constitutional claims because the "similarity of language does not

indicate that [the Utah Supreme Court] moves in lockstep with the United States Supreme

Court's constitutional analysis or foreclose [the Utah Supreme Court's] ability to decide in the

future that [Utah] state constitutional provisions afford more rights than the federal

Constitution."  *Id*. at 477. (internal quotations omitted).

　　The same is true here.  That the U.S. revenue rule and Dicey Rule 3 are "almost

identically worded" is not determinative.  (Defs. Br. 43.)  What matters is that the legal standards

and interpretive case law that English courts use in applying Dicey Rule 3 are different than the

standards and case law U.S. courts use in applying the U.S. revenue rule.  *Cf. Pasquantino*, 544

U.S. at 363 & 363 n.10, 125 S. Ct. at 1776 & 1776 n.10 (relying on English cases to show

revenue rule principles were well-established is "perilous" in part because U.S. revenue rule is

based on "features peculiar to the American system of separation of powers").  In England, "the

preferred rationale for the revenue rule . . . is that an assertion of sovereign authority by a foreign

state within the territory of [English] Courts is not admissible."  (Decl. of Brandon R. Dillman,

dated Apr. 29, 2022 ("Dillman Decl."), Ex. 141 (*Skatteforvaltningen v. Solo Capital Partners*

---

Supp. 687, 695 (S.D.N.Y. 1993).)  But as defendants acknowledge, Utah, not New York, law governs in the
ED&F bellwethers.

29.  *Accord Kuhar v. Thompson Mfg. Inc.*, 506 P.3d 1200, 1203 n.2 (Utah Ct. App. 2022) (admissibility of expert
testimony under federal and Utah law is not the same issue for collateral estoppel purposes because of Utah's
"arguably more lenient standards").

*LLP*, [2022] EWCA Civ 234) ¶ 139.)  By contrast, in the U.S., the preferred rationales for the revenue rule are the distinct separation of powers and sovereignty concerns discussed above.  *See In re SKAT*, 356 F. Supp. 3d at 317.  Defendants, in fact, acknowledge that the U.S. and English revenue rule issues are not identical in the relevant sense when they argue that the English Court of Appeal's decision vitiating the reasoning in the High Court of Justice's revenue rule decision "is inapposite here, as it did not focus on the separation of powers concerns that animate the Revenue Rule in the Second Circuit."  (Defs. Br. 29 n.24.)

Finally, even if the U.S. and English revenue rule issues were identical, which they are not, none of collateral estoppel's purposes would be served by its application here.  "[C]ollateral estoppel is not an inflexible, universally applicable principle."  *Gudmundson*, 232 P.3d at 1067 (internal quotation omitted).  "[I]t can yield an unjust outcome if applied without reasonable consideration and due care."  *Id.* (internal quotations omitted).  Thus, "its application may be unwarranted" where "its three primary purposes"—"(1) preserving the integrity of the judicial system by preventing inconsistent judicial outcomes; (2) promoting judicial economy by preventing previously litigated issues from being relitigated; and (3) protecting litigants from harassment by vexatious litigation"—"would not be served."  *Id.* (internal quotation omitted).

Applying collateral estoppel to SKAT's claims against the ED&F bellwether defendants will not prevent inconsistent judicial outcomes.  To the contrary, the reasoning on which the High Court of Justice relied in dismissing SKAT's claims against ED&F is entirely inconsistent with this Court's previous revenue rule decision, *see generally In re SKAT*, 356 F. Supp. 3d at 300, and was overturned on appeal and so is no longer even good law in England.  (Dillman Decl. Ex. 141 ¶¶ 126-46.)  The English Court of Appeal held that Dicey Rule 3 was no bar to SKAT's claims to "recover monies which had been abstracted from SKAT's general funds by

fraud," *i.e.*, the same claims SKAT asserts against the defendants in the ED&F bellwethers. (Dillman Decl. Ex. ¶ 128.)[30]

Nor will application of collateral estoppel prevent issues from being relitigated because, as discussed above, the U.S. and English revenue rule issues are distinct. And SKAT's litigation against the ED&F bellwether defendants in this Court, while it pursued claims against ED&F in England, is neither "harassment" nor "vexatious." *See Gudmundson*, 232 P.3d at 1069 (plaintiff "could not involve third-party defendants in her workers' compensation adjudication even if she had so desired," so "her subsequent lawsuit against defendants was neither a waste of judicial resources nor an attempt to harass the defendants through vexatious litigation").

## II.  Defendants' motion for summary judgment on the ground that defendants made no false statements to SKAT should be denied.

Next, defendants argue that all SKAT's claims should be dismissed because defendants supposedly made no "actionable" false statements to SKAT. (Defs. Br. 45-57.) According to defendants, the representations of share ownership and the defendant plans' tax-exempt status are "inactionable legal conclusions" and were "objectively reasonable." (Defs. Br. 46-54.) And, defendants argue, SKAT cannot prove that any of those representations or the representations that the plans received dividends and suffered withholding tax are false. (Defs. 54-57.) Defendants' arguments fail on all counts.[31]

---

30. Indeed, on June 6, 2022, SKAT sent ED&F a Letter Before Action notifying ED&F that SKAT intends to assert fraud claims against ED&F, which under the English Court of Appeal's decision are not barred by Dicey Rule 3, based on information that ED&F failed to disclose in the English litigation but produced to SKAT in this litigation.

31. Contrary to defendants' argument, an actionable false statement is not an element of SKAT's restitution claims. (Defs. Br. 45 n.40.) Further, defendants fail to explain why SKAT's restitution claims should be dismissed even if the representations of share ownership and the plans' tax-exempt status were false, and so the plans were not entitled to the money SKAT paid, just because SKAT's fraud claims are supposedly inactionable—which they are not.

A.    **The defendants' false statements that the plans were the owners of shares and dividends and tax-exempt are actionable.**

First, defendants argue that the plans' misrepresentations of beneficial ownership and tax-exempt status in the refund applications "are not actionable as a matter of law because they are legal conclusions rather than statements of fact." (Defs. Br. 46-49, 53-54.)  But, as an initial matter, with the respect to the representations of share ownership and dividend receipt, the reason that the representations were false does not turn on the intricacies of Danish law on beneficial ownership.  In the Solo bellwethers, the plans did not own shares or receive dividends in any sense as the shares they claimed to own and the dividends they claimed to have received did not exist.  (SKAT Mem. 12-20.)  Likewise, in the ED&F bellwethers, there were no shares or dividends in the plans' cum-ex trades that the plans could have owned, beneficially or otherwise, and with respect to the cum-cum trades, the plans transferred to ED&F all right, title and interest in any such shares and dividends.  (*Id.* at 22-34, 55-58.)

In any event, the distinction between "legal conclusions" and "statements of fact" on which defendants rely is illusory.  (Defs. Br. 46.)  New York law long ago "outgr[ew] the over-simple dichotomy between law and fact in the resolution of issues in deceit."  *Nat'l Conversion Corp. v. Cedar Building Corp.*, 23 N.Y.2d 621, 627 (1969); *see also id.* (recognizing "sharp distinction between a pure opinion of law" and "a mixed statement of fact as to what the law is or whether it is applicable").  Thus, "a statement as to the law, like a statement as to anything else, may be intended and understood either as one of fact or one of opinion only, according to the circumstances of the case."  *Id.* (internal quotations omitted).  The rule is the same under Florida and Utah law.  *See Chino Elec., Inc. v. U.S. Fidelity & Guar. Co.*, 578 So.2d 320, 323 (Fla. Dist. Ct. App. 1991) ("the modern trend of cases is to find statements of fact implied in otherwise material misrepresentations which have some legal character"); *Demarco v. LaPay*,

35

No. 2:09-CV-190 TS, 2009 WL 3855704, at *10 (D. Utah Nov. 17, 2009) ("if a misrepresentation of law includes, either expressly or by implication, a misrepresentation of fact, it is justifiable to rely on the misrepresentation of fact as if it were like any other misrepresentation of fact").[32]

Even to the extent they could be considered mixed statements of law and fact, the plans' representations of share ownership included in tax refund applications submitted to the Danish government "exemplify ideally an instance in which the statements are not intended or understood merely as an expression of opinion." *Nat'l Conversion Corp.*, 23 N.Y.2d at 628. The same is true with respect to the representations that the plans were tax-exempt under U.S. law. All the defendants' false statements of share ownership and tax-exempt status were supposedly evidenced by supporting third-party documents included in the refund applications, issued by the Solo Custodians or ED&F for share ownership and the Internal Revenue Service with respect to the plans' tax-exempt status. (Joint 56.1 ¶¶ 92, 172-203, 359-60, 368-69.) Whether these representations were of "mixed questions of fact and law" or otherwise had "some legal character" is of no moment because under the circumstances, a reasonable jury could easily conclude they were intended as statements of fact, not opinion. *See AIU Ins. Co. v. Deajess Med. Imaging, P.C.*, 24 Misc.3d 161, 169 (Sup. Ct. Nassau Cty. 2009) (misrepresentation as to

---

32. *See also Drew v. Pacific Life Ins. Co.*, 496 P.3d 201, 227 n.22 (Utah 2021) (citing favorably Restatement (Second) of Torts § 525) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act . . . is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation" (emphasis removed))); *Gadd v. Olson*, 685 P.2d 1041, 1044 (Utah 1984) (recognizing exception to "general rule that misrepresentations of law . . . do[] not constitute remedial fraud . . . . [w]here the speaker sustained a confidential relation toward the hearer, or possessed superior means of information, or wilfully mislead him into a misconception of his rights and liabilities." (emphasis removed; internal quotations omitted)).

"eligibility of a professional corporation for no fault reimbursement"—"a mixed question of fact and law"—"may provide the basis for a fraud cause of action").[33]

The cases on which defendants rely are not to the contrary. *Cucchiaro v. Cucchiaro* recognized that "a fraud action" may "be based upon a false 'mixed statement of fact as to what the law is or whether it is applicable,'" so does not support defendants' argument. 627 N.Y.S.2d 224, 229 (Sup. Ct. Orange Cty. 1995) (quoting *Nat'l Conversion Corp.*, 23 N.Y.2d at 627)). Other cases on which defendants rely predate the New York Court of Appeals' recognition in *Nat'l Conversion Corp.* that legal conclusions may form the basis for fraud claims and so are no longer good law to the extent they held to the contrary. *See Lefferts v. Lefferts*, 243 A.D. 278, 279 (1st Dep't 1935); *Magalnick v. Empire State Mut. Life Ins. Co.*, 180 N.Y.S.2d 575, 576 (2d Dep't 1958); *Zuyder Zee Land Corp. v. Broadmain Bldg. Co.*, 86 N.Y.S.2d 827, 828 (Sup. Ct. N.Y. Cty. 1949); *Abraham v. Wechsler*, 200 N.Y.S. 471, 472 (Sup. Ct. N.Y. Cty. 1923).

And in *DirecTV, Inc. v. Lewis*, the Court simply stated, in dicta, that DirecTV's "expression of its *opinion*" that possession of an "unlooper" device is illegal was not actionable. No. 03-CV-6241-CJS-JWF, 2005 WL 1006030, at *11 (W.D.N.Y. Apr. 29, 2005) (emphasis added).[34] Unlike DirecTV's statement about "unloopers," the defendants plans' representations

---

33. Further, even "a false opinion of law if misrepresented as a sincere opinion, as in the case of any other opinion," is actionable. *Nat'l Conversion Corp.*, 23 N.Y.2d at 628. As such, even if defendants' representations of beneficial ownership and tax-exempt status are understood as opinions, whether they were sincerely held presents a question of fact precluding summary judgment. *See, e.g.*, *Green v. Gaskell*, No. 87 CIV. 3861 (CSH), 1988 WL 78373, at *2 (S.D.N.Y. Jul. 18, 1988) ("communication of a legal opinion regarding the vulnerability of a corporation to veil piercing claims can, under certain circumstances, form the basis of an action for common law fraud in New York").

34. *DirecTV's* holding was that the defendant's fraud counterclaim fell to be dismissed because it was "nothing more than a malicious prosecution claim pleaded as a fraud claim," and so could not "successfully be maintained" as a counterclaim in the same action alleged to be "instituted wrongfully." *Id.* (internal quotation omitted). Thus, the Court's subsequent observation that DirecTV's representation that possession of an "unlooper" is illegal was in fact true, "or if not, then DirecTV's expression of its opinion that its possession is illegal is not an opinion that can form the basis for a fraud claim" is best understood as dicta. *Id.* Further, *DirecTV* relied exclusively on cases predating *Nat'l Conversion Corp*. *Id.* (citing *Magalnick*, 180 N.Y.S.2d at 575; *Zuyder Zee Land Corp.*, 86 N.Y.S.2d at 828-29).

of share ownership and tax-exempt status in tax refund applications submitted to Denmark were statements of fact, not expressions of opinion.[35]

## B. SKAT is not required to prove that the defendants' purported interpretations of applicable law were objectively unreasonable.

Second, defendants argue that that their representations of the plans' share ownership and tax-exempt status "cannot as a matter of law be false" because they were "objectively reasonable" interpretations of law. (Defs. Br. 49-54.) But defendants base this argument on inapposite criminal cases discussing the government's burden of proof in prosecutions involving false statements made in response to ambiguous reporting requirements. For instance, in *United States v. Harra*, the Court held that "[w]hen a defendant is charged with false reporting based on an ambiguous reporting requirement," the "prosecution's burden at trial as to the element of falsity" is to prove that the government's "interpretation of the reporting requirement is the only objectively reasonable interpretation or that the defendant's statement was also false under the alternative, objectively reasonable interpretation." 985 F.3d 196, 204 (3d Cir. 2021).[36]

Defendants argue that this burden of proof is "merely a gloss on what it means for a statement to be false" and there is "no reason" it should not apply to SKAT's claims. (Defs. Br.

---

35. Defendants' other cases are inapposite as they involved representations concerning the meaning of terms in a contract to which both parties had equal access. *See Charid Props., Inc. v. Berger*, 37 A.D.2d 987, 987 (2d Dep't 1971); *Netherby Ltd. v. G.V. Licensing, Inc.*, No. 92 Civ. 4239 (MBM), 1993 WL 463679, at *4 (S.D.N.Y. 1993).

