# Exhibit 75

| | |
|---|---|
| Message | |
| **From:** | Richard Markowitz [Rmarkowitz@argremgt.com] |
| **Sent:** | 3/21/2011 8:18:35 PM |
| **To:** | Ben-Jacob, Michael [/O=KAYESCHOLER/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Ben_m]; Tuchman, Louis [/O=KAYESCHOLER/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tuchman] |
| **Subject:** | FW: Opinion_Solo_US_Charitable.doc |
| **Attachments:** | Opinion_Solo_US_Charitable.doc |

Michael and Louis:

Here is the first draft of the German tax opinion. None of us have looked at it yet, but we wanted to let you see what is likely to come. Please pass this on to anyone else at Kaye Scholer who may need to review.

--
Richard Markowitz
Managing Director
Argre Management LLC
40 West 57th Street
20th Floor
New York, NY 10019

Tel:     (212) 247-2600
Fax:     (212) 247-2753
Mobile:  (917) 848-5675

RMarkowitz@Argremgt.com


------ Forwarded Message
**From:** Guenther Grant-Klar <guenther.grant-klar@solo-capital.com>
**Date:** Sun, 20 Mar 2011 10:37:53 -0700
**To:** Richard MARKOWITZ <rmarkowitz@argremgt.com>, Matthew Stein <mstein@argremgt.com>
**Cc:** Raj Shah <Raj.shah@solo-capital.com>, Sanjay Shah <sanjay.shah@solo-capital.com>
**Subject:** FW: Opinion_Solo_US_Charitable.doc


Hi Richard & Matt

Please find attached first draft of Norton Rose opinion.

You will see that for the time being the qualification of the foundation for the treaty benefits is an assumption.

We are relatively relaxed about this, given the practice of the BZSt as outlined in the guideline we previously sent you (i.e. they refund claims based on confirming the 501c3 status of the entity), & also given the stated concerns of your chosen foundations to confirm beneficial ownership of the underlying shares (which the opinion does cover at some length).

That said, we would of course be happy to revert to Norton Rose about what could be done to beef up the opinion.

Best regards
Guenther

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                                              WH_MDL_00276168

Guenther Grant-Klar
Solo Capital Limited
4 Throgmorton Avenue
London, U.K.
EC2N 2DL

m: +971 50 8860 365
e: guenther.grant-klar@solo-capital.com
w: www.solo-capital.com

---

This email message has been delivered safely and archived online by Mimecast.
For more information please visit http://www.mimecast.com

---

------ End of Forwarded Message

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER   WH_MDL_00276169

Norton Rose LLP · Stephanstraße 15 · 60313 Frankfurt am Main

**Solo Capital Ltd.**
4 Broadgate
London EC2M 2QY
United Kingdom

Norton Rose LLP
Rechtsanwälte
Stephanstraße 15
60313 Frankfurt am Main

Tel   +49 (0)69 505096 0
Fax   +49 (0)69 505096 100
www.nortonrose.com

[●] March 2011

# German Tax Opinion

Dear Sirs,

Solo Capital Ltd. ("**Solo**") has asked us for a German tax opinion (the "**Opinion**") on certain aspects of the transaction described below (the "**Transaction**").

## 1   Facts and Assumptions

The Transaction is comprised of the following:

### 1.1   The Investor

A United States company or organization operated exclusively for religious, charitable, scientific, educational, or public purposes (the "**Investor**") is established and maintained in the United States and resident in the United States for purposes of the double taxation agreement in place between the United States of America and Germany (the "**Treaty**").

The Investor will not carry on or be deemed to carry on a business or trade.

The Investor will perform the investment strategy described below in a manner qualifying for the tax exemption in Germany under the Treaty.[1] Within its general conduct of asset administration (*Vermögensverwaltung*) with respect to its assets used for religious, charitable, scientific, educational, or public purposes, the Investor will perform the strategy shown in 1.2 below.

### 1.2   Investment Strategy

---

[1]   Cf. Art. 27 Treaty

Norton Rose LLP ist eine Limited Liability Partnership, eingetragen im Registry of Companies für England und Wales beim Companies House, Cardiff (Wales), unter der Nummer OC328697. Eine Liste der Partner ist am Sitz der Gesellschaft, 3 More London Riverside, London, SE1 2AQ, Vereinigtes Königreich erhältlich.

Norton Rose LLP, Norton Rose Australia sowie ihre verbundenen Unternehmen stellen die Norton Rose Group dar. Genauere Informationen zu den Büros und den regulatorischen Rahmenbedingungen der internationalen Rechtsanwaltskanzlei sind unter www.nortonrose.com zu finden.

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER          WH_MDL_00276170

NORTON ROSE

As a general rule, the Investor may pursue all investment strategies. The investment policy may include the strategy described below, to which this Opinion is strictly limited. The Investor will not have a non-assessment notice (*Nichtveranlagungsbescheinigung*).