36. *Accord United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) ("In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of law."); *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994) ("In cases arising under 18 U.S.C. § 1001, which criminalizes making false statements to a government agency, the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous."). *United States v. Connolly* is also inapposite because in that case the Court reversed the defendants' convictions not because the reporting requirement was ambiguous, but rather because it disagreed with the government's interpretation of it. 24 F.4th 821, 839 (2d Cir. 2022). In particular, the Court held that the "BBA LIBOR Instruction" at issue called for the submission of rates at which the bank "could have borrowed," and "the government failed to show that [the] trader-induced LIBOR submissions did not reflect rates at which [the bank] could have borrowed." *Id.*

49-50.)  As the *Harra* Court explained, however, the prosecution's burden in these cases is based on the "due process principle," inapplicable here, that "potential defendants be given 'fair warning' of what conduct could give rise to criminal liability."  985 F.3d at 212.  Thus, SKAT does not bear the burden to prove defendants' purported interpretations of applicable law were objectively unreasonable.

Even if it did, whether the defendants' purported interpretations of applicable law—under which they owned non-existent shares and dividends or shares and dividends in which they previously transferred all their ownership interest, and their sham pension plans were tax-exempt under U.S. law—were objectively reasonable would at best present a fact issue precluding summary judgment.  *Id.* at 215 ("disagree[ing]" with government's argument "that reasonableness must be a question of law for the judge, not the jury").  In the New York Solo and Utah bellwethers, the plans' own agreements with Goal defined "beneficial owner(ship)," contrary to defendants' purportedly reasonable interpretation of the term, as the "individual or entity who is the legal and registered owner of a security."  (*See, e.g.*, Second Weinstein Decl. Ex. 236 at 1.)  None of the bellwether defendant plans were the "legal and registered" owners of any Danish shares.

### C. The refund applications included false representations of share ownership, dividend receipt, suffering of withholding tax and tax-exempt status.

Finally, defendants argue that SKAT cannot prove that the refund applications included any false statements.  (Defs. Br. 54-57.)  But the evidentiary record demonstrates conclusively that defendants' representations in the refund applications that the plans owned Danish shares on which they received dividends, net of withholding tax, all were false.  (SKAT Mem. 12-34, 55-

58.)  And there is abundant evidence in the record from which a reasonable jury could conclude that defendants' representations that the plans were tax-exempt under U.S. law were too.

### 1. Defendants' representations that the plans owned Danish shares, received dividends and suffered withholding tax were false.

As SKAT demonstrated in moving for partial summary judgment on its restitution claims and the false statement element of its fraud and negligent misrepresentation claims, the defendants' tax refund applications all included false representations that the plans owned Danish shares on which they received dividends, net of withholding tax.  (*Id.*)  In the Solo bellwethers, these representations were false because no such shares or dividends existed, so necessarily no withholding tax was suffered either.  (*Id.* at 12-20.)  And the defendant plans in the ED&F bellwethers likewise suffered no withholding tax because there were no dividends in the cum-ex trades and they transferred all right, title and interest in dividends paid on shares from the cum-cum trades to ED&F.  (*Id.* at 22-34, 55-58.)

With respect to the Solo bellwethers, the best defendants can muster is that the representations and dividend credit advices included in the refund applications were supposedly literally true because all they said was that the plans' Solo Custodian accounts had been credited with "net dividends" issued on Danish shares, not that any such Danish shares or dividends in fact existed.  (Defs. Br. 54-55.)  But the refund applications in fact were explicit in representing that the plans purportedly had suffered Danish withholding tax, and so necessarily owned actual Danish shares on which actual dividends had been paid.  (*See, e.g.*, Weinstein Decl. Exs. 172-76 (Goal cover letters enclosing refund application "together with evidence of payment and tax deduction paid on the above client's securities"); *id.* Ex. 177 (Syntax cover letter enclosing application "for a complete refund of Danish Dividend Tax that was previously withheld in relation to their Investments"); SKAT's 56.1 ¶¶ 124(a), 128(a).)

For the ED&F bellwethers, despite the clear evidence of falsity in the record, defendants argue that SKAT somehow has "an insurmountable evidentiary hurdle" and "no admissible evidence" of falsity. (Defs. Br. 56.) But the plans' agreements with ED&F, the admissibility of which is not in question, show that the representations of share ownership and dividend receipt based on the cum-cum trades were false because the plans transferred to ED&F all ownership interest in any shares and dividends.

With respect to the representations based on the cum-ex trades, a plethora of evidence demonstrates their falsity. That evidence includes the trading records ED&F and the plans produced in this litigation, on which defendants themselves rely to show the plans purportedly received dividends, net of withholding tax, and from which alone SKAT's expert concluded that they in fact did not. (Weinstein Decl. Ex. 91 ("Initial Wade Report") ¶¶ 92-93, 160-166, App'x B.) And with respect to the representations based on the so-called Annex E vouchers in particular, the evidence also includes the admissible testimony of ED&F's Rule 30(b)(6) witness Andrew Wall and ED&F's admissible reports to the FCA admitting the vouchers were false.

### i. The testimony of ED&F's Rule 30(b)(6) witness admitting the falsity of the Annex E vouchers is admissible.

Defendants and ED&F implicitly argue that the testimony of ED&F's Rule 30(b)(6) witness admitting the falsity of the Annex E vouchers is inadmissible because the witness supposedly lacked "personal knowledge of any falsities," presumably because he did not work "on ED&F's trading desk" at the time of the plans' purported trading. (Defs. Br. 56.) But the fact that Mr. Wall did not work on the trading desk does not preclude him from having personal knowledge of the falsity of the Annex E vouchers. Indeed, "it is axiomatic that a corporate representative may testify . . . based on knowledge gained from a review of corporate books and

records," and that is exactly what Mr. Wall did here. *Pace v. Air & Liquid Sys. Corp.*, 171 F.

Supp. 3d 254, 272 (S.D.N.Y. 2016) (internal quotation omitted).[37]

In particular, Mr. Wall testified that each of the Annex E vouchers were false because

"[a]t the time the trade was executed by [ED&F Dubai] by . . . selling of the shares to the

pension plan, [ED&F Dubai] did not own the shares to sell . . . on that date." (Weinstein Decl.

Ex. 87 (Wall Dep.) at 55:10-21.)[38] The "Annex E Vouchers in relation to [ED&F Dubai] are

incorrect," Mr. Wall further explained, "in that they mention the withholding tax amount

suffered on the dividend payment," but "[t]here was no dividend paid in the case of [ED&F

Dubai], so there was no tax paid." (Second Weinstein Decl. Ex. 221 (Wall Dep.) at 87:18-88:1.)

Mr. Wall was explicit that his understanding as to why the Annex E vouchers were false

was based on his review of ED&F's business records. (*See e.g.*, *id.* at 89:1-4 ("To my

understanding, looking at the documents in preparation for today, the issue was that [ED&F

Dubai] short sold shares that they didn't have.").) Further, Mr. Wall's testimony that the Annex

E vouchers were false is supported by the other evidence, *i.e.*, ED&F's trading records on which

defendants themselves rely and that are admissible under the business records exception to the

rule against hearsay and ED&F's FCA reports. *See Societe Genarale Energie Corp. v. N.Y.

Marine & Gen. Ins. Co.*, 368 F. Supp. 2d 296, 299 n.3 (S.D.N.Y. 2005) (rejecting argument that

---

37. *See also id.* (holding that "to the extent [corporate representative's affirmation] is based upon his review of [company's] books and records, or other documents he reviewed in his official capacity as corporate representative, it can be considered" on motion for summary judgment (internal quotation omitted); *OneWest Bank, N.A. v. Guerrero*, No. 14-cv-3754, 2018 WL 2727891, at *5 (S.D.N.Y. June 6, 2018) (affiant acquired "sufficient personal knowledge" "by examining relevant business records"); *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461-62 (S.D.N.Y. 2000) ("corporate officer" "had personal knowledge of the facts about which she testified" based on her review of "administrative materials and files" and company "policy").

38. ED&F produced Mr. Wall to testify pursuant to the Court's decision finding its first Rule 30(b)(6) witness insufficiently prepared to testify on the designated topic of the Annex E vouchers, among other topics. *See In re Customs & Tax Administration of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, No. 18-md-2865 (LAK), 2021 WL 6064793, at *3 (S.D.N.Y. Dec. 22, 2021).

"evidence [was] not based on personal knowledge" where "testimony was given by a Fed.R.Civ.P. 30(b)(6) witness who testified to the defendant organization's knowledge, and [was] supported by documentary evidence").

> ii. **ED&F's FCA reports admitting the falsity of the Annex E vouchers are admissible under the residual exception to the rule against hearsay.**

ED&F's reports to the FCA admitting that the Annex E vouchers were false are likewise admissible.  Under the residual exception, "a hearsay statement is not excluded by the rule against hearsay" if "(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  Fed. R. Evid. 807(a)(1)-(2).  Thus, "[t]o be admissible pursuant to the residual exception, the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice."  *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991).

ED&F's FCA reports easily meet all the requirements.  ED&F's statements in the reports admitting to its regulator that it wrongly issued false tax vouchers have sufficient guarantees of trustworthiness in that ED&F would not likely have made them if they were not true.  *See Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Bernard L. Madoff)*, 528 F. Supp. 3d 219, 234 (S.D.N.Y. 2021) ("plea allocutions" were admissible under residual exception "due to the 'sufficient guarantees of trustworthiness' . . .  when a defendant is admitting facts against the defendant's own penal interest under oath" (quoting Fed. R. Evid. 807)).  Indeed, ED&F made the reports to the FCA in furtherance of its duty under English law to "deal with" the FCA "in an open and cooperative way" and "disclose to the FCA appropriately anything relating to the firm

of" which the FCA "would reasonably expect notice."[39]  And the truthfulness of the explanations in the FCA reports are corroborated by the testimony of ED&F's Rule 30(b)(6) witness and the trading records ED&F produced.

ED&F's FCA reports undoubtedly are "material" and highly "probative" because they bear on a central issue in this case, *i.e.*, whether the ED&F bellwether defendant plans in fact received the dividends and suffered the withholding tax as they represented in their refund applications.  *Parsons*, 929 F.2d at 907.  And the interests of justice are best served by the reports' admission.  "One of the principal purposes of the Federal Rules of Evidence is to 'ascertain the truth and secure a just determination.'"  *United States v. Prevezon Holdings, Ltd.*, 319 F.R.D. 459, 468 (S.D.N.Y. 2017) (quoting Fed. R. Evid. 102).  The Court should not countenance ED&F's attempt to subvert that principal by arguing that there is no admissible evidence showing the falsity of tax vouchers it has repeatedly admitted were false in this Court, before the English courts, to its English regulator and in sworn deposition testimony.  "Against that backdrop, the purposes of the rules of evidence and the interests of justice are served" by admitting the FCA reports under the residual exception.  *Id.* at 468.

### 2. Defendants' representations that the plans were tax-exempt were false.

Each of the defendants' tax refund applications also represented falsely that the plan was tax-exempt under U.S. law and so entitled to a full refund in the first place.[40]  Defendants argue

---

39. PRIN 2.1(11), FCA Handbook, FINANCIAL CONDUCT AUTHORITY, https://www.handbook.fca.org.uk/handbook/PRIN/2/1 html (last visited June 6, 2022).

40. Defendants argue that under the U.S.-Denmark tax treaty, U.S. "pension funds" are not required to be tax-exempt to be entitled to a full refund of withheld tax on dividend income, (Defs. Br. 54), but as the U.S. Department of Treasury's Technical Explanation to the treaty makes clear, for the purpose of the treaty, U.S. "pension funds" "are the tax-exempt organizations described in subparagraph 1(b)(ii) of Article 4 (Residence)." (Pilgaard Decl. Ex. 41 (Dep't of Treasury Technical Explanation) at 65 (Art. 22(2)(e))); *see also Blue Ridge Invs., LLC v. Republic of Arg.*, 902 F. Supp. 2d 367, 377 (S.D.N.Y. 2012), *aff'd sub nom. Blue Ridge Invs., L.L.C. v. Republic of Arg.*, 735 F.3d 72 (2d Cir. 2013) (courts "look beyond the written words to the history of

that the tax refund applications payment agent Goal submitted to SKAT on behalf of the defendants in the New York Solo and ED&F bellwethers did not include any representation that the plans were tax-exempt under U.S. law.  But each refund application included a Form 6166 issued by the IRS certifying that "to the best of [its] knowledge" the plan was tax-exempt.  (Joint 56.1 ¶¶ 92-93, 359-60, 368-69.)  And in submitting the applications seeking a full refund of supposedly withheld tax, each of the defendant plans implicitly represented that it met the requirements to be entitled to such a refund, *i.e.*, that it was tax exempt under U.S. law.  *See AIU Ins. Co.*, 24 Misc.3d at 171 ("in submitting no fault claims" defendants "impliedly represented that they were wholly-owned by licensed physicians").[41]

Nor, as defendants contend, do the IRS's forms establish that the plans were tax-exempt. (Defs. Br. 54.)  The forms are explicit that the IRS's certification is only to the "best of [its] knowledge."  (*See, e.g.*, Bahnsen Decl. Ex. 82 at SKAT_MDL_001_00056867.)  And the IRS's knowledge of the plans was limited.  The IRS's statements concerning the plans' tax-exempt status in the Form 6166 were based on representations the plans' trustees or other authorized representatives made to the IRS in Form 8802s, under penalty of perjury, that the plans were qualified plans under section 401(a) of the Internal Revenue Code ("IRC").  (*See, e.g.*, Second Weinstein Decl. Ex. 264 (Basalt Ventures Form 8802).)[42]

---

the treaty, the negotiations, and the practical construction adopted by the [signatory] parties' in determining the meaning of a treaty provision.").

41.  *See also Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 402 (E.D.N.Y. 2010) ("New York courts have, on occasion, recognized fraud claims premised on implied or implicit representations").

42.  Nor do the determination letters the IRS issued stating that the plans "were qualified as to form" show that the plans in fact were tax-exempt under U.S. law.  (Defs. Br. 5.)  The IRS's determination letters explicitly state that its "opinion on the acceptability of the form of the plan is not a ruling or determination as to whether an employer's plan qualifies under Code section 401(a)" and that "[t]he terms of the plan must be followed in operation."  (Wagner Report ¶¶ 120-22.)