Component 1 – Long stock position

The Investor intends to take a position in German stock-listed shares. The position will be entered into by either: (i) directly purchasing the stocks (the "**Stocks**") themselves, on or before the dividend record date (*Hauptversammlungstag*); or (ii) purchasing a physically settled single stock future expiring on or before the record date.

The counterparty ("**Counterparty**") may be a central counterparty or a broker.

The global certificate of the Stocks will be subject to collective safe custody (*Girosammelverwahrung*) with Clearstream Banking AG ("**Clearstream**"), and purchase of the Stocks or expiry time of the future, as the case may be, will be before Clearstream's close of business on the record date, at the latest.

The Stocks will be held in a segregated account for the Investor and will not be subject to circumstances (other than described and opined on in this Opinion) affecting true/beneficial/economic ownership (*wirtschaftliches Eigentum*).

Component 2 – Short futures position

The Investor will also take a short futures position in German stocks. The position will be entered into by selling a cash-settled single stock future. For the avoidance of doubt, physical settlement will be excluded. The expiry date of the short future will be on or after the ex date (record date + one day), and will always be after the trade date (or expiry date, as the case may be) of Component 1.

The Counterparty may be a central counterparty or, otherwise, will not be the same counterparty as for Component 1.

The short future with the Counterparty is likely to be closed out prior to maturity of the future, and the Stocks are likely to be sold in the market.

Conditions of the above

It will be ensured that execution will be effected through an official stock exchange and/or an official futures exchange. All terms will match market standards.

In the case of both Components, the instructions to the Counterpart(y)(ies) will specify the number of shares (or futures as the case may be) being bought (or sold as the case may be), together with the target price. If the Counterpart(y)(ies) can find sufficient liquidity at this price, it (they) will enter into the respective contracts.

The above set of economics is not designed such that it would fit only short sellers outside the substitutional withholding tax. Moreover, there will be no direct or indirect instructions or any other pre-arrangement neither by the Investor nor an investment manager nor an investment advisor, if any, regarding the involvement of a short seller outside the scope of the substitutional withholding tax. Correspondingly, the Counterparty will not report back any details, in particular, whether or not a short seller not subject to the substitutional withholding tax is involved.

## 2  Scope of Opinion

This Opinion is strictly limited to German tax laws and does not cover any other issues. It does not cover any foreign laws or aspects. Where issues related to other jurisdictions than Germany are dealt

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                                        WH_MDL_00276171

NORTON ROSE

with this is by way of an assumption. This Opinion is strictly limited to the statements made therein. This Opinion only covers the tax consequences arising from the investment strategy described above. Other or additional strategies and/or activities by the Investor are not covered. In particular, no opinion on regulatory matters is expressed.

This Opinion is based on our professional interpretation of German tax laws in force as of the date of signing.

It is not coordinated or otherwise discussed with German regulatory or tax authorities or with audit firms and shall, therefore, not be construed as a guarantee for certain results.

For the purpose of this Opinion, we have solely relied upon the facts and assumptions in 1 above and have made no further enquiries.

## 3   Opinion

Based on the facts and assumptions in 1 above and subject to the qualifications in 4 below, we are of the opinion (*sind der Auffassung*) that:

3.1   the Investor should acquire true/beneficial/economic ownership (*wirtschaftliches Eigentum*) of the Stocks (i) on the trade date in the event of an acquisition via a stock exchange and (ii) on the expiry date in the event of expiry of a stock-traded future. Please refer to the qualifications under 4.1.

3.2   the decree of the Federal Ministry of Finance dated 5 May 2009 (as amended) requiring a special tax certificate as a condition for the withholding tax refund should not affect the Investor;

3.3   the Investor should be entitled to a full refund of withholding tax. Please refer to the qualifications under 4.3; and

3.4   the Investor should not be disregarded by application of the anti-avoidance-rule. Please refer to the qualifications under 4.3(c).

## 4   Qualifications

4.1   True/Beneficial/Economic Ownership

Upon acquisition of Stocks by the Investor (i.e. purchase on a stock exchange or expiry of a stock-traded future), it should acquire the true/beneficial/economic ownership of the Stocks (cf. under (a) below) at the day of the acquisition (cf. under 4.1(b) below) and the dividend income should be allocated to it at the very end of the dividend record date (cf. under (c) below).

(a)   Transfer of True/Beneficial/Economic Ownership to the Investor

As a general rule, the true/beneficial/economic ownership of the Stock should be transferred to the Investor upon acquisition of the Stock within Component 1. The point of time of transfer of the true/beneficial/economic ownership is described in (b) below.

The tax provisions for true/beneficial/economic ownership are laid down in § 39 of the General Tax Code (*Abgabenordnung – AO*). Under § 39 (1) AO, the true/beneficial/economic ownership generally follows the civil-law ownership. As an exception, however, pursuant to § 39 (2) no. 1 sentence 1 AO, true/beneficial/economic ownership is assigned to a person other than the legal owner if this person is in a position to effectively exclude the legal owner from accessing the asset. There are no explicit criteria on such exclusion. Rather, an assessment has to be made looking at and evaluating all aspects relevant for the individual case. With regard to shares, the risk and reward for a certain period of time is particularly important. Furthermore, the dividend entitlement as well as voting, pre-emption and other rights are essential.