Thus, when the IRS issued its certifications, it was unaware that the plans were not operating in accordance with U.S. law for qualified pension plans, which requires, among other things, that plans be (1) created and operated for the exclusive benefit of the plan's participants; (2) funded from the business activities of their sponsors; and (3) intended to be permanent as opposed to temporary programs. Numerous genuine issues of disputed fact as to whether the bellwether plans failed one or more of these requirements preclude summary judgment on the bellwether plans' tax-exempt status.

In particular, under section 401(a) of the IRC, pension plans must be created and operated for the exclusive benefit of the plans' participants and their beneficiaries. 26 U.S.C. § 401(a); Wagner Report at ¶¶ 93-96. There is at least a genuine issue of material fact as to whether the bellwether defendant plans complied with this requirement because all the plans paid most, and in some cases the overwhelming majority, of SKAT's payments on their refund applications to Sanjay Shah's Ganymede or other defendants in the case of the Solo bellwether plans[43] and ED&F and Acer in the case of the ED&F bellwether plans.[44] These payments grossly exceeded industry norms, thus violating the exclusive benefit rule. (Wagner Report ¶ 112 ("Typically, fees in excess of 20% of profits may be considered unreasonable by the IRS and/or the DOL.").) Further, the Solo bellwether defendant plans were all formed for the purpose of participating in

---

43. The RJM Capital plan paid Ganymede 66 percent of the "refunds," the Basalt Ventures and Roadcraft Technologies plans paid Ganymede 75 percent, and the FWC Capital and Proper Pacific plans paid Ganymede at least 95 percent. (Joint 56.1 ¶¶ 204-206; Weinstein Decl. Ex. 79 (R. Markowitz Dep.) at 451:18-453:18, Ex. 115; id. Ex. 116; id. Ex. 117 at FWCCAP00000225-26, FWCCAP00000409, FWCCAP00000410; id. Ex. 120 at PROPPACIF00000142-44, PROPPACIF00000319, PROPPACIF00000320.) The Roadcraft Technologies plan further paid 95 percent of its 25 percent share of SKAT's payments to defendants Markowitz and Klugman's trusts pursuant to a partnership agreement. (Second Weinstein Decl. Ex. 291; id. Ex. 279 at MPSKAT00008784; id. Ex. 287 at RC00000101.)

44. Both the AIG and Riverside plans paid approximately 95 percent of the net profit from each structured transaction to ED&F and Acer. (SKAT 56.1 ¶¶ 130-133; Second Weinstein Decl. Ex. 208 (Kaminer Dep.) at 327:22-329:13.)

the fraud, and so primarily for the purpose of benefitting Shah, and in the case of the Roadcraft

Technologies plan, other defendants too, not the plan participants.  (Weinstein Decl. Ex. 79

(Markowitz Dep.) at 137:19-138:21 (RJM plan); *id.* Ex. 80 (Lehman Dep.) at 393:5-15 (FWC

plan); Second Weinstein Decl. Ex. 273; *id.* Ex. 218 (van Merkensteijn Dep.) at 172:17-174:5

(Basalt and Roadcraft plans); *id.* Ex. 202 (Bradley Dep.) at 307:10-313:8 (Proper Pacific plan).)

Further, there is a genuine issue of material fact as to whether the plans met the IRC's

requirement that the plans be funded from the trade or business of the plan's sponsor and as to

whether any of the plans' sponsoring companies even had any such trade or business.  26 U.S.C.

§ 401(a).  For instance, the FWC and Proper Pacific Plans conducted no business whatsoever.

(Second Weinstein Decl. Ex. 286 at Resp. No. 15; Wagner Report ¶ 81.)  And, according to

defendant van Merkensteijn, the Basalt Ventures plan's sponsoring company's income consisted

of circular payments between van Merkensteijn's companies and defendant Markowitz's

companies, in which each paid the other's companies $100,000, and purported "management"

fees from another defendant plan.  (Second Weinstein Decl. Exs. 267, 271, 218 (van

Merkensteijn Dep.) at 280:22-290:15.)  Likewise, the Roadcraft Technologies plan's sponsoring

company purportedly earned "income" solely from "consulting services" it supposedly provided

to one of van Merkensteijn's entities.  (*Id.* Exs. 284, 243 at RA00001967-68.)  These related-

party transactions do not constitute the legitimate business income required by the IRC.  (*Id.* Ex.

226 (Expert Rebuttal Report of Marcia S. Wagner, dated Feb. 1, 2022) at ¶ 11 n.12; *id.* Ex. 227

(Expert Reply Report of Marcia Wagner, dated February 28, 2022 ("Wagner Reply")) at ¶ 36.)[45]

---

45.  With respect to the ED&F bellwether defendant plans, at the time of its formation, the AIG plan's sponsoring
entity was not conducting any business.  (SKAT's 56.1 ¶ 57; Second Weinstein Decl. Ex. 204 (Crema Dep.) at
163:23-165:12.)  And the Riverside plan was funded with a one-time $200,000 payment from a friend of the
plan's participant.  (Joint 56.1 ¶ 267; SKAT Supplemental 56.1 ¶¶ 58-59; Second Weinstein Decl. Ex. 213 (D.
Schulman Dep.) at 46:18-50:3.)

Finally, there is a disputed issue of material fact as to whether the Solo bellwether

defendant plans complied with the IRC's requirement that the plans be created with the intention

that they be permanent, not temporary.  26 CFR 1.401-1(b)(2); Wagner Report at ¶¶ 100-102,

135-137, 148-149.  In the Solo bellwethers, all the plans were created just a few weeks or months

before they began participating in the fraud.  (Wagner Report ¶¶ 135-137, 148-149.)  And the

FWC Capital plan, for instance, was terminated in 2016, less than a year after the fraud ended.

(*Id*. at ¶ 148.)  The Proper Pacific plan likewise was effectively abandoned after the fraud ended.

(*Id*.)  And defendant Altbach, the sole participant and trustee of the Roadcraft Technologies plan,

does not even know whether it still exists.  (Wagner Report ¶ 135; Second Weinstein Decl. Ex.

201 (Altbach Dep.) at 230:15-18.)[46]

### III.   Defendants' motion for summary judgment on the ground that the amounts SKAT paid did not belong to it should be denied.

Defendants argue that all SKAT's claims stand to be dismissed because an element of

each is that SKAT suffered injury and it was the Kingdom of Denmark, not SKAT, that was

injured by defendants' fraud.  (Defs. Br. 56-57.)  This argument fails for the same reason the

defendants' previous motion to dismiss SKAT's claims for lack of standing failed: the Kingdom

of Denmark and SKAT are not separate legal entities.  (Andersen Decl. ¶¶ 97-128.)

---

46. Nor is there any merit to defendants' suggestion that an IRS audit of the RJM Capital plan demonstrates that the plan operated in accordance with the IRC's requirements.  (Defs. Br. 5.)  The audit was limited to whether the plan's 2016 Form 5500-EZ—the annual return that single participant plans are required to file in certain circumstances—was proper.  (Wagner Reply ¶ 31; *see also About Form 5500-EZ*, IRS, https://www.irs.gov/forms-pubs/about-form-5500-ez (last visited June 6, 2022)).  The "no change" letter the IRS issued at the audit's conclusion states only that the IRS accepted the return as filed.  (Wagner Reply ¶ 31.)  The "scope of an IRS audit examination rarely covers all the conditions for tax qualification and IRS determinations are correspondingly narrowed."  (*Id*.)  Further, the record is unclear as to whether the IRS was aware of critical facts showing that the RJM Capital plan violated the IRC's requirements for tax-exempt pension plans, such as that the plan paid Ganymede 66 percent of the payments the plan received from SKAT.  (*Id*. at ¶¶ 31-35.)

In moving to dismiss SKAT's claims for lack of standing, defendants made the same argument that SKAT was merely the Kingdom of Denmark's agent in collecting tax and so itself suffered no injury from defendants' fraud.[47]  In response, SKAT explained that the premise of defendants' argument, *i.e.*, that SKAT is a separate legal entity distinct from the Kingdom of Denmark, was false.[48]  And the Court denied defendants' motion "for substantially the reasons" SKAT "stated."  (Pretrial Order No. 13, ECF No. 243.)  While defendants now argue that SKAT cannot prove an element of its claims, rather than that it lacks standing to assert them, the result is the same.

## IV.  Defendants' motion to dismiss certain of SKAT's claims as time-barred should be **denied.**

Defendants argue that under Denmark's limitations period, made applicable in the New York Solo and ED&F bellwethers by New York and Utah's respective borrowing statutes, SKAT's claims in those actions based on refunds it paid before January 2015 are untimely. (Defs. Br. 58-70.)[49]  Further, defendants argue, some of SKAT's unjust enrichment claims in the New York Solo bellwethers are time-barred.  (Defs. Br. 71.)  Neither argument has merit.

### A.  Defendants' motion for summary judgment on the ground that certain of SKAT's claims are time-barred under Danish law should be denied.

Under Danish law, the statute of limitations for all SKAT's claims is three years. (Andersen Decl. ¶ 135.)  The limitations period generally runs from "the earliest point in time whe[n] the claimant could claim satisfaction of its claim."  (*Id.* ¶ 139 (emphasis removed).)  But

---

47.  *See generally* Defs.' Mem. of Law in Support of Their Mot. to Dismiss the Compls. Pursuant to Fed. R. Civ. P. 12(b)(1), ECF No. 135.

48.  *See generally* Pl. Skatteforvaltningen's Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Compls., ECF No. 158.

49.  Defendants do not argue that the Danish limitations period applies to SKAT's claims in the Florida Solo bellwether.

when the plaintiff is unaware of its claim or the debtor, the limitations period is suspended until

the plaintiff "became aware or should have become aware of its claim" against the defendant.

(*Id*. ¶ 150 (emphasis removed).)  The Danish law "test for whether the claimant 'should have'

become aware of its claim against a defendant is whether the claimant had sufficient information

for a prudent person acting in the claimant's shoes to assess the basis for its claim against the

defendant." (*Id*.)  Determining when SKAT should have become aware of its claims against

each of the bellwether defendants is a fact-intensive inquiry under Danish law that "depend[s] on

the particular circumstances in relation to each claim" against each defendant.  (*Id*. ¶ 188.)

Nonetheless, defendants argue that all SKAT's claims based on payments it made over

three or four years (depending on whether the parties entered into a tolling agreement with

respect to SKAT's claims in the particular case) before it filed its complaints are time-barred as a

matter of Danish law because SKAT should have been aware of its claims against all the

defendants immediately or at least no later than January 2015.  (Defs. Br. 69-70.)  That is so,

defendants argue, because Danish law imposes on SKAT a "legal obligation, known as the

inquisitorial procedure, to ascertain all relevant information before taking official action," there

supposedly were "flashing red warnings" of defendants' fraud from before it even started, and

the overall volume of tax refunds SKAT paid purportedly should have alerted it to the fact that

defendants were not entitled to the tax refunds they claimed.  (*Id.* 61-69.)

Defendants' argument ignores a substantial body of Danish case law applying the law on

suspension of the statute of limitations to SKAT's claims against Danish taxpayers.  Under that

case law, where, as here, a defendant has withheld from SKAT the information necessary to alert

SKAT to its claim against the defendant, the three-year limitations period is not triggered until

SKAT became aware of the relevant information necessary to assess the basis for its claim

against the defendant.  (Andersen Decl. ¶¶ 151-72.)  Danish law does not impose on SKAT a

duty to "make *active investigations* (like police investigations in criminal matters)" of all facially

sufficient tax refund applications it receives "on a presumption that facts of relevance to the case

may be hidden somewhere."  (*Id.* ¶ 155.)  To the contrary, the case law, including the cases on

which defendants' Danish law expert Professor Ørgaard relies, "demonstrates that *only* in such

cases where" the defendant made full disclosure of "the relevant information," such that it "was

already available to" SKAT, "is it reasonable to hold that SKAT had . . . sufficient knowledge"

of its claim to trigger the limitations period "due to its obligation to investigate."  (*Id.* ¶ 156.)

For instance, in U 1936.823 Ø, the Eastern High Court held that SKAT's claims to

recover unpaid wealth tax were not time-barred where the taxpayer reported to SKAT that he

was not obligated to pay the tax over an eight-year period because "he had founded a trust that

had taken ownership of a substantial part of his assets."  (*Id.* ¶¶ 160-61 (emphasis removed).)

SKAT subsequently discovered that the tax was owed for the period because the taxpayer had

received proceeds from the trust.  (*Id.*)  Despite that SKAT had not investigated the taxpayer's

claims earlier and by doing so "would clearly have been informed of its claim," the Court held

that none of SKAT's claims was time-barred.  (*Id.* ¶ 161.)[50]

This case law "clearly shows" that even in instances "where SKAT has been misinformed

. . . to a much *lower degree*" than it was here "(characterized by the fact that SKAT *could*—by

---

50.  Similarly, in TfS 1988 641 V, in November 1979, the taxpayer provided SKAT with "untruthful information
regarding his ownership of . . . government bonds that he had purchased by taking a loan with a stockbroker."
(*Id.* ¶¶ 166-67.)  "SKAT initiated investigations" of "various stockbrokers regarding" their "practices of loan-
financed bond purchases" in 1980, and in 1983, SKAT visited the stockbroker involved in the relevant
transaction, which at first "refused to hand out the relevant documents," but eventually did so in November
1984.  (*Id.* ¶ 168.)  The Western High Court held that "under these circumstances," SKAT's claim was not time-
barred because "nothing in the information provided by the taxpayer" in 1979 "could have given SKAT reason
to doubt the correctness of the information," and the limitations period for SKAT's claim started in November
1984 when the stockbroker revealed the relevant information to SKAT.  (*Id.* ¶¶ 167-68.)

investigating the file—easily have discovered the 'realities' of the case)," Danish courts still find the limitations period on SKAT's claims suspended until it discovers it has been misinformed. (*Id.* ¶ 183.)  Under Danish law, the "critical question is, at *what point in time* SKAT should have known of th[e] fraudulent information, with the consequence that SKAT at least at that time 'should have' known of its claim against a particular defendant."  (*Id.* ¶ 184.)  Answering that question as to SKAT's claims against each defendant in the bellwether cases requires "evidence," which defendants fail to provide, "of *when* SKAT became aware of—or should have been aware of—its possible claim for damage in regard to that *individual* case."  (*Id.* ¶ 188.)