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                                                        WH_MDL_00276172

In our opinion, the criteria for true/beneficial/economic ownership should be satisfied in the case at issue. There are four levels of analysis to this: (i) the acquisition of true/beneficial/economic ownership upon a standard acquisition via a stock exchange or expiry of a future, as the case may be, (ii) the irrelevance of a short future position with cash-settlement, (iii) the special impact of a short seller and (iv) the general question whether true/beneficial/economic ownership of one asset can be allocated to two persons at the same time.

(i)   Acquisition of Stock via Stock Exchange or Expiry of Future

If the Investor purchases the Stocks directly over a stock exchange, the acquisition should result in a transfer of true/beneficial/economic ownership. Following the expiry of a physically-settled future, the Investor should also acquire true/beneficial/economic ownership of the Stocks.

(ii)  Short Future

The cash-settled future in Component 2, has no impact on the physical share position of the Investor. After the acquisition of the Stocks, the Investor is legally and contractually free to hold or sell the Stock at its sole discretion. By nature, due to its cash-settlement mechanism, the short future position does not require the delivery of the Stocks or, otherwise, impair the right of disposal by the Investor over the Stocks. Furthermore, the sale of the Stocks on the market should not retroactively jeopardise the true/beneficial/economic ownership since the disposal is at the sole discretion of the Investor. For the foregoing reasons, we take the view that the short future position should not impact on the Investor's true/beneficial/economic ownership.

(iii) Impact in the Event of a Short Seller

The above statements hold true in a scenario in which the seller actually holds the stocks. The question arises whether this also applies where the seller is a short seller and, to settle its obligations, acquires the shares only on the ex-date and delivers these shares to the Investor. In this scenario, there are no shares at the level of the seller on the dividend record date and, consequently, one might argue that the purchaser cannot acquire true/beneficial/ economic ownership in shares.

This argumentation has most recently been formed by scholars[2]. The authors argue that a short seller cannot transfer true/beneficial/economic ownership in stocks, at all. As a consequence, the acquirer would acquire the true/beneficial/economic ownership only at the time of settlement of the stock, i.e. at the same time the legal ownership in the stocks is transferred. On application of this view, the Investor cannot generate dividend income pursuant to § 20 (1) no. 1 of the German Income Tax Act (*Einkommensteuergesetz – EStG*) on the dividend record date, but, rather, only general commercial income not entitling to a withholding tax refund under the Treaty.

Historically, however, the German legislator's view is that true/beneficial/economic ownership in shares is also acquired by a purchaser if the seller is a short seller. This position has been explicitly laid down in the notes of the legislator to the Annual Tax Act 2007 (*Jahressteuergesetz 2007*)[3] introducing a new provision (§ 20 (1) no. 1 sentence 4 EStG) which aimed at closing the existing loophole for short sales over the dividend date but did not fully achieve its goal. This provision defines dividend-like income (*sonstige*

---

[2]   Cf. *Bruns*, DStR 2010, 2061, 2063 (a tax officer in Hamburg) and *Rau*, DStR 2010, 1267 (a tax auditor in Frankfurt). Doubts are expressed that true/beneficial/economic ownership can exist in the event of a short sale. For the avoidance of doubt, both articles are of a purely scholar nature and are not official statements of the tax authorities.
[3]   Federal German Parliament, Document no. 16/2712, dated 25 September 2006, 48

NORTON ROSE

*Bezüge*) as monies received instead of dividends (from or by)[4] a person other than the true/beneficial/economic owner.

The following example is given by the legislator in the notes (in German language):

Die steuerrechtliche Lage im Fall von sog. Leerverkäufen, bei denen der Leerverkäufer die Aktien, die er veräußert, selbst erst am Markt beschaffen muss, stellt sich nach geltendem Recht wie folgt dar:

| 28. 06. | 29. 06. | 30. 06. |
|---|---|---|
| Aktien im Marktbesitz | Gewinnverteilungsbeschluss der Hauptversammlung | |
| Leerverkäufer gibt Verkaufs-Order | | Leerverkäufer gibt Kauf-Order als Ausgleich für Verkaufs-Order |
| Kunde Y gibt Kauf-Order | | Erfüllungsgeschäft. |

Am 29. Juni sind die Aktien steuerlich den Marktteilnehmern zuzurechnen, in deren Eigentum und Besitz sich die Aktien an diesem Tag befinden, mit der Folge, dass diese die Nettodividende und den Kapitalertragsteuer-Anrechnungsanspruch erhalten.

Der Leerverkäufer wird nur in Höhe der Nettodividende belastet, damit die Bank in gleicher Höhe eine Verrechnung mit Kunde Y vornehmen kann.