None of defendants' "red flags," from years before defendants first submitted to SKAT any fraudulent tax refund applications and having nothing to do with defendants' fraud, show that SKAT was aware or should have been aware of its claims against any of the bellwether defendants.  (Defs. Br. 63-67.)  For instance, SKAT's chief internal legal officer's 2007 memorandum identified "a legal issue" concerning whether the buyer of borrowed shares is entitled to a tax refund.  (Defs. Br. 63-66.)  But the fraud here was not that the plans purchased borrowed shares; the fraud was that the plans had no shares at all.  And defendants fail to explain how this memorandum, from five years before defendants' fraud and identifying a "legal issue" having nothing to do with their fraud, shows when SKAT should have known that defendants fraudulently claimed in the refund applications that the plans owned shares and received dividends that never existed, or, in the case of some of the ED&F bellwether defendants, to which they had expressly transferred all right, title and interest.

Likewise, the issue that Lisbeth Rømer raised about SKAT's ability "to identify the foreign beneficial owner of the dividends" and the 2010 internal audit report with respect to whether "SKAT might be refunding dividend taxes more than once per dividend," (Defs. Br. 66-

67), concerned a separate method for claiming tax refunds from SKAT, which defendants did not use, called the "bank scheme," whereby Danish banks could apply to SKAT for refunds on behalf of their customers, including foreign banks that held omnibus accounts at Danish banks on behalf of their own customers. (SKAT's 56.1 Resp.¶ ¶ 18, 44, 60.)[51]  None of this is sufficient to show when, as a matter of Danish law, SKAT was or should have been aware of defendants' fraud. (Andersen Decl. ¶ 196.)  On the contrary, Ms. Rømer testified that at no point during her tenure at SKAT, which ended in 2013, did she or anyone else suspect actual fraud in either the form or the bank scheme. (SKAT's 56.1 Resp.¶¶ 17, 21-23, 35-37, 39-40, 43, 54-56, 59.)

Finally, even if as defendants claim, SKAT knew that in 2014 it paid more refunds than tax collected on some unspecified dividend issued by some unidentified Danish company, (Defs. Br. 69), "and even if SKAT should have suspected that such overpayments were due to fraud rather than the timing of when applicants submitted" refund applications or "administrative error," which it had no reason to suspect, that fact alone still does not show when SKAT was aware or should have been aware of its claims against any bellwether defendant. (Andersen Decl. ¶ 197.)  SKAT still "would have to make a specific investigation of each individual claim and obtain the information needed to file the claim against the defendant." (*Id.*)  Further, defendants fail to explain how such knowledge could trigger the limitations period with respect to SKAT's claims arising from its payments of fraudulent refund applications related to other dividends.[52]

---

51. By contrast, in the "form scheme" that defendants used to submit their refund applications, SKAT's application forms required identification of the "owner/usufructuary" or "beneficial owner" of the shares. (*See, e.g.*, Joint 56.1 ¶¶ 172-203.)

52. Defendants also separately argue that all SKAT's claims against defendant Robert Crema, the sole participant in the AIG plan, are time-barred under Danish law because SKAT purportedly knew by October 2016 that Crema was the sole participant in the plan and SKAT did not assert claims against Crema based on his role as sole

**B.** **Defendants' motion for summary judgment on the ground that certain of SKAT's New York law unjust enrichment claims are time-barred should be denied.**

Defendants argue that under New York law, the limitations period for unjust enrichment claims seeking money damages only is three years, so SKAT's claims based on payments it made more than three or four years (accounting for tolling) before it filed its complaints in the New York Solo bellwethers are untimely. (Defs. Br. 71.) "New York's intermediate appellate courts have split," however, "in their treatment of the statute of limitations for unjust enrichment." *City of Almaty v. Sater*, 503 F. Supp. 3d 51, 65 (S.D.N.Y. 2020). The First Department applies a "six-year limitations period when a claim for unjust enrichment rests on facts that also support another claim governed by a six-year statute of limitations, even when the plaintiff seeks damages." *Id.* (citing *Deutsche Bank, AG v. Vik*, 142 A.D.3d 829, 829 (1st Dep't 2016)). The Second Department, on the other hand, follows the rule for which defendants argue and holds that "the three-year limitations period under C.P.L.R. § 214(3) applies to a claim for unjust enrichment whenever a plaintiff seeks monetary relief." *Id.* (citing *Ingrami v. Rovner*, 45 A.D.3d 806, 808 (2d Dep't 2007)). "In essence, the First Department emphasizes the nature of the claim, where the Second Department emphasizes the nature of the remedy." *Id.*

---

participant until March 2020. (Defs. Br. 70 n.62.) But neither the paragraphs in the parties' Joint 56.1 on which defendants rely nor the documents to which those paragraphs cite show that "[b]y October 2016, SKAT knew that Crema was the sole participant of the AIG Plan." (*Id.* (citing Joint 56.1 ¶¶ 390-91); Dillman Decl. Ex. 133.) Thus, defendants fail to demonstrate that SKAT "became aware or should have become aware of its claim[s]" against Crema by that date and that its claims are time-barred as a matter of Danish law. (Andersen Decl. ¶ 150.) Nor are SKAT's fraud claims against Crema untimely under Utah's three-year limitations period because the Utah fraud statute of limitations includes a statutory discovery rule under which SKAT's claims did not "accrue until the discovery by [SKAT] of facts constituting the fraud." Utah Code Ann. § 78B-2-305. That SKAT believed in October 2016 that the AIG plan did not have sufficient capital to purchase the Danish shares identified in its refund applications does not demonstrate that SKAT knew the AIG plans' refund applications were fraudulent by that date. (Defs. Br. 70 n.62.) Indeed, Crema and the AIG plan argue that the plan purchased shares using financing provided by ED&F.

In *Almaty*, the Court expressed "skeptic[ism] of the line of cases in this district," which defendants urge the Court to follow, "that simply recite the Second Department's rule without considering the split of authority or the specific provisions of the New York Civil Practice Law and Rules." *Id.* Considering that split of authority and the specific provisions of the CPLR, the limitations period for SKAT's unjust enrichment claims is six years. SKAT's claims rest on facts that also support fraud, negligent misrepresentation, money had and received, and payment by mistake claims, which defendants concede all are governed by a six-year limitations period under the CPLR. (Defs. Br. 71 n.63.)

## V.  Defendants' other arguments that the Court should dismiss SKAT's claims on summary judgment fail.

### A.  SKAT's actions do not implicate the limits of the Court's equity jurisdiction.

Defendants argue that the Court lacks subject-matter jurisdiction over SKAT's unjust enrichment, money had and received, and payment by mistake claims because they are equitable claims and SKAT has an adequate remedy at law. (Defs. Br. 72-75.) But as an initial matter, SKAT's New York law money had and received and payment by mistake claims, Utah law money had and received claims, and Florida law unjust enrichment and money had and received claims are all actions at law, not in equity. *See In re SKAT*, 356 F. Supp. 3d at 326 (recognizing that New York law money had and received and payment by mistake claims are actions at law, "even though [they] rest on equitable principles"); *see also* SKAT Mem. 39-40, 51-52, 54.

Further, SKAT's New York and Utah law unjust enrichment claims do not implicate the limits of the Court's equity jurisdiction because SKAT does not now seek "an equitable accounting" or "other equitable remedies." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478, 82 S. Ct. 894, 900 (1962). Rather, SKAT seeks "a money judgment," making its claim "unquestionably legal." *Id.* at 476, 899; *see also Miller v. Doniger*, 293 A.D.2d 282, 282 (1st

55

Case 1:18-cv-05053-AKD  Document 830  Filed 06/25/24  Page 69 of 97

Dep't 2002) ("claims for unjust enrichment where award of money would fairly compensate the

party bringing the claim" are "legal in nature"); *Jones v. Mackey Price Thompson & Ostler*, 355

P.3d 1000, 1015 (Utah 2015) ("Restitution is available as a legal remedy where the plaintiff asks

exclusively for monetary relief.").[53]

### B.    The Court should deny defendants' motion for summary judgment on SKAT's New York law payment by mistake claims.

Next, defendants argue that SKAT's New York law payment by mistake claims should be

dismissed on summary judgment because SKAT's payments to defendants "were the product of

conscious—not mistaken—decisions." (Defs. Br. 75-79.) But none of the record evidence

defendants cite shows that SKAT was aware, or even had reason to believe, the defendants were

not entitled to the refunds they claimed when it made the payments, much less that there is no

genuine dispute that was the case.

The cases on which defendants rely demonstrate the shortcomings of their argument. For

instance, in *Est. of Hatch, ex. rel. Ruzow v. NYCO Mins. Inc.*, the court affirmed dismissal of the

claim to recover the supposedly mistakenly paid "royalties" on "mining activities" from 1982 to

1994 because it was "abundantly clear that [the company's] former president . . . had

communicated to [its] lawyers, accountants and parent company as early as 1979, and again in

1982, 'that there was reason to believe'" no royalties were owed. 270 A.D.2d 590, 591 (3d

Dep't 2000). Despite "these notifications," the company "decided to defer any inquiry into the

matter and to 'examine that' issue at a later date." *Id.* Thus, the Court found, the company

---

53. Even if SKAT did seek equitable relief on its unjust enrichment claims, that would not be grounds for their dismissal. As defendants acknowledge, SKAT is pursuing its available legal remedies against the defendants in these actions. *Cf. Dairy Queen*, 369 U.S. at 479, 82 S. Ct. at 900-01 (holding that where action sought legal and equitable relief, "the legal claims involved in the action must be determined prior to any final court determination of respondents' equitable claims"). Further, defendants cite no authority in support of their argument, (Def. Br. 74), that SKAT's unjust enrichment claims should be dismissed because it did not file claims against the defendants in Denmark duplicative of those it filed in U.S. federal courts.

"deliberately assumed the risk that it might be mistaken in its understanding of its contractual obligation," so the case was not one "of money paid by mistake." *Id.*

Likewise, in *ITT World Directories, Inc. v. CIA Editorial de Listas SA*, the Second Circuit affirmed the district court's finding, after a bench trial, that plaintiff failed to prove the "overpayment" was the result of a mistake where there was a dispute over the purchase price under the parties' acquisition agreement, and "the overpayment may well have been the result not of a mistake but of a conscious decision to avoid [the] negotiation and arbitration" called for by the parties' agreement to resolve the dispute. 525 F.2d 697, 702 (2d Cir. 1975); *see also id.* ("for aught that appears in the record, [plaintiff] may well have been willing to pay the full amount in order to expedite performance of the acquisition agreement"). And in *Turner Network Sales, Inc. v. DISH Network L.L.C.*, "[t]he unrebutted evidence" showed that the company made the alleged mistaken overpayments because its "employees, with 'full knowledge of the facts,' decided to do so." 413 F. Supp. 3d 329, 340 (S.D.N.Y. 2019).

Defendants cite no evidence indicating that SKAT made a conscious decision to pay the defendants the "tax refunds" they sought despite knowing, or having reason to believe, that contrary to the representations in the refund applications, the defendant plans never owned Danish shares or dividends and were not qualified U.S. pension plans. Indeed, Ms. Rømer testified that at no point during her tenure at SKAT, which ended in 2013, did she or anyone else suspect actual fraud. (SKAT's 56.1 Resp.¶¶ 17, 21-23, 35-37, 39-40, 43, 54-56, 59.) Rather, defendants essentially argue that SKAT was somehow negligent in relying on their representations and supporting documents in the refund applications, which to this day defendants maintain were accurate. (*See, e.g.*, Defs. Br. 78 ("It is undisputed that SKAT undertook no analysis or investigation of any information contained within the four corners of

the DCAs.")).)  But even if that were so, which it is not, "[t]he principle that a party who pays money, under a mistake of fact, to one who is not entitled to it should, in equity and good conscience, be permitted to recover it back . . . applies even if the mistake is due to the negligence of the payor."  *Mfrs. Hanover Trust Co. v. Chem. Bank*, 160 A.D.2d 113, 117 (1st Dep't 1990).

### C. Defendants' motion for summary judgment on SKAT's negligent misrepresentation claims on the ground that SKAT cannot show reasonable reliance should be denied.

Next, defendants argue that SKAT's negligent misrepresentation claims should be dismissed as a matter of law because SKAT supposedly cannot show reasonable reliance since it purportedly did not attempt to verify the representations in the refund applications that the defendant plans owned Danish shares, on which they received dividends, net of withholding tax. (Defs. Br. 79-82.)[54]  But under both New York and Utah law, the reasonableness of the plaintiff's reliance on the defendant's negligent misrepresentations is generally a fact issue for trial.  *See e.g.*, *Mayaguez S.A. v. Citibank, N.A.*, No. 16 Civ. 6788 (PGG) (JLC), 2022 WL 901627, at *37 (S.D.N.Y. Mar. 25, 2022) ("the general rule is that questions of the reasonableness of reliance raise issues of fact that must be resolved at trial" (internal quotation omitted)); *Paskenta Enters. Corp. v. Cottle*, No. 1:17-cv-00033-JNP-BCW, 2018 WL 522322, at *5 (D. Utah Jan. 22, 2018) ("the question of reasonable reliance is usually a matter within the province of the jury" (internal quotation omitted)).[55]

---

54. Defendants do not argue that SKAT cannot show reasonable reliance on the defendants' misrepresentations that the plans were tax-exempt under U.S. law.  Nor could they.  As the Court previously noted, each of the refund applications "submitted to SKAT included a statement from the Internal Revenue Service certifying that applicants were qualified plans and tax exempt under U.S. law."  *In re SKAT Tax Refund Scheme Litig.*, No. 18-md-2865 (LAK), 2020 WL 7496272, at *3 n.24 (S.D.N.Y. Dec. 21, 2020).  Defendants do not even attempt to "explain how SKAT could have verified this claim."  *Id.*

55. SKAT's negligent misrepresentation claims in the Florida Solo bellwether against defendants Lehman and FWC Capital plan are governed by Florida law, but defendants cite no cases applying Florida law to support their argument.  In any event, as under New York and Utah law, the reasonableness of the plaintiff's reliance is

That is the case here as there is ample evidence in the record from which a reasonable jury could find that SKAT's reliance on the defendants' misrepresentations that the plans owned shares, on which they received dividends, net of withholding tax was reasonable. SKAT required that each of the defendants include documents from third-party financial institutions verifying the plans' ownership of Danish shares, receipt of a dividend on such shares, and suffering of Danish withholding tax. (Joint 56.1 ¶ 31.) And each of the plans' refund applications included such a document from a Solo Custodian or ED&F. (*Id.* at ¶¶ 172-203, 359, 368.) Contrary to defendants' assertions, there were no "red flags" or "warning signs" alerting SKAT that the plans' purportedly independent, FCA-regulated custodians, *i.e.*, the Solo Custodians and ED&F, were issuing dividend credit advices and tax vouchers to their customers even though they owned no Danish shares and received no Danish dividends. (Defs. Br. 79-80.) Thus, "[u]ltimately, whether SKAT was justified in relying on" defendants' representations and the Solo Custodians and ED&F's "certifications in light of what it knew at the time is a factual question that cannot be decided at this stage of litigation." *In re SKAT*, 2020 WL 7496272 at *3.