Am 29. Juni sind aber auch Kunde Y die erworbenen Aktien steuerlich zuzurechnen, d. h., er erhält ebenfalls eine Nettodividende und den Kapitalertragsteuer-Anrechnungsanspruch. Um sicherzustellen, dass dem Leerverkäufer weder eine Dividende noch ein Kapitalertragsteuer-Anrechnungsanspruch vermittelt wird und sämtliche Ansprüche des Kunden Y abgedeckt werden, ist es erforderlich, dass die Bank den Leerverkäufer zusätzlich mit einem Ausgleichsanspruch in Höhe der Kapitalertragsteuer belastet. Darauf zielt die Neuregelung ab.

The free translation of this note of the legislator reads:

*Under existing law, the tax situation for a short seller who has to acquire the shares himself is the following:*

| *28 June* | *29 June* | *30 June* |
|---|---|---|
| *Shares held by a third party* | *Shareholder dividend resolution* | |
| *Short seller trades* | | *Short seller purchases to hedge* |
| *Purchaser Y trades* | | *Settlement* |

*On 29 June, the true/beneficial/economic ownership in the shares is attributed to those market participants who are legal owners and in possession of the shares at this time and, consequently, these participants receive the net dividend plus the withholding tax credit.*

*The short seller will only be debited with the net dividend so that the bank can settle against the purchaser Y.*

---

[4] The German law uses the term "*von*" which permits both interpretations, so one has to assess which one is the correct interpretation. See below for our assessment.

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                WH_MDL_00276174

NORTON ROSE

> On 29 June, the true/beneficial/economic ownership in the shares is also attributed to purchaser Y and, therefore, from a tax perspective, purchaser Y generates the net dividend and is entitled to the withholding tax credit. To ensure that the short seller neither generates a dividend nor receives a withholding tax credit, the bank has to debit the short seller with a compensation payment for the withholding tax amount. This is the objective of the new provision.

On the basis of the above, it is obvious that the legislator takes the position that a purchaser from a short seller will become true/beneficial/economic owner. This view has just recently been supported by a scholar[5].

In our view, the wording of § 20 (1) no. 1 sentence 4 EStG is not an argument against the legislator's position. Theoretically, if one interpreted the term "*von*" as "by", the provision could be understood as a statement against the acquisition of true/beneficial/economic ownership from a short seller or, alternatively, as its abolishment for the future. We would, however, not subscribe to such interpretations:

- The first alternative would fundamentally contradict the notes of the legislator as described above in detail.

- The second alternative is unrealistic because, obviously, the legislator would have laid down this in the notes. It would be a complete surprise if the legislator described in detail the acquisition of true/beneficial/economic ownership in a short seller environment without mentioning with a single word the abolishment of such rule.

It is our interpretation that the provision does not aim at challenging true/beneficial/economic ownership but, rather, pursues the objective to facilitate the collection of withholding tax under the procedures laid down in §§ 43 et ss. EStG.

(iv)  Concerns against Doubling Beneficial Ownership

As a general concern, scholars are sceptical whether there can be double true/beneficial/economic ownership at all[6]. The scholars hold that true/beneficial/economic ownership is something which is unique by nature and cannot be replicated. It would contravene the definition pursuant to which the true/beneficial/economic ownership is to be attributed to such person to the disposition of which the asset stands. Logically, this can be only one person.

The above-referenced position by the legislator implies double true/beneficial/economic ownership. If the legislator had been in doubt about the existence of double true/beneficial/economic ownership, its view taken in the notes would not make sense. In our view, the arguments put forward by the legislator are reasonable.

(b)  Date of Transfer of True/Beneficial/Economic Ownership to the Investor

The acquisition of true/beneficial/economic ownership of the Stocks by the Investor is one prerequisite for the dividend entitlement. The other decisive component is the point of time of transfer of true/beneficial/economic ownership. We take the view that this should be (i) the trade date in the event of Stock purchase or (ii) the expiry date of the long future in Component 1.

---

[5] *Englisch*, FR 2010, p. 1023, 1026.
[6] *Rau*, DStR 2010, 1267; *Häuselmann*, FR 2010, 200, 201.

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                         WH_MDL_00276175

NORTON ROSE

Generally, true/beneficial/economic ownership is transferred at the same point of time when legal ownership is transferred because, as stated above under (a), true/beneficial/economic ownership generally follows the civil-law ownership. However, in case of exchange-traded stocks, the Federal Fiscal Court (*Bundesfinanzhof*) stated that the true/beneficial/economic ownership is transferred on trade date even if – according to exchange usages – the settlement date is two days later[7]. The reason is that at trade date the stock is locked in and cannot be sold or otherwise disposed of any longer by its legal owner. The fact that the settlement date is two days later is seen as a rather technical aspect which does not affect the economics of the trade. In the case at hand, the time lag results from the usages of the official stock and/or futures exchange and the clearing system.

(c)   Point of Time During the Dividend Record Date for the Allocation of the Dividend

The dividend should be allocated to the true/beneficial/economic owner of the Stock at Clearstream's close of business on the dividend record date.