The cases on which defendants rely only underscore the insufficiency of the supposed undisputed facts on which defendants rely to argue that SKAT's reliance was unreasonable as a matter of law. For instance, in *Schaifler Nance & Co. v. Est. of Warhol*, the Second Circuit held that the plaintiff's reliance on the Warhol estate's representation in a licensing agreement "that it controlled all rights to Warhol's works" was unreasonable as a matter of law where, among other things, the plaintiff was informed before Warhol died that Warhol "own[e]d copyrights on most of his images, but not all" of them, plaintiff's lawyer who drafted the licensing agreement

---

generally a question left for trial under Florida law. *See, e.g.*, *Hetrick v. Ideal Image Dev. Corp.*, No. 8:07-cv-871-T-33TBM, 2008 WL 5235131, at *13 (M.D. Fla. Dec. 13, 2008) ("entry of summary judgment . . . would invade the province of the jury" because "[t]he jury, rather than this Court[,] should determine whether the . . . reliance . . . was reasonable").

admitted that "she 'expected' that Warhol did not own the copyrights to all of his art," and the

licensing agreement "itself provided notice of copyright problems." 119 F.3d 91, 98-100 (2d

Cir. 1997). By contrast, defendants cite no evidence, let alone any coming even close to the

level of evidence in *Warhol*, showing that SKAT was on notice that any defendant's

representations of share ownership and dividend receipt, and the confirmation of those

representations by the plans' custodians, were false.[56]

Nor does the record show that SKAT "had *indisputable access* to truth-revealing

information." *Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087 CSH, 1999 WL 566311, at *11

(S.D.N.Y. Aug. 3, 1999). All defendants can offer in this regard is that SKAT could have sought

more information from the defendant plans themselves, (Defs. Br. 81-82), which undoubtedly

would have resulted in the plans' providing the same fraudulent account statements and broker

confirmations that defendants now claim prove ownership of shares, and only goes to show that

even if SKAT had some hint of falsity, which it did not, SKAT had no independent means of

uncovering the truth. *See Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006)

("when matters are . . . peculiarly within defendant's knowledge, the plaintiff may rely without

prosecuting an investigation, as [the plaintiff] ha[s] no independent means of ascertaining the

truth" (internal quotation omitted)).[57]

---

56. *See also Jardine v. Brunswick Corp.*, 423 P.2d 659, 663 (Utah 1967) (no reasonable reliance because "fact that [defendant] could not raise the down payment on the property as he had promised should have served as a warning to [plaintiff] of the questionable status of [defendant's] finances before he had advanced any money to him"); *Richmond v. Weston*, No. 20020799-CA, 2004 WL 440187, at *2 (Utah Ct. App. Mar. 11, 2004) ("The very nature of the representation itself, that all bills had been paid, seems almost preposterous on its face, given the ongoing nature of this business.").

57. Further, "the peculiar knowledge exception applies not only where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty." *DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999).

Finally, SKAT did not invest in the plans or otherwise enter into arm's length transactions with them, so the cases on which defendants rely precluding plaintiffs from establishing reasonable reliance in those circumstances where they failed to conduct due diligence are inapposite.  *See UST Priv. Equity Invs. Fund v. Salomon Smith Barney*, 288 A.D.2d 87, 88 (1st Dep't 2001) ("As a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it, such as reviewing the files of the other parties.").[58]

### D. Defendants' motion for summary judgment on SKAT's fraud and negligent misrepresentation claims in the ED&F bellwethers on the ground that SKAT cannot show defendants' scienter or negligence should be denied.

Under Utah law, whether the defendant possessed the requisite scienter for a fraud claim is generally a fact issue for trial.  *See Condas v. Adams*, 388 P.2d 803, 804 (Utah 1964) ("The question as to whether or not the evidence" of fraud "is clear and convincing is usually determined by the trier of the facts.").  The same is true of the question of the defendant's negligence.  *See Donovan v. Sutton*, 498 P.3d 382, 388 (Utah 2021) ("Breach of duty is

---

58.  *See also Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615, 623 (S.D.N.Y. 2001) ("the sophisticated investor such as Emergent must show that he or she has made an independent inquiry into all available information"); *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 188 (1st Dep't 2012) ("HSH—a sophisticated commercial entity—cannot satisfy the element of justifiable reliance, inasmuch as the undisputed documentary evidence establishes that HSH agreed that it was not relying on any advice from UBS; assented to the inherent conflicts of interest;" "was explicitly warned of the risks it was undertaking;" and "could have uncovered any misrepresentation of the risk of the transaction through the exercise of reasonable due diligence"); *Klas v. Van Wagoner*, 829 P.2d 135, 141 n.9 (Utah Ct. App. 1992) ("Defendants could have ascertained with reasonable diligence the truth or falsity of Carol Klas's alleged misrepresentations by requesting copies of the appraisals, or demanding to know the basis for her information, or by obtaining an independent appraisal of the subject property prior to executing the agreement.").

determined on a case-specific basis, generally by the fact finder." (internal quotation and citation omitted).)[59]

Defendants argue that the record shows the ED&F bellwether defendants did not possess the requisite scienter and were not negligent because for every refund application submitted, Acer received from ED&F "trade confirmations," "account statements" and "tax vouchers" purportedly evidencing the defendant plans' ownership of Danish shares and receipt of Danish dividends, net of withholding tax.  (Defs. Br. 82-83.)[60]  Contrary to defendants' argument, the record reveals a disputed issue of fact as to whether the plans and participants, including via their agent Acer and its principal Kaminer, who coordinated the submission of the plans' refund applications, knew that the representations of beneficial ownership were false or were at least reckless or negligent in making such representations.  (SKAT's 56.1 Resp. ¶¶ 120, 373-374, 376-381; Joint 56.1 ¶¶ 323 (a)-(c); Weinstein Decl. Ex. 93 (Reply Expert Report of Graham Wade, dated February 28, 2022) at ¶ 50 & n.52.)

Kaminer is a sophisticated market participant, who, by 2012 when the plans opened accounts at ED&F, had participated in tax- and dividend-driven trades for years, including with individual traders who eventually worked at ED&F.  (Second Weinstein Decl. Ex. 208 (Kaminer Dep.) at 57:5-12; *id.* Ex. 204 (Crema Dep.) 52:4-55:15.)  As she stated in her declaration, "[t]hroughout my career I have structured transactions involving dividend reinvestment, dividend arbitrage, and derivative financing."  (Dillman Decl. Ex. 96 (Kaminer Decl.) at ¶ 2.)  And before

---

59.  The ED&F bellwether defendants do not argue that SKAT's fraud and negligent misrepresentation claims based on the representations in the refund applications that the plans were tax-exempt under U.S. law should be dismissed on this ground.

60.  As defendants admit, Acer, of which defendant Stacey Kaminer was a principal, acted as the AIG and Riverside plan's agent with respect to ED&F, and the respective participants in the plans, defendants Crema and Schulman, relied on "Acer/Kaminer" as well to "review[] and receive[] information directly from ED&F." (Defs. Br. 83 n.71)

opening the plan's accounts at ED&F, she engaged in dividend arbitrage transactions on the plans' behalf with a different custodian. (Second Weinstein Decl. Ex. 208 (Kaminer Dep.) at 57:2-12.) During the relevant period, Kaminer was the only trader for Acer and its specialist in dividend arbitrage trading. (*Id.* Ex. 204 (Crema Dep.) at 26:3-11; Dillman Decl. Ex. 96 (Kaminer Decl.) at ¶ 4.) Kaminer was assisted by Crema, who helped establish the relationship between the pension plans and ED&F, participated in calls and communications with ED&F about trading by the AIG and Riverside plans, assisted in determining which Danish stocks to trade, assisted in selecting and structuring the purported transactions that comprised the fraudulent scheme, and negotiated Acer's share of the plans' profits with ED&F. (Second Weinstein Decl. Exs. 232, 234, 237, 245, 204 (Crema Dep.) at 185:21-186:14, 208 (Kaminer Dep.) at 63:18-64:15.)

Kaminer was responsible for the ED&F bellwether plans' communications and trading with ED&F, and obtained legal advice on, and so fully understood, the provisions in the plan's agreements with ED&F under which the plans transferred to ED&F all rights, title and interest in any shares. (Joint 56.1 ¶¶ 279, 281-82.) Likewise, Crema and Schulman, the plans' participants and trustees, both executed a "Confirmation of Election Statement/FSA Client Categorisation" with ED&F, which expressly states that "[a]ny assets, including cash, held or received by us from you or in respect of your account will be dealt with in accordance with clause 10(b) ("Assets Transferred") of our Terms and Conditions," and were aware of ED&F's financing of the plans' purported trading. (*Id.* ¶¶ 277-78; Second Weinstein Decl. Exs. 239, 288.) Notwithstanding their knowledge of the title transfer provisions in ED&F's Terms and Conditions, defendants nonetheless instructed ED&F to send tax vouchers that it prepared for the AIG and Riverside plans to their agent Goal for the purpose of making the fraudulent refund

applications to SKAT. Kaminer also testified that Acer's fee of approximately 50 percent of the

overall profit on the Plan's transactions was "based on our relationship, based on overall value

that we brought to the table . . . . [t]hey viewed us as a relationship in the whole." (Second

Weinstein Decl. Ex. 208 (Kaminer Dep.) at 66:15-67:8, 269:12-19.)[61]

E. **Defendants' motion for summary judgment on SKAT's aiding and abetting fraud claims in the ED&F bellwethers should be denied.**

Defendants argue for dismissal of SKAT's aiding and abetting fraud claims in the ED&F

bellwethers on the theory that the Utah courts have not explicitly recognized the cause of action.

(Defs. Br. 83.) But if faced with the issue, Utah courts would recognize the cause of action

aiding and abetting fraud. And, if not, there is an actual conflict between Utah law and Danish

---

61. Kaminer also had detailed knowledge of the specific terms of the ED&F bellwether plans' trades, including the settlement periods and pricing. As SKAT's expert Graham Wade observed, and Kaminer admits, the ED&F bellwether plans' Danish trades were highly structured transactions worked out in advance among the parties. (Initial Wade Report at ¶¶ 15(b), 128-133, 144, 155-156; Dillman Decl. Ex. 96 (Kaminer Decl.) at ¶ 10.) For example, Kaminer sent ED&F a generic trade structure that served as "a starting point for a conversation" with ED&F about the ED&F bellwether plans' purported dividend arbitrage trades, and described in detail the differences between that generic trade structure and the one ultimately used by the ED&F bellwether plans. (Second Weinstein Decl. Ex. 208 (Kaminer Dep.) at 182:3-185:3; *id.* Ex. 235.) In her trade instructions to ED&F on behalf of the ED&F bellwether plans, Kaminer often indicated a specific settlement period, including whether the trades should settle either before or after the record date, and often a counterparty with which ED&F should transact. (*See*, *e.g.*, SKAT's 56.1 ¶¶ 85(f)(i)-(ii).) Finally, despite her extensive experience in dividend arbitrage transactions over more than a decade, that she created planning documents listing different prices for stock that was acquired "Cum/Cum" or "Cum/Ex," and though she was able to testify in detail about the significance of various dates to dividend entitlement, Kaminer claimed at her deposition not to know that a cum-ex trade was one where the trade date is before the relevant ex-date and the transaction settles after the record date. (Second Weinstein Decl. Exs. 234, 208 (Kaminer Dep.) at 164:2-170:6, 192:2-202:23.) SKAT's expert dismissed as "non-sensical" Kaminer's proffered explanation of why cum-ex shares were so much cheaper than cum-cum shares. (Weinstein Decl. Ex. 93 (Reply Expert Report of Graham Wade, dated February 28, 2022) at n.52.) It is inconceivable that Kaminer, who had done similar trading with Victoria Foster and Mark Whitehead while they were at MF Global, did not understand the nature of the trades at least as well as Ms. Foster. (Weinstein Decl. Ex. 93 (*Id.* ¶ 50; Second Weinstein Decl. Ex. 204 (Crema Dep.) at 52:4-55:1; *id.* Ex. 208 (Kaminer Dep.) at 57:2-12, 109:10-23.) Similarly, Crema participated in calls with ED&F (including calls with Whitehead, Foster, and Chris Henstock, ED&F Dubai's trader) about trading by the AIG and Riverside plans, assisted Kaminer in determining what Danish stocks to trade, and was aware that ED&F provided financing for the AIG and Riverside plans' trades, without which the plans could not have made the trades in Danish shares, all of which demonstrate his involvement with and knowledge of the plans' fraudulent trading and tax refund applications. (Second Weinstein Decl. Exs. 234, 237, 245, 204 (Crema Dep.) at 185:21-186:14.) Thus, Kaminer's self-proclaimed ignorance of the fraud is inconsistent with her industry background and testimony; in any event, Kaminer's purported lack of knowledge that the representations of beneficial ownership were false, or her recklessness or negligence in making such representations, is a question of fact to be determined by the jury.

law, which does recognize the cause of action, and Danish law should apply to SKAT's aiding and abetting fraud claims in the Utah bellwethers.