According to § 20 (5) EStG, a dividend is allocated to the person who holds the share at the time the general assembly resolves upon a dividend distribution. If this rule were strictly applied, it would be necessary to determine the exact time of the dividend resolution as well as to determine the true/beneficial/economic owner of the share at this point of time on the dividend record date.

However, especially in case of exchange-listed stocks, it would be hardly possible from a practical point of view to determine the true/beneficial/economic owner at this exact point of time. The legislator took the same view when introducing § 20 (2a) EStG (which is now para. 5) and stated in the legislative notes that in case of exchange-listed stocks the allocation of dividends for tax purposes follows the civil law assessment for practical reasons[8]. Although, it is not clear whether the legislator has noted the difference between listing on a stock exchange and clearing through a clearing system, the legislator aims at synchronisation between the legal and the tax treatment.

Therefore, we take the view that the decisive point of time is the detachment of the dividend coupon from the shares. From this time on, the shares are traded "ex dividend" and, thus, from a civil law perspective, the purchaser is not entitled to receive the dividend.

According to No. 33 (1) of Clearstream's general terms and conditions, the dividend coupons are detached from the shares at the end of the day when the general assembly resolves upon the dividend (i.e. midnight on the dividend record date). According to No. 33 (6) of Clearstream's general terms and conditions, the shares are traded "ex dividend" from the day after dividend record date (i.e. ex date) onwards.

We take the view that the civil law assessment should be adopted from a tax point of view and, thus, the dividend should be allocated to the true/beneficial/economic owner of the stock in accordance with Clearstream's business practice. For the foregoing reasons, the dividend paid under the Stock should be allocated to the Investor if the Investor acquires true/beneficial/economic ownership of the Stock before Clearstream's close of business at dividend record date at the latest.

4.2   Inapplicability of the Tax Guideline dated 5 May 2009 to the Investor

---

[7] Cf. Federal Fiscal Court, judgment dated 15 December 1999, I R 29/97, Federal Tax Gazette (*Bundessteuerblatt*) II 2000, 527. The Federal Ministry of Finance issued a tax decree to the contrary on 6 October 2000, IV C 6 – S 2189 – 11/00, Federal Tax Gazette I 2000, 1392 instructing the tax authorities to disregard the judgment. However, the Federal Fiscal Court has confirmed its view again in its judgment dated 20 November 2007, I R 85/05, BFH/NV 2008, 551. The tax authorities have been silent since then.

[8] Cf. *Bundestags-Drucksache* 12/5016, 88

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                                    WH_MDL_00276176

NORTON ROSE

The tax guideline dated 5 May 2009 on dividend withholding tax in connection with short sales as amended from time to time should not adversely affect the Investor since the tax guideline is limited to German entities, but the Investor at hand is established in the USA. Nevertheless, the guideline is not entirely irrelevant for the Investor because it can serve as an indication for the criteria relevant for the Ministry to accept the investment strategy.

Under the tax guideline dated 5 May 2009[9] as last amended by the guideline dated 3 March 2011[10], in general, a German entity purchasing shares cum dividend but receiving settlement ex dividend has to provide a certificate from its auditor to the tax authorities certifying the following (freely translated into the English language):

> *"From my insight in the circumstances of the enterprise and after consultation (Befragung) of the taxpayer, I see no findings (Erkenntnisse) that the taxpayer has made any arrangement with regard to the acquisition of shares over the dividend date or the acquisition of German investment fund units over the distribution date or the end of the fund's business year, where the distribution within the meaning of § 7 (3) Investment Tax Act (Investmentsteuergesetz – InvStG) was made after 15 October 2010 or distributions within the meaning of § 7 (3) or (4) InvStG took effect after 31 December 2010, and respective short sales which were not subject to § 44 (1) sentence 3 in connection with § 20 (1) no. 1 sentence 4 EStG."*

If no such certification is filed, the tax authorities will not grant a credit or refund of the respective withholding tax to a German entity.

Furthermore and only for the sake of completion, the consequences of the tax guideline only kick-in in the event of a pre-arrangement (*Absprache*) between the short seller and the purchaser regarding a short sale outside the substitutional withholding tax pursuant to § 44 (1) sentence 3 in connection with § 20 (1) no. 1 sentence 4 EStG. In the absence of such a pre-arrangement, which holds true by way of assumption, the tax guideline should not apply anyway, irrespective of the fact that the Investor is a non-German entity.

4.3   Refund of Withholding Tax under the Double Tax Treaty

(a)   Treaty entitlement

The Investor should be entitled to a refund of German withholding tax on portfolio dividends since Germany may not levy withholding tax vis-à-vis US-resident charitable entities pursuant to Article 27 (2) Treaty under certain conditions. According to the facts and assumptions, the Investor acts in a manner entitling it for tax exemption in Germany under the Treaty, i.e. the conditions set out in Art. 27 (2) Treaty are met.