### 1. Utah courts would recognize the cause of action aiding and abetting fraud.

If faced with the issue, Utah courts would recognize the cause of action aiding and abetting fraud. *Cf. Farm Bureau Life Ins. Co. v. Am. Nat'l Ins. Co.*, 505 F. Supp. 2d 1178, 1189 (D. Utah 2007) (Utah courts would recognize "cause of action of inducing a breach of fiduciary duty and/or duty of loyalty"). As an initial matter, the Utah Supreme Court has repeatedly followed the Restatement (Second) of Torts in defining Utah law. *See, e.g.*, *Wood v. United Parcel Serv., Inc.*, 496 P.3d 139, 143 (Utah 2021) ("To determine whether another party's subsequent negligence is foreseeable, we have adopted the test from the Restatement (Second) of Torts[.]"); *Wagner v. State*, 122 P.3d 599, 603 (Utah 2005) ("Utah has adopted the Second Restatement of Torts to define the elements of" battery).[62] The cause of action for aiding and abetting an underlying tort, such as fraud, is recognized in the Restatement (Second) of Torts, which provides for liability "[f]or harm resulting to a third person from the tortious conduct of another" if one "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Restatement (Second) of Torts § 876(b); *see also El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 897 (W.D. Mich. 2010) ("section 876(b) is generally recognized as describing a concept of secondary liability similar to the criminal concept of aiding and abetting a crime").

---

62. *See also, e.g.*, *Colosimo v. Gateway Cmty. Church*, 424 P.3d 866, 872 (Utah 2018) (noting Court has "expressly adopted section 333 of the Restatement (Second) of Torts" for "duty a landowner owes to a trespasser"); *Judge v. Saltz Plastic Surgery, P.C.*, 367 P.3d 1006, 1011 (Utah 2016) ("adopt[ing] . . . requirement in section 652(D)(b) of the Restatement (Second) of Torts . . . for claims for publication of private facts"); *Kessler v. Mortenson*, 16 P.3d 1225, 1228 (Utah 2000) ("adopt[ing] Section 339 as the rule in Utah" for "attractive nuisance"); *Slisze v. Stanley-Bostitch*, 979 P.2d 317, 321 (Utah 1999) (following Restatement section "permit[ting] courts to adopt . . . standard from a legislative enactment or an administrative regulation").

Further, Utah courts have explicitly recognized the similar cause of action for aiding and abetting breach of fiduciary duty. *See Mower v. Simpson*, 278 P.3d 1076, 1088 (Utah Ct. App. 2012) ("Utah law recognizes a cause of action for aiding and abetting the breach of a fiduciary duty"). And Utah courts have implicitly recognized a cause of action for aiding and abetting other torts as well. In particular, in *D.D.Z. v. Molerway Freight Lines, Inc.*, the Utah Court of Appeals implicitly recognized a cause of action for aiding and abetting the tort of civil assault by dismissing the plaintiffs' claim, in part, because there was no "assertion or allegation that [defendant] was acting in concert . . . or pursuant to a common design, or that he gave substantial encouragement or assistance." 880 P.2d 1, 4 (Utah Ct. App. 1994) (citing Restatement (Second) of Torts § 876); *cf. Mower*, 278 P.3d at 1087 ("By applying the statute of limitations to the plaintiff's claims, without reservation or language suggesting a remaining question as to the claims' viability, the supreme court implicitly acknowledged that such claims exist under Utah law.").

Finally, the cause of action for aiding and abetting fraud is widely recognized, including in Utah's neighboring states of Colorado, Wyoming, Arizona, and Nevada. *See Sender v. Mann*, 423 F. Supp. 2d 1155, 1175 (D. Colo. 2006) ("it is reasonable to conclude that fraud is included in the broad category of torts for which aiding and abetting is a cognizable claim" in Colorado).[63] "The substantial support from other jurisdictions and the Restatement (Second) of Torts," along with Utah's explicit and implicit recognition of a cause of action for aiding and abetting other

---

63. *See also Quest Holdco, LLC v. Bushkie*, No. 21-cv-0051-ABJ, 2021 WL 7210165, at *3 (D. Wyo. Jul. 19, 2021) (concluding that "the tort of aiding and abetting fraud . . . is consistent with Wyoming law"); *Koss Corp. v. Am. Express Co.*, No. 2:10-cv-00543 JWS, 2010 WL 1168769, at *4 (D. Ariz. Jul. 12, 2010) ("for aiding and abetting fraud and breach of fiduciary duty, Arizona recognizes aiding and abetting as embodied in Restatement § 876(b)" (internal quotation omitted)); *CMB Infrastructure Grp. IX, LP v. Cobra Energy Inv. Fin., Inc.*, No. 2:21-cv-00214-JAD-DJA, 2021 WL 5304175, at *7 (D. Nev. Nov. 15, 2021) ("plaintiffs' aiding-and-abetting-fraud claim [was] sufficiently pled to withstand dismissal").

torts, "are persuasive" that Utah courts likewise would recognize the cause of action aiding and abetting fraud.  *Farm Bureau Life Ins. Co.*, 505 F. Supp. 2d at 1189.[64]

> ### 2.    If Utah law does not recognize the cause of action, then the Court should apply Danish law to SKAT's aiding and abetting fraud claims in the Utah bellwethers.

Should the Court find that Utah courts would not recognize the cause of action aiding and abetting fraud, the Court should apply Danish law, which does recognize the claim, to SKAT's aiding and abetting fraud claims in the ED&F bellwethers.  *See Anapoell v. Am. Express Bus. Fin. Corp.*, No. 2:07-CV-198-TC, 2007 WL 4270548, at *11 (D. Utah Nov. 30, 2007) ("A conflict exists . . . if the forum state does not recognize the cause of action."); Andersen Decl. ¶¶ 71-92 (discussing aiding and abetting liability under Danish law).[65]  In the event of a conflict, Utah follows "the most 'significant relationship' approach as described in the Restatement (Second) of Conflict of Laws in determining which state's laws should apply to a given circumstance."  *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1059 (Utah 2002).

For fraud and misrepresentation claims where "the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made," the Restatement provides that courts consider the following four relevant "contacts" in determining the jurisdiction with the most significant relationship: (i) "the place, or places, where the plaintiff acted in reliance upon the defendant's representations;" (ii) "the place where the plaintiff

---

64. None of the cases on which defendants rely held that the Utah courts would not recognize the cause of action aiding and abetting fraud, but rather, in each, the Court declined to consider the issue.  *See Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249, 1252 n.1 (D. Utah 2017) ("the court need not reach the question of whether Utah courts would recognize such a claim"); *Martineau v. Currutt*, No. 1:21-cv-00045-JNP-DBP, 2022 WL 180735, at *6 n.6 (D. Utah Jan. 19, 2022) ("the court need not—and does not—determine whether [aiding and abetting fraud] qualifies as an improper means under Utah law"); *DiTucci v. Ashby*, No. 2:19-cv-277-TC-PMW, 2020 WL 956890, at *5 (D. Utah Feb. 27, 2020) (dismissing aiding and abetting fraud claim were "Plaintiffs simply ignored . . . argument" that "no Utah court has ever recognized such a claim").

65. *See* SKAT's Rule 44.1 Not.

received the representations;" (iii) "the place where the defendant made the representations;" and (iv) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 148(2)(a)-(d); *see also Advanced Comfort Techs., Inc. v. London Luxury, LLC*, No. 2:17-cv-00497-JNP, 2017 WL 6060634, at *5 (D. Utah Dec. 6, 2017) (applying section 148(2) contacts to "fraud claims").[66]

Considering the parties' contacts with the respective jurisdictions, Denmark, not Utah, is the jurisdiction with the most significant relationship to SKAT's aiding and abetting fraud claims against the ED&F bellwether defendants. SKAT's reliance on defendants' fraudulent misrepresentations took place in a single jurisdiction, Denmark, where SKAT paid defendants the amounts claimed in the refund applications. Restatement (Second) of Conflict of Laws § 148, Comment f ("Plaintiff's action in reliance provides a more important contact when it is confined to a single state . . . ."). Denmark is likewise the place where SKAT received the defendants' misrepresentations. Even if Utah, where defendants Acer and Stacey Kaminer were domiciled, is the jurisdiction from where defendants made the fraudulent misrepresentations, that contact is only "approximately as important" as where SKAT received the misrepresentations. *Id.* Comment g. Finally, "because a financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship," SKAT's domicile, Denmark, is a "contact[] of substantial significance" and is "more important than are similar contacts on the part of the defendant[s]." *Id.* Comment i.

Thus, where, as here, "the plaintiff acted in reliance upon the defendant's representations in a single state," "the defendant's representations were received by the plaintiff in this state" and

---

66. Two other contacts—"the place where a tangible thing which is the subject of the transaction between the parties was situated at the time" and "the place where the plaintiff is to render performance under a contract which he had been induced to enter by the false representations of the defendant,"—are not relevant here. Restatement (Second) of Conflict of Laws § 148(2)(e)-(f).

"this state is the state of the plaintiff's domicil[e]," the "general approach" under the Restatement is that "this state will usually be the state of the applicable law, with respect to most issues." *Id.* Comment j. Here, Denmark is that state and Danish law applies to SKAT's aiding and abetting fraud claims in the ED&F bellwethers.

## VI. Defendants' motion for summary judgment on SKAT's restitution claims in the <u>Proper Pacific, FWC Capital and ED&F bellwethers should be denied.</u>

### A. Defendants Bradley and Lehman's motion for summary judgment on SKAT's restitution claims to recover the "introducing broker" fees they were paid should be denied.

Defendants Bradley and Lehman argue that SKAT's restitution claims against them to recover the amounts of SKAT's payments they received as purported "introducing broker" fees should be dismissed because SKAT itself did not pay the amounts to Bradley and Lehman directly. (Defs. Br. 84-87.)[67] But SKAT is not "speculating" and "conjecturing" that the "introducing broker" fees Bradley and Lehman were paid came from SKAT's "refund" payments. (Defs. Br. 86.) To the contrary, that is the only reasonable inference that can be drawn from the record.

For instance, Bradley testified that his work colleague Danny Fletcher agreed to pay him $100,000 per plan to establish and "introduce" five U.S. pension plans to the Solo Custodians in 2014, one of which was defendant Proper Pacific plan. (SKAT's 56.1 ¶¶ 30, 51; Weinstein Decl. Ex. 81 (Bradley Dep.) at 305:14-308:4.).) Fletcher first introduced Bradley and some of their other colleagues to Shah and his purported dividend arbitrage scheme in August 2013, and according to two of Bradley's colleagues who also participated, served as the "go-between" for Shah and the participants and "point man" for distributing proceeds from the scheme. (SKAT's

---

67. Defendants rely solely on New York law but make no argument as to why under Florida's choice of law rules, New York law would apply to SKAT's claims against Lehman in the Florida Solo bellwether. In any event, defendants' argument is meritless under both New York and Florida law.

56.1 ¶ 48; Second Weinstein Decl. Ex. 205 (Driscoll Dep.) at 145:18-147:2, 150:11-14; *id.* Ex. 219 (Vergari Dep.) at 117:13-118:3; 134:1-135:2.)

In response to the Proper Pacific plan's refund applications, SKAT paid the plan's payment agent Goal a total of DKK 29,035,894.47 on May 8, June 24, and July 1, 2015. (Weinstein Decl. Ex. 89 (Expert Report of Bruce Dubinsky, dated Dec. 31, 2021 ("Dubinsky Report") ¶¶ 218, 225; Joint 56.1 ¶¶ 218-20.)  Goal then transferred SKAT's payments, after taking a small fee, to the Solo Custodians, which credited the amounts to the plan's accounts. (Dubinsky Report ¶ 225.)  For each "refund" credited to the plan's accounts, shortly thereafter, approximately 95 percent was transferred to Ganymede, a Cayman Islands entity controlled by Shah.  (SKAT's 56.1 ¶¶ 24, 29; Weinstein Decl. Ex. 120 at PROPPACIF00000142-44, PROPPACIF00000319, PROPPACIF00000320.)  Only after SKAT started paying the plan's refund applications, did Fletcher, in turn, via his entities SBD TT Limited and Patek PA Limited,[68] pay Bradley a total of $1,174,890 on June 25, July 2, August 13, and September 28, 2015, which in addition to at least the $100,000 for the Proper Pacific plan, also included payment for other plans Bradley established to participate in the fraud.  (Second Weinstein Decl. Ex. 272 at JPM00000847, JPM00000854, JPM000000862, JPM00000868.))

Bradley has no credible explanation for why Fletcher would pay him, by his own account, $500,000 simply for establishing five U.S. pension plans, which cost Bradley only a few thousand dollars to do, and opening accounts for the plans at the Solo Custodians, if the money were not Bradley's share of SKAT's payments.  (*Id.* Ex. 202 (Bradley Dep.) at 321:4-322:5.)  Even more incredibly, according to Bradley, the amount of his "introducing broker fees"

---

68.  *See Daniel John Fletcher*, COMPANIES HOUSE, https://find-and-update.company-information.service.gov.uk/officers/9EUypgRpStKgqaemZqmz1jRfjxU/appointments (last visited June 6, 2022).

increased exponentially as the fraud progressed. For establishing ten more pension plans on behalf of his family members in 2014, according to Bradley, he was due a total of another $5 million in "fees." (Weinstein Decl. Ex. 81 (Bradley Dep.) at 308:12-309:13.) And when the fraud unraveled in summer 2015, he was in the process of establishing 45 more pension plans, for which Shah had agreed to pay him at least $20 million. (Second Weinstein Decl. Ex. 202 (Bradley Dep.) at 346:8-348:14.) It defies belief that these supposed "introducing broker fees" were not Bradley's share of, and paid from, SKAT's "refund" payments.[69]

The evidence is similar with respect to Lehman's purported "introducing broker fees." According to Lehman, Shah agreed to pay him $700,000 or $800,000 to establish the FWC Capital plan and "introduce" it to the Solo Custodians (and the same amount for additional plans Lehman established and "introduced"). (SKAT's 56.1 ¶ 47.) In response to the FWC Capital plan's refund applications, SKAT paid the plan's payment agent Syntax a total of DKK 70,930,260.73 on April 24, May 8, May 27, July 3, and July 6, 2015. (Dubinsky Report ¶¶ 218, 225; Joint 56.1 ¶¶ 215-17.) After deducting a small fee, Syntax, in turn, transferred SKAT's payments to the Solo Custodians, which credited the amounts to the plan's accounts. (Dubinsky Report ¶ 225.) Soon after it was credited to the plan's account, approximately 95 percent of each

---

69. That the at least $100,000 "introducing broker fee" Fletcher paid Bradley for the Proper Pacific plan came from Shah (thus from the amounts of the "refunds" the plan transferred to Shah's entity Ganymede) is further confirmed by the testimony of Bradley's former colleague non-bellwether defendant Mathew Tucci. According to Tucci, he and Bradley learned in 2015 or 2016 that Fletcher had "shorted" them on the amounts they should have been paid for their plans. (Second Weinstein Decl. Ex. 217 (Tucci Dep.) at 170:11-176:14, 203:20-204:11.) Tucci and Bradley travelled to Dubai to discuss the matter with Shah, and ultimately, to make it up to them, Shah "loaned" each of them $2 million, which they never repaid. (Id. Ex. 202 (Bradley Dep.) at 324:16 – 327:19; id. Ex. 217 (Tucci Dep.) at 172:21-174:25; 175:22-176:14; 178:20-179:22; 233:9-14.) In testimony wholly lacking in credibility, Bradley testified that the $2 million "loan" he received from Shah was unconnected to his establishing and "introducing" U.S. pension plans to the Solo Custodians and never mentioned learning that Fletcher had cheated him or travelling to Dubai to discuss the matter with Shah. (Id. Ex. 202 (Bradley Dep.) at 324:16-327:19.) That Tucci's version of events is the more accurate one is confirmed by the fact that after 2015, both he and Bradley were paid directly by Shah, which, according to Tucci, was because they refused to deal with Fletcher any longer after learning he cheated them. (Id. at 324:16–325:17; id. Ex. 217 (Tucci Dep.) at 196:16-198:5, 233:9-14.)