(b)   German Treaty Override Provision

We take the view that the German treaty override in § 50d (3) EStG should not apply to the scenario at hand.

As a first level argumentation, strictly adhering to the wording, the provision would apply. However, the tax authorities[11] have taken the view that the domestic treaty override provision of § 50d (3) EStG shall not apply to cases where the relevant treaty contains a conclusive regulation. The prevailing view in literature is that Art. 28 Treaty contains such conclusive regulation[12]. This is based on the argument that the limitation of benefits-clause contained in

---

[9]   The tax guideline dated 5 May 2009 is published in the Federal Tax Gazette 2009 I, p.631.
[10]  File-no.: IV C 1 - S 2252/09/10003 :005, DOK 2011/0010699
[11]  Decree issued by the Federal Ministry of Finance dated 3 April 2007, file-no. IV B 1 - S 2411/07/0002, as amended, annotation 11
[12]  Cf. *Wolff* in Debatin/Wassermeyer, Double Taxation, Treaty USA, Art. 28, annotation 8; *Eimermann* Debatin/Wassermeyer, Double Taxation, Treaty USA, Art. 29, annotation 42, *Gohr* in Endres/Jacob/Gohr/Klein, Double Tax Treaty Germany/USA, Art.

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                                                   WH_MDL_00276177

NORTON ROSE

Art. 28 Treaty is a specific provision to prevent abuse of the Treaty by "treaty shopping", i.e. by interposition of companies without function for the purpose of obtaining benefits under the Treaty. Art. 28 Treaty contains a detailed set of conditions to be fulfilled by different types of persons or companies in order to qualify for the benefits under the Treaty. Therefore, it is the prevailing view in literature that, if these conditions are satisfied, which holds true as per the assumption above, there is no need for an additional domestic provision aiming at the prevention of treaty shopping.[13]

The view taken by the Federal Ministry of Finance pursuant to which § 50d (3) EStG does not apply in the event of a conclusive set of regulations in a treaty, seems reasonable to us because it would be inconsistent by the legislator, on the one hand, to grant a withholding tax privilege to US charitable entities and, at the same time, on the other hand, claw-back such privilege under § 50d (3) EStG by way of a treaty override.

(c) Abuse of Law

The Investors' entitlement to reclaim German withholding taxes should not be challenged under the general anti-avoidance provision of § 42 AO. It should be noted that the legislator has expressed its dislike to withholding tax related transactions, and as a consequence has announced change of law measures that will change the withholding tax regime with effect from 2012. In the meantime, it has announced plans to limit the refund entitlement for German funds with effect from 2011.

In the notes for the UCITS IV Transformation Act (*OGAW-IV-Umsetzungsgesetz*)[14], the legislator states that the tax revenue is significantly reduced due to the use of unfair/dishonest (*unlauter*) strategies. However, we take the view that this statement should not result in the Transaction being regarded as abusive. Rather, in our view, the context of the legislator's notes which mentions the tax guideline dated 5 May 2009 implies that the legislator's statement of unfairness/dishonesty applies to cases where there is a pre-arrangement between the short seller and the purchaser regarding a short sale outside the substitutional withholding tax. In the case at hand, there are no such pre-arrangements. Therefore, the Investor cannot even know whether or not the Counterparty is a short seller. We take the view that a party which does not know its counterparty and whether or not it is a short seller outside the scope of the substitutional withholding tax cannot be seen as acting in an unfair or dishonest way.

The general anti-avoidance provision could apply if the conditions of the specific anti-treaty shopping rule are not met. Under § 42 AO it shall not be possible to circumvent tax legislation by abusing legal options for tax planning schemes. An abuse shall be deemed to exist where an inappropriate legal option is selected which, in comparison with an appropriate option, leads to tax advantages unintended by law for the taxpayer or a third party. This shall not apply where the taxpayer provides evidence of non-tax reasons for the selected option which are relevant from an overall perspective.

We take the view that the general anti-avoidance provision should not apply.

(i) No Abuse under the Criteria of the Federal Ministry of Finance

---

[13] 28, annotation 11; *Klein* in Herrmann/Heuer Raupach, § 50d EStG, annotation 52; *Kempf/Bandl*, Der Betrieb 2007, 1377, 1380; Jacob IStR 2011, 45, 55.
It should be noted, however, that this is not a unanimous view and there are also views different and to the contrary, cf. *Höppner*, IWB Fach 3, Gruppe 3, 1153 and *Hundt* in Festschrift-Debatin, 1997, 153, 173, published in relation to former versions of the Treaty and § 50d EStG and before the issuance of the decree referred to in footnote 21.

[14] German Federal Council, Document no. 850/10, p. 155

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                    WH_MDL_00276178

NORTON ROSE

Pursuant to the tax guideline on the General Tax Code (*Anwendungserlass zur Abgabenordnung* – "**AEAO**")[15], an abuse is contingent on

(i) a legal structure inappropriate to the economic transaction,

(ii) the chosen structure generating a tax benefit at the level of the taxpayer or a third party,

(iii) such tax advantage not being provided for by the law, and

(iv) the absence of sound business reasons.