"refund" was then transferred by the plan to Shah's Ganymede. (SKAT's 56.1 ¶¶ 24, 27; Weinstein Decl. Ex. 117 at FWCCAP00000225-26, FWCCAP00000409, FWCCAP00000410.)

To obtain the purported "introducing broker fees" he was due, in February, May, June, and July 2015, Lehman invoiced Ganymede for "consulting" services, even though he never provided any such consulting services, and at Shah's direction, in July and August 2015, likewise invoiced four other Shah entities, Acai Investments Limited, Fire Capital One Limited, Parla Global Investments Limited, and Philo Holdings Limited, for never-provided "consulting" services. (Weinstein Decl. Exs. 118, 119; Second Weinstein Decl. Ex. 209 (Lehman Dep.) at 472:13-25; 480:9-483:6.)[70]  In March, May and June 2015, Ganymede paid Lehman a total of $4,087,569.19, and in July and September 2015, Solo paid Lehman $14,151,227.78, all into the accounts Lehman listed on his phony invoices. (Second Weinstein Decl. Ex. 272 at JPM00003490, JPM00003498, JPM00003503 (Ganymede), JPM00003507 (Solo, noting payments from Parla Global Investments Limited and Fire Capital One Limited); id. Ex. 289 at WELLSFARGO_00008440, WELLSFARGO_0008447 (Solo).)  Like Bradley, Lehman has no believable explanation for why Shah would pay him $700,000 or $800,000 simply for establishing a U.S. pension plan and opening accounts for the plan at the Solo Custodians if the money were not Lehman's share of SKAT's payments.

It is of no consequence that SKAT did not itself pay Bradley and Lehman's "introducing broker fees."  See, e.g., City of Almaty, 503 F. Supp. 3d at 60 ("lack of direct business dealings between [defendants] and [plaintiffs] does not suggest[] that it would be just for [defendants] to retain the stolen funds"); Aceto Corp. v. TherapeuticsMD, Inc., 953 F. Supp. 2d 1269, 1288 (S.D.

---

70.  Shah's wife, Usha Shah, was the shareholder and director of these entities. (Second Weinstein Decl. Exs. 240, 209 (Lehman Dep.) at 476:24-477:4.)

Fla. 2013) ("unjust enrichment claim" may "stand where the benefit is conferred through an intermediary" because "direct *contact*, or privity, is not the equivalent of conferring a direct *benefit*"). Indeed, it is "black letter law that 'a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment.'" *City of Almaty*, 503 F. Supp. 3d at 60 (quoting *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215 (2007)).

The cases on which defendants rely do not assist them. For instance, in *Bibicheff v. PayPal, Inc.*, the plaintiff failed to state an unjust enrichment claim because the fees PayPal collected from the purchases made from the fraudulent accounts set up in her name were paid by the sellers in the transactions, not the plaintiff, so PayPal was not enriched at "her expense." No. 2:17-cv-4679 (DRH)(AYS), 2020 WL 2113373, at *6 (S.D.N.Y. May 4, 2020).[71] By contrast, the record is clear that defendants' "introducing broker fees" were paid from SKAT's money.[72]

### B. The ED&F bellwether defendants' motion for summary judgment on SKAT's restitution claims should be denied.

The ED&F bellwether defendants argue that SKAT's Utah law restitution claims against them should be dismissed because SKAT did not confer a benefit on any of the defendants other than the AIG and Riverside plans, and defendants did not perform any "misleading act" by submitting to SKAT false tax refund applications. (Defs. Br. 88-89.)

---

71. *See also Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 209 (S.D.N.Y. 2016) (dismissing unjust enrichment claim where there was "no allegation that [plaintiff] paid [defendant] or even an allegation of an amount of money that [defendant] received from any source"); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009) (no unjust enrichment claim where plaintiff "did not pay the alleged fees" and they were not paid with money obtained from plaintiff).

72. Finally, defendants' argument that SKAT's payments are too "attenuated" from Bradley and Lehman's "introductory broker fees" because their plans filed presumably fraudulent tax refund applications in Belgium and Austria too, (Defs. Br. 87), is meritless, at least with respect to the Proper Pacific and FWC Capital plans, because the plans' Solo Custodian account statements show credits for Danish "refunds" only. (Weinstein Decl. Ex. 117 at FWCCAP00000223-26; *id.* Ex. 120 at PROPPACIF00000142-45.)

As an initial matter, defendants Crema and Schulman, the respective sole participants in the AIG and Riverside plans, benefitted from SKAT's payments to the same extent their plans did. *See In re Customs and Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Scheme Litig.*, No. 18-md-2865 (LAK), 2021 WL 2689908, at *5 n.47 (S.D.N.Y. Jun. 30, 2021) ("sole participant in the plan" was "enriched by the plan's enrichment"). And Acer was enriched by the fees it was paid, contingent on SKAT paying the "refunds," out of SKAT's payments to the AIG and Riverside plans. (SKAT's 56.1 ¶¶ 130-136.) The same as under New York and Florida law, under Utah law, it does not matter that SKAT did not pay Acer directly. *See Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580, 583 (Utah 2000) (rejecting argument that plaintiff "did not receive a benefit . . . because the benefit did not come directly" from counterclaimant).

Nor is there any merit to defendants' argument that SKAT's unjust enrichment claims fail because it "cannot establish that any one of those defendants engaged in inequitable conduct or some other 'misleading act' to warrant restitution." (Defs. Br. 88.) To the contrary, the record establishes clearly that defendants submitted false tax refund applications to SKAT. To succeed on its unjust enrichment claims, SKAT need only show defendants' "acceptance or retention" of the benefit conferred by SKAT, *i.e.*, the "refund payments," "under such circumstances as to make it inequitable for the" defendants "to retain the benefit." *Desert Miriah*, 12 P.3d at 582.[73] Courts have "broad discretion" to apply "the law of unjust enrichment to the facts of the particular case." *Desert Miriah*, 12 P.3d at 583.

Not surprisingly, defendants cite no case law indicating, let alone establishing as a matter of law, that defendants' retention of SKAT's payments, to which they had no entitlement, would

---

73. Similarly, to succeed on its Utah law money had and received claims, SKAT need only show that "defendants have received money belonging to [SKAT] or to which [it] is in equity and good conscience entitled." *Ace Invs., LLC v. Rubin*, No. 2:08-CV-289 TS, 2009 WL 1684482, at *2 (D. Utah Jun. 16, 2009) (internal quotations omitted).

be equitable.  Unlike the defendant in *Com. Fixtures & Furnishings, Inc. v. Adams*, the ED&F

bellwether defendants did not merely "benefit[] from a contract between two others" with which

they had no involvement.  564 P.2d 773, 774 (Utah 1977).  The ED&F bellwether defendants

themselves submitted the false tax refund applications to SKAT.[74]

## VII.   Defendant Altbach's motion for partial summary judgment should be denied.

Defendant Altbach, who was the sole participant in and trustee for five pension plans[75]

set up to participate in the fraud and a partner in five partnerships with defendants Markowitz,

van Merkensteijn, and Klugman for the purpose of splitting up the proceeds of the fraud,

attempts to shirk all personal responsibility for his participation by seeking dismissal of the fraud

and negligent misrepresentation claims against him personally.  His arguments for doing so are

unavailing and are contrary to the Court's previous decisions in this litigation.

### A.   Genuine issues of material fact exist as to whether Altbach is liable for fraud.

Altbach contends that he is not liable for fraud because (i) he himself did not make any

false statements to SKAT, and (ii) Goal, the agent authorized to submit refund applications on

Altbach's plan's behalf, did not have knowledge that the refund applications were false or intend

to defraud.  (Defs. Br. 89-93.)  As to the first argument, Altbach is liable for the false statements

made to SKAT by his authorized agents, and also as his plan's *alter ego*.  The latter argument is

equally meritless as a principal cannot escape fraud liability by engaging others to make the false

statements unknowingly.

---

74. The other cases on which defendants rely are distinguishable for the same reason, *i.e.*, the ED&F bellwether defendants' "misleading act" in submitting false tax refund applications to SKAT.  *See Deer Crest Assocs. I., L.C. v. Deer Crest Resort Grp., L.L.C.*, No. 2:04-CV-220 TS, 2006 WL 722216, at *2 (D. Utah Mar. 16, 2006) ("Defendants have offered no evidence to prove a misleading act or other inequity on the part of Plaintiff."); *Knight v. Post*, 748 P.2d 1097, 1101 (Utah Ct. App. 1988) (applying *Com. Fixtures*).

75. In addition to the Roadcraft Technologies plan, Altbach was the sole participant in and trustee for non-bellwether defendants Crucible Ventures LLC Roth 401(K) Plan, Limelight Global Productions LLC Roth 401(K) Plan, Plumrose Industries LLC Roth 401(K) Plan, and True Wind Investments LLC Roth 401(K) Plan.

### 1.    Altbach is liable for the acts of his authorized agents.

Altbach's argument that he did not personally make statements to SKAT misses the mark as he is undoubtedly liable for the statements his authorized agents made on his behalf.  It "is well established . . . that a principal is liable to third parties for the acts of an agent operating within the scope of his real or apparent authority."  *Rivera v. Est. of Ruiz*, No. 16 CIV. 7328 (ER), 2020 WL 1503663, at *4 (S.D.N.Y. Mar. 30, 2020) (internal quotation omitted).  And the record is clear that Altbach, via his agent defendant Michael Ben-Jacob, authorized Goal to submit to SKAT the Roadcraft Technologies plan's fraudulent refund applications.

There is a clear chain of agency running from Altbach to Ben-Jacob to Goal.  For the purpose of participating in the Solo Custodians' fraudulent trading scheme, Altbach personally designated Ben-Jacob to act as his agent through a limited power of attorney, which authorized Ben-Jacob to, among other things, "execute...tax reclaim agreements."  (Bahnsen Decl. Ex. 79.)  Pursuant to this delegated power, Ben-Jacob executed a contract with Goal that expressly provided that Goal would "submit [t]ax [r]eclaims to the relevant tax authorities."  (Bahnsen Decl. Ex. 80 at WH_MDL 00029599.)[76]  And Ben-Jacob also signed a limited power of attorney authorizing Goal to submit the refund applications on behalf of the Roadcraft Technologies plan.  (Bahnsen Decl. Ex. 81.)  Ben-Jacob signed the Goal contract and limited power of attorney as "attorney-in-fact" for Altbach, the "trustee" of the Roadcraft Technologies plan.  (Bahnsen Decl. Ex. 80 at WH_MDL 00029597; *id.* Ex. 81 at SKAT_MDL_001_00056869.)[77]  As Ben-Jacob

---

[76].  Powers of attorney are generally "construed according to ordinary principles of contract interpretation."  *Green Tree Servicing, LLC v. Christodoulakis*, 689 F. App'x 66, 70 (2d Cir. 2017).  Here, the clear text of the power of attorney authorized Ben-Jacob to enter into the tax reclaim agreement with Goal.  *See McCarthy Concrete, Inc. v. Banton Constr. Co.*, 203 A.D.3d 1496, 1499 (3d Dep't 2022) ("It is well settled that a contractual agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." (internal quotation omitted)).

[77].  Altbach, as the trustee of the Roadcraft Technologies plan, can be sued in his personal capacity for his acts as trustee.  *See* Second Weinstein Decl. Ex. 290 (Roadcraft Plan Certification of Trust); *Kirchner v. Muller*, 280 N.Y. 23, 28 (1939) ("Judgments obtained against executors or trustees are collectible out of their private

was Altbach's agent, the agreements he executed with Goal pursuant to his designated authority

are functionally signed by Altbach as trustee for the plan.  There is ample evidence for a jury to

find Altbach liable based on the acts of his designated agents.[78]

### 2.     Altbach is liable as the Roadcraft Technologies plan's *alter ego*.

Altbach is also liable for the Roadcraft Plan's misstatements to SKAT as the plan's *alter

ego*.  *Alter ego* liability requires that "(1) the person exercised dominion and control with respect

to the transaction attacked such that the corporation had no separate will of its own; and (2) the

domination was used to commit a fraud or wrong against the plaintiff, which proximately caused

the plaintiff's injuries."  *In re Skat*, 356 F. Supp. 3d at 322-23.  The question of *alter ego* liability

is fact intensive and typically left for the jury.  *See, e.g.*, *Am. Protein Corp. v. AB Volvo*, 844

F.2d 56, 59 (2d Cir. 1988) ("[T]he issue of corporate disregard is generally submitted to the

jury.").[79]  Factors to be considered in determining *alter ego* liability include:

---

property"); A.M. Hess, *et al.*, Bogert's The Law of Trusts and Trustees § 731 (2022) ("At common law…the weight of English and American authority imposed responsibility for such torts upon the trustee as an individual and not as a fiduciary. Any judgment recovered was collectible out of the private property of the trustee and not out of trust assets.").  New York has retained the common law rule, which imposes liability on the trustee even for acts of the trustee's agents for which the trustee was not responsible.  *See* Bogert's The Law of Trusts and Trustees, § 731; *id.* § 712 n.31.