A tax auditor might try to argue that the investment structure aims at achieving a withholding tax refund and, therefore, would be abusive. However, we would not subscribe to this even though there is no guarantee that the following argumentation would be shared by the tax authorities or courts. The acquisition and disposal of shares is a straight forward and easy transaction and is also done by private individuals. Therefore, the legal structure should be appropriate for market-neutral strategies. Furthermore, whether or not a tax benefit will be achieved is an entirely open question. If the Investor purchases from a long seller there will be no tax advantage at all (not even on an aggregated basis if one looks at this from the fiscal authorities' perspective) but only a mere market pricing advantage. In the absence of any sort of prearrangements, benefiting from the market pricing advantage is a sound business reason for the investment.

(ii) Latest Developments

One scholar particularly holds that the investment policy would be abusive[16]. We do not agree to this view based on the reasons mentioned above  Furthermore, the legislator of the draft of the UCITS IV Transformation Act has given the following view in the notes (free translation below):

„*Allgemein*

*Die Neuregelung beinhaltet eine grundlegende verfahrensmäßige Umstellung bei dem Einbehalt von Kapitalertragsteuer auf Dividenden inländischer sammelverwahrter Aktien. Sie ist erforderlich, um weitere missbräuchliche steuerliche Gestaltungen bei Leerverkäufen von Aktien über den Dividendenstichtag zu verhindern, durch die durch Verwendung unlauterer Mittel Steuermindereinnahmen in beträchtlicher Höhe verursacht werden. …*

*Ist-Zustand*

*Bei Leerverkäufen um den Dividendenstichtag wird die Order zur Veräußerung von Aktienbeständen kurz vor dem Dividendenstichtag erteilt, während die Belieferung an den Erwerber tatsächlich aber erst nach dem Dividendenstichtag ausgeführt wird. Dies führt dazu, dass der Verkäufer seine vertraglich vereinbarte Verpflichtung zur Lieferung einer Aktie einschließlich Dividendenanspruch (sog. „Aktie cum Dividende") nicht mehr erfüllen kann, da er dem Erwerber - aufgrund der vorangegangenen Ausschüttungen zum Dividendenstichtag - nur noch eine „Aktie ex Dividende" liefern kann. Dementsprechend kann er ihm über die Übertragung der Aktie selbst hinaus nicht mehr den - rechtlich eigentlich bereits dem Erwerber zustehenden - Dividendenanspruch vermitteln und leistet*

---

[15] Federal Tax Gazette I 2008, 26 as modified and amended from time to time
[16] *Bruns*, DStR 2010, 2061 et ss.

NORTON ROSE

*zum Ausgleich hierfür eine entsprechende Zahlung an ihn (Kompensationszahlung, „manufactured dividends").*

*Nach aktueller Steuerrechtslage werden derartige Ausgleichszahlungen bei Abwicklung der Leerverkäufe über deutsche Stellen inländischen Dividenden gleichgestellt, mit der Konsequenz, dass die Vorschriften zum Kapitalertragsteuerabzug analog zur Anwendung kommen (…).*

*Problematisch stellen sich nun die Fälle dar, in denen die den (Leer-)Verkaufsauftrag ausführende Stelle im Ausland liegt und damit mangels Zahlstelle im Inland keine Kapitalertragsteuer auf die zu leistende Ausgleichszahlung einzubehalten ist, während das inländische Kreditinstitut des Käufers diesem aufgrund der - im Ergebnis von der tatsächlichen Vornahme des Kapitalertragsteuerabzugs losgekoppelten - Verpflichtung zur Ausstellung einer Steuerbescheinigung gem. § 45a Absatz 3 EStG weiterhin ein anrechenbares bzw. erstattungsfähiges Kapitalertragsteuerguthaben ausweist. Als Konsequenz rechnet dadurch im Ergebnis der Aktienerwerber Kapitalertragsteuer an, obwohl tatsächlich - mangels inländischer Zahlstelle des (Leer-)Verkäufers - kein Steuereinbehalt stattgefunden hat.*

*Zur Schadensbegrenzung werden derzeit als vorübergehende Maßnahme durch das BMF-Schreiben vom 5. Mai 2009 (BStBl I S. 631) gesonderte Anforderungen an die Steuerbescheinigungen dieser Dividendenausschüttungen gestellt, um Absprachen zwischen Leerverkäufer und Erwerber zu verhindern. Sie laufen mit Einführung der Neuerung aus. …"*

<u>Free Translation:</u>

"General

*The revision includes a fundamental administrative change of the withholding tax regime for dividends on German shares held in German custody. The revision is vital to avoid a further abuse of tax structures in connection with short sales over the dividend record date which causes a significant tax damage through the use of dishonest measures.*