78. Because Goal had actual authority to act, Goal's apparent authority is irrelevant.  Regardless, Goal did not, as Altbach suggests, lack apparent authority to submit the refund applications to SKAT.  (Defs. Br. 90-91.)  Apparent authority "arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him."  *Khodeir v. Sayyed*, 348 F. Supp. 3d 330, 342 (S.D.N.Y. 2018).  There is no requirement that the principal's representation "be made through actual contact between the principal and third party."  *Id.* (citation and internal quotation marks omitted).  "The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment."  *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).  Each of the Roadcraft Technologies plan's refund applications included the Goal power of attorney, bearing Altbach's name and signed by his agent Ben-Jacob as Altbach's "attorney-in-fact," thus a reasonable jury could find that Goal, even if it lacked actual authority, had apparent authority to submit the plan's refund applications to SKAT.  *See Janneh v. GAF Corp.*, 887 F.2d 432, 436 (2d Cir. 1989) (signature of principal provided agent with apparent authority to complete transaction), *abrogated on other grounds by Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 114 S. Ct. 1992 (1994).

79. *See also, e.g.*, *Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 194 (E.D.N.Y. 2009) ("corporate separateness is a remedy that differs with the circumstances of each case" (internal quotation omitted)); *DER Travel Servs., Inc. v. Dream Tours & Adventures, Inc.*, No. 99 CIV. 2231 (HBP), 2005 WL

the failure to adhere to corporate formalities, undercapitalization, intermingling of funds, overlap in ownership … the degree of discretion shown by the wrongdoer, whether the dealings between the entities are at arm's length, and whether the corporations are treated as independent profit centers.

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 292 (S.D.N.Y. 2005) (internal citations and quotation omitted).

Here, Altbach was the sole participant, the sole trustee, and the authorized representative of the Roadcraft Technologies plan, and the sole member of the Roadcraft Technologies LLC, the plan's sponsoring company. (Wagner Report ¶¶ 56-57.) Altbach funded the Roadcraft Technologies plan with $100 of his personal money (as opposed to the assets of Roadcraft Technologies LLC, as required by the Internal Revenue Code). (*Id.* ¶ 58.) The Roadcraft Technologies plan's profits in essence accrued to Altbach personally, as he was the plan's sole participant.

The plan and its sponsoring company were created by Altbach for one purpose only—to participate in the fraud against SKAT. Altbach signed a power of attorney allowing Ben-Jacob to implement all aspects of the scheme for the plan. (Bahnsen Decl. Ex. 79.) Using his control over the plan, Altbach (through his agent Ben-Jacob) authorized Goal to submit the fraudulent refund applications to SKAT. (Bahnsen Decl. Exs. 80, 81.) Because Altbach "controlled the very existence of the compan[y] affiliated with the" plan, "created [it] for the purpose of receiving tax refunds," and used his control over the plan to authorize the submission of the plan's fraudulent tax refund applications, there are (at minimum) genuine issues of material fact

---

2848939, at *8 (S.D.N.Y. Oct. 28, 2005) ("Whether the corporate veil should be pierced requires a fact specific inquiry; there are no bright-line rules.").

as to whether Altbach is liable to SKAT as the Roadcraft Technologies plan's *alter ego*.  *In re Skat*, 356 F. Supp. 3d at 323.[80]

### 3.  Altbach's agent Goal need not have knowledge and intent for Altbach to be held liable.

Whether Goal, as an authorized agent, had knowledge of the false statements or the intent to defraud has no bearing on Altbach's liability.  Not surprisingly, Altbach cites no case suggesting that a principal can escape fraud liability by causing an agent who does not know of a statement's falsity to make the statement for him.  New York law is to the contrary.

Under New York law, when a defendant uses a third-party "as a conduit" to relay a false statement, the plaintiff need only show that the defendant intended that the information be "communicated to the plaintiff and that the plaintiff rely on it."  *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 827-29 (2016) (citing *Eaton Cole & Burnham Co. v. Avery*, 83 N.Y. 31, 35 (1880); *Bruff v. Mali*, 36 N.Y. 200, 206 (1867)).  "In other words, 'if A. makes the statement to B. for the purpose of being communicated to C. or intending that it shall reach and influence him, he can be ... held [liable]."  *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12-CV-7372 (LJL), 2020 WL 5518146, at *84 (S.D.N.Y. Sept. 14, 2020) (alteration in original) (quoting *Eaton*, 83 N.Y. at 34–35).  Were the law as Altbach suggests, it would lead to the ridiculous result, as he seeks here, that principals could escape liability simply by engaging an unknowing agent to deliver their fraudulent statement to the injured party.

---

80.  Altbach's argument that SKAT cannot as a matter of law establish reasonable reliance (Defs. Br. 93) fails for the same reason, *i.e.*, Goal's representations to SKAT are attributable to Altbach because he personally authorized them and the Roadcraft Technologies plan is his *alter ego*.

**B.** **The Court should not dismiss SKAT's aiding-and-abetting fraud claim against Altbach.**

Altbach contends that the aiding and abetting claim against him should be dismissed because he had no actual knowledge of and did not provide substantial assistance to the fraud. Both arguments fail. There are genuine issues of material fact concerning Altbach's knowledge of and assistance to the fraud which preclude summary judgment in his favor.

**1.** **Genuine issues of material fact exist as to whether Altbach had actual knowledge of the fraud.**

Summary judgment "is generally inappropriate where questions of intent and state of mind are implicated." *Gelb v. Bd. of Elections of City of New York*, 224 F.3d 149, 157 (2d Cir. 2000). "Circumstantial evidence may permit a factfinder to infer that a witness had knowledge of a particular fact despite his testimonial denial of knowledge." *In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009).

Here, record evidence creates genuine issues of material fact as to whether Altbach had actual knowledge of, or at the very least consciously avoided confirming, the fraud. *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) ("conscious avoidance" sufficient for aiding and abetting fraud).[81] Altbach knew that, despite putting up no money and taking no risk, he could make $50,000 for each of his five newly-formed pension plans just by (in his words) "signing a bunch of signature pages." (Decl. of Ronald Altbach, dated April 29, 2022, ¶ 3; Second Weinstein Decl. Ex. 201 (Altbach Dep.) at 38:11-39:10, 83:22-84:12.) These "fantastical, implausibly high" returns create a strong inference of actual knowledge of fraud. *Picard v. Est. of Stanley Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 222 (Bankr. S.D.N.Y. 2011) (internal quotation marks omitted).

---

81. Even if Altbach lacked actual knowledge, Danish law does not require actual knowledge for aiding and abetting liability, (Andersen Decl. ¶¶ 71-92), and the Court must apply Danish law if there is a conflict.

Altbach was aware that his five plans were funded with a mere $100; that van Merkensteijn had created for Altbach five companies to sponsor these plans; and that the only "business" these companies purportedly conducted was unidentified "consulting" services to an entity controlled by van Merkensteijn. (Second Weinstein Decl. Exs. 243, 276, 284.)

Altbach understood the scheme involved trading in Danish securities and "tax treaties." (*Id.* Ex. 201 (Altbach Dep.) at 50:10-23.) Yet Altbach never reviewed (or even asked to review) any documents related to any of his five plans' purported trading or submissions to SKAT. (*Id.* at 136:24-137:25, 139:15-140:21.) In January 2015, Altbach participated in a telephone call about whether Altbach and other defendants should go forward with the scheme. (*Id.* Exs. 285, 201 (Altbach Dep.) at 128:11-131:8.) Record evidence suggests that the call was prompted by a Wall Street Journal article, which discussed government investigations into cum-ex trades. [82] The article described these trades as ones in which investment firms "claim[ed] rebates on withholding-tax payments despite not having actually paid such taxes in the first place." (Second Weinstein Decl. Exs. 293, 304.) In addition, the article stated that the German government considered these trades "illegal" and that the U.S. Federal Reserve was concerned with the "legal and reputational harm" of the trades. Altbach's testimony suggests he read the article. (*Id.* Ex. 201 (Altbach Dep.) at 133:23-135:8.) Regardless, soon after the call, Altbach agreed to go forward with the scheme. (*Id.* at 135:22-136:16.) These facts provide a jury with ample evidence to find that Altbach had actual knowledge of the fraud or consciously avoided confirming it.

---

82. If any shares had existed in the Solo trades, the trades would have been "cum/ex" because the trades were purportedly executed prior to the ex-date (*i.e.* cum dividend), but purportedly settled after the record date (*i.e.* ex-dividend). (Initial Wade Report ¶¶ 79-81, 229.)

In addition, Altbach's actual knowledge can be imputed to him through the knowledge of his agents and the Roadcraft Plan's partners. Under New York Law an agent's "actual knowledge" can be imputed to a principal. *See Nolan v. Sam Fox Pub. Co.*, 499 F.2d 1394, 1398 (2d Cir. 1974); *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217, 230 (S.D.N.Y. 2013).[83] Ben-Jacob was Altbach's agent, and defendants make no argument that there is no issue of material fact as to whether Ben-Jacob had actual knowledge of the fraud.[84]

### 2. Genuine issues of material fact exist as to whether Altbach substantially assisted the fraud.

"Substantial assistance exists where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003) (internal quotation marks omitted). Altbach affirmatively assisted the fraud by, among other things, (1) forming the Roadcraft Technologies plan; (2) signing the power of attorney authorizing Ben-Jacob to execute the scheme for the plan; and (3) authorizing the

---

83. In arguing that actual knowledge of an agent cannot be imputed to a principal, defendants cite only to cases applying Colorado or Utah law, neither of which applies to SKAT's claims against Altbach. (Def Br. 94 n.81 (citing *Wardley Better Homes & Gardens v. Cannon*, 61 P.3d 1009, 1016 (Utah 2002); *Jehly v. Brown*, 327 P.3d 351, 354 (Colo. App. 2014)).)

84. Further, "[i]n partnerships, each partner acts, as to himself, as a principal . . . and, as to each other partner, as a general agent." *Deutsche Bank Nat. Tr. Co. v. Bills*, 37 Misc. 3d 1209(A), 2012 WL 4868108, at *3 (Sup. Ct. Essex Cty. 2012) (internal quotation omitted). The Roadcraft Technologies plan entered into a partnership agreement with defendant Routt Capital Trust (controlled by Markowitz) and defendant RAK Investment Trust (controlled by Klugman). (Second Weinstein Decl. Ex. 291.) The knowledge of the Roadcraft Technologies plan's partners, acting as its agents in furtherance of the fraud, can be imputed to Altbach and his *alter ego* pension plan. *See Deutche Bank*, 2012 WL 4688108 at *4 ("as partners with respect to the subject property any . . . knowledge of Bills relative to the mortgage loan . . . is imputed to Morris"); *221 Second Ave., LLC v. Fid. Nat. Fin., Inc.*, 33 Misc. 3d 1208(A), 2011 WL 4861853, at *5 (Sup. Ct. N.Y. Cty. 2011) ("it is . . . well settled that knowledge of [partnership] activity is imputed and chargeable to the remaining general partners regardless of their personal participation in the offending transaction"); *Mfrs. Hanover Tr. Co. v. Jayhawk Assocs.*, 766 F. Supp. 124, 127 (S.D.N.Y. 1991) (under "New York law of partnership . . . knowledge is imputed to all the partners"). Again, defendants do not claim there is not a genuine issue of material fact as to the knowledge of Markowitz and Klugman or the entities they controlled.

submissions of the fraudulent refund applications to SKAT.  Clearly, the Roadcraft Technologies

plan's fraud on SKAT could not have occurred if the plan did not exist or had not made any

submissions to SKAT.  Indeed, this Court has already ruled that the defendant pension plans'

authorized representatives' acts of authorizing the submission of the refund claims to SKAT can

constitute substantial assistance.  *See In re Skat*, 356 F. Supp. 3d at 325.  Altbach has not

established a lack of any genuine dispute as to his substantial assistance of the fraud.

### C. Genuine issues of material fact exist as to whether Altbach is liable for negligent misrepresentation.

Altbach's argument that he cannot be liable for negligent misrepresentation because he

did not make the false statements to SKAT and SKAT cannot establish "a special relationship

with Altbach, (Defs. Br. 95-96), fails for the same reasons his arguments as to fraud fail: genuine

issues of material fact exist as to whether Altbach is liable for the acts of his authorized agents

and as the plan's *alter ego*.  (*See supra* Section VII.A.)

Nor did *Jurgensen v. Felix Storch, Inc.* hold that (in defendants' words) there "cannot be

a 'special relationship' when information is provided pursuant to statutory or regulatory

requirements."  (Defs. Br. 97.)  Rather, *Jurgensen* dismissed the negligent misrepresentation

claim because there was "nothing approximating 'privity' as between the parties, nor could such

privity" have been "alleged on the typical commercial purchase at the heart of plaintiffs' claims"

involving a seller of goods and a consumer.  No. 12 Civ. 1201 (KBF), 2012 WL 2354247, at *9

(S.D.N.Y. June 14, 2012).  *Jurgensen* does not speak to whether a special relationship exists

where a defendant makes a false statement to a government.  Altbach, via his and his *alter ego*

pension plan's authorized agents, submitted tax refund applications to SKAT including false

representations of share ownership and the plan's tax-exempt status to obtain "tax refunds" from

SKAT.  Altbach "cannot claim plausibly that [he] did not intend for SKAT to rely on the

statements and information that [he] submitted specifically for that purpose." *In re SKAT*, 2020 WL 7496272 at *4.[85]

## **CONCLUSION**

For the reasons set forth above, SKAT respectfully requests that the Court deny the bellwether defendants and third-party defendant ED&F's motion for summary judgment.

Dated: New York, New York
June 6, 2022

HUGHES HUBBARD & REED LLP

By:   /s/ Marc A. Weinstein
     William R. Maguire
     Marc A. Weinstein
     Neil J. Oxford
     Dustin P. Smith
     Gregory C. Farrell
   One Battery Park Plaza
   New York, New York 10004-1482
   Telephone: (212) 837-6000
   Fax:  (212) 422-4726
   bill.maguire@hugheshubbard.com
   marc.weinstein@hugheshubbard.com
   neil.oxford@hugheshubbard.com
   dustin.smith@hugheshubbard.com
   gregory.farrell@hugheshubbard.com

*Counsel for Plaintiff Skatteforvaltningen
(Customs and Tax Administration of the
Kingdom of Denmark)*

---

85. Even if no special relationship exists as between any defendant and SKAT, Danish law does not require privity to establish a claim for negligent misrepresentation, (Andersen Decl. ¶¶ 62-70), and the Court must apply Danish law if there is a conflict.