*Actual Situation*

*In the event of short sales around the dividend record date, the order to sell the shares is only issued shortly before the dividend record date. As a consequence, the seller, contrary to its contractual obligation, cannot deliver the share including the dividend right (share cum dividend) but only a share ex dividend. Correspondingly, the seller cannot provide the dividend right to the purchaser even though, the purchaser would be entitled to, and, therefore, makes a compensation payment (manufactured dividends).*

*Under the laws in effect, such compensation payments are treated as deemed dividends and German settling agents apply the provisions on withholding tax, as appropriate (…).*

*Problematic are those cases in which the agent settling the short sale is domiciled outside Germany which results in no withholding tax being withheld by such agent whilst the domestic credit institution of the purchaser issues a tax certificate under § 45a (3) EStG – at the end of the day unrelated from the question whether or not withholding tax was withheld. Consequently, the purchaser receives a withholding tax credit even though, in the absence of a domestic settling agent of the short seller, no withholding tax has actually been withheld.*

*To limit the damage, as a temporary measure, the tax guideline dated 5 May 2009 (Federal Tax Gazette I, 631) imposes specific requirements on the tax certificates for*

Opinion_Solo_US_Charitable.doc                    11

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                    WH_MDL_00276180

NORTON ROSE

*such dividend distributions to prevent pre-arrangements between the short seller and the purchaser. These measures expire with the new regime."*

In our view, the legislator expresses that it does not see an alternative to a change of the withholding tax regime from 2012 onwards. Furthermore, in light of the most recent draft of the UCITS IV Transformation Act providing for a limitation of the refund of withholding tax for German investment funds, the legislator expresses that it further wishes to reduce the flexibility. Nevertheless, these measures are limited to German investment funds and, thus, do not apply to the Investor, who is neither an investment fund nor German, so that the Investor does not circumvent the UCITS IV Transformation Act.

(d) Downside Risks

As stated above, the Investor should be entitled to a refund of withholding taxes.

We have noted some scholar views[17] that consider the possibility that such strategies might result in criminal prosecution. We do not agree with these views, on the basis that it would be entirely inconsistent for the Federal Ministry of Finance to issue on the one hand a tax guideline with clear rules and to change the withholding tax regime from 2012 onwards and, nevertheless, on the other hand sue persons fully complying with the tax guideline in the interim. The fact that the latest draft of the UCITS IV Transformation Act restricts the withholding tax refund for German investment funds should not impact on this position because non-German entities are clearly not covered and it would not be adequate to accordingly apply the tightened rules to them on the basis of an analogy because this would imply a treaty override which would be permissible in essence but in the event of a treaty override would need to be marked (*kenntlich gemacht*)[18] which is not the case here.

However, if one followed the various scholars arguing that there is nothing like double true/beneficial/economic ownership or that in the event of a short sale such ownership only transfers on the settlement date, the Investor would not be entitled to a withholding tax refund. The tax authorities and courts might adopt such view. However, based on the aforementioned analysis, we are of the opinion that the refund of the withholding tax under the Treaty should not be denied to the Investor.

## 5 Limitation of Liability

This Opinion is solely for the benefit of the addressee. This Opinion may not be (i) relied upon by any other person or for any other purpose or (ii) quoted or referred to in any other document or filed with anyone, in each case, without our written consent. This Opinion is not intended to create third party rights pursuant to § 328 of the German Civil Code (*Bürgerliches Gesetzbuch*). This Opinion may not be disclosed to any other person except that disclosure shall be permitted: (i) in the event disclosure is required by law or by a regulatory authority, or is made in a court of law, (ii) to any government authority including any tax authority, regulatory or banking authority, and (iii) in other circumstances upon (A) written request by the addressee and (B) our written consent in response to such request (which consent shall not be unreasonably withheld provided no liability results thereof). For the avoidance of doubt, no party to which disclosure is permitted shall be permitted to rely upon this Opinion.

This Opinion is based on German law (including its interpretation by authorities and courts) as it is in effect as of the date of this Opinion. In light of the administrative and legislative activities so far, it should be noted that new legislation and/or administrative decrees might be issued changing the legal

---

[17] Cf. *Bruns*, DStR 2010, 2061, 2064; Podewils, FR 2011, 69, 74 et seq. Furthermore, the authors take the view that with regard to the sums of investments typically involved in tax-abusive structures the criminal-law provision for a severe tax evasion usually applied.

[18] Federal Fiscal Court, judgment dated 23 June 2010 (I R 71/09), DStR 2010, 1665

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                              WH_MDL_00276181

NORTON ROSE

and/or tax environment with immediate or, potentially, even with retroactive effect. We assume no obligation to advise either you or any other party of changes that could occur after the date of this Opinion, even though the change may affect the analysis or conclusion given in this Opinion, potentially with retroactive effect.

This Opinion is governed by, and shall be construed in accordance with, German law. The exclusive place of jurisdiction is Frankfurt/Main, Germany.

\* \* \* \* \*

Yours sincerely

Frankfurt am Main [●] March 2011

Norton Rose LLP

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                             WH_MDL_00276